**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

**CASE NO. 6:15-mn-02613-BHH**

---

**IN RE: TD BANK, N.A. DEBIT CARD
OVERDRAFT FEE LITIGATION**

**MDL No. 2613**

---

**THIS DOCUMENT RELATES TO:**

*King v. TD Bank, N.A.*
D.S.C. Case No. 13-cv-02264

*Koshgarian v. TD Bank, N.A. and
The Toronto-Dominion Bank*
D.S.C. Case No. 15-cv-01534
S.D.N.Y. Case No. 14-cv-10250

*Ucciferri v. TD Bank, N.A.*
D.S.C. Case No. 15-cv-01535
D.N.J. Case No. 15-cv-00424

*Klein, et al. v. TD Bank, N.A.*
D.S.C. Case No. 15-cv-01536
D.N.J. case No. 15-cv-00179

*Hurel v. TD Bank, N.A.*
D.S.C. Case No. 15-cv-01537
D.N.J. Case No. 14-cv-07621

*Goodall v. TD Bank, N.A. and
The Toronto-Dominion Bank*
D.S.C. Case No. 15-cv-01538
M.D. Fla. Case No. 15-cv-00023

*Austin v. TD Bank, N.A.*
D.S.C. Case No. 15-cv-01559
D. Conn. Case No. 15-cv-00088

*Padilla v. TD Bank, N.A.*
D.S.C. Case No. 15-cv-01563
E.D. Pa. Case No. 14-cv-01276

*Robinson v. TD Bank, N.A.*
S.D. Fla. Case No. 15-cv-60469
D.S.C. Case No. 6:15-cv-01937-BHH

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

TABLE OF CONTENTS

*Page*

I     INTRODUCTION ........................................................................................................1

II    PARTIES .....................................................................................................................4

    A.      PLAINTIFFS ................................................................................... 4

           1.     South Carolina .................................................................... 7

                  a.     Michael Goheen .....................................................7

                  b.     Jan R. Kasmir .........................................................7

                  c.     James King, Jr. .......................................................7

                  d.     Joanne McLain .......................................................8

                  e.     Michael McLain .....................................................8

           2.     North Carolina ................................................................... 8

                  a.     Geoffrey Grant .......................................................8

                  b.     Keith Irwin ............................................................9

           3.     Florida ............................................................................... 9

                  a.     Shawn Balensiefen..................................................9

                  b.     Elizabeth Goodall ..................................................9

                  c.     Kendall Robinson .................................................10

                  d.     Ronald Ryan .........................................................10

           4.     New York ......................................................................... 10

                  a.     Tashina Drakeford ...............................................10

                  b.     John Koshgarian ...................................................11

           5.     New Jersey ....................................................................... 11

TABLE OF CONTENTS (cont.)

*Page*

    a.    John Hurel ................................................................................11

    b.    Frederick Klein ..........................................................................11

    c.    Dawn Ucciferri ..........................................................................11

6.    Connecticut .........................................................................................12

    a.    Caroline Austin .........................................................................12

    b.    Brittney Lawrence ......................................................................12

7.    Pennsylvania .......................................................................................12

    a.    Emilio Padilla ...........................................................................12

    b.    Sheila Padilla ............................................................................13

8.    Massachusetts .....................................................................................13

    a.    Jennifer Bond ...........................................................................13

    b.    John LaFlamme ........................................................................13

9.    New Hampshire ...................................................................................14

    a.    Kevin Barry ..............................................................................14

    b.    Jennifer Bond ...........................................................................14

    b.    Jonathan Partridge ....................................................................14

10.    District of Columbia ...........................................................................15

    a.    Amos Jones ..............................................................................15

11.    Vermont ..............................................................................................15

    a.    Brittney Brooker .......................................................................15

12.    Maryland .............................................................................................15

TABLE OF CONTENTS (cont.)

*Page*

a.    Marilyn Vailati.............................................................................15

B.    DEFENDANT TD BANK, N.A. ........................................................ 16

III    COMMON FACTUAL ALLEGATIONS.......................................................17

A.    TD BANK AND OVERDRAFT FEES ................................................ 17

B.    DEFENDANT ASSESSES OVERDRAFT FEES DESPITE SUFFICIENT
FUNDS ....................................................................................... 23

C.    DEFENDANT'S REORDERING OF CHECKING ACCOUNT
TRANSACTIONS ........................................................................ 30

D.    DEFENDANT VIOLATES EFTA ....................................................... 35

E.    DEFENDANT'S OVERDRAFT POLICIES AND PRACTICES ARE
CONTRARY TO BEST PRACTICES ................................................ 36

F.    DEFENDANT'S UNCONSCIONABLE PROVISIONS AND POLICIES......... 40

G.    DEFENDANT'S OVERDRAFT PRACTICES HARMED PLAINTIFFS AND
THE MEMBERS OF THE PUTATIVE CLASSES............................................ 41

H.    THE EXTENDED OVERDRAWN BALANCE PRACTICE ............................ 42

I.    DEFENDANT'S POLICIES AND/OR PRACTICES CONSTITUTE UNFAIR
OR DECEPTIVE TRADE PRACTICES ........................................... 44

J.    THE DAMAGE SUSTAINED BY PLAINTIFFS AND THE CLASSES........... 47

IV    CLASS ALLEGATIONS ...............................................................47

TABLE OF CONTENTS (cont.)

*Page*

V      VIOLATIONS ALLEGED.................................................................................53

       COUNT I - BREACH OF CONTRACT ...................................................... 53

       COUNT II - BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING..... 54

       COUNT III - UNCONSCIONABILITY .......................................................... 56

       COUNT IV - CONVERSION ......................................................................... 58

       COUNT V - UNJUST ENRICHMENT .......................................................... 59

       COUNT VI - VIOLATION OF STATE STATUTES PROHIBITING UNFAIR AND

              DECEPTIVE ACTS AND PRACTICES ............................................. 60

       COUNT VII - VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT AND

              REGULATIONS SUCH AS 15 U.S.C. § 1693 AND 12 C.F.C. § 205............... 62

       COUNT VIII - VIOLATION OF NATIONAL BANK ACT, 12 U.S.C. §§ 85, 86 AND

              USURY ............................................................................................... 63

PRAYER FOR RELIEF .................................................................................66

Plaintiffs Michael Goheen, Jan Kasmir, James King, Jr., Joanne McLain, Michael McLain, Geoffrey Grant, Keith Irwin, Shawn Balensiefen, Elizabeth Goodall, Kendall Robinson, Ronald Ryan, Tashina Drakeford, John Koshgarian, John Hurel, Frederick Klein, Dawn Ucciferri, Caroline Austin, Brittney Lawrence, Emilio Padilla, Sheila Padilla, Jennifer Bond, John Laflamme, Kevin Barry, Jonathan Partridge, Amos Jones, Brittney Brooker, and Marilyn Vailati, on behalf of themselves and all persons similarly situated, submit this Consolidated Amended Class Action Complaint and allege the following based on personal knowledge as to allegations regarding Plaintiffs and based on information and belief as to other allegations.

# I

## INTRODUCTION

1.     This is a class action brought by Plaintiffs to assert claims, individually and in their capacity as class representatives, against Defendant TD Bank, N.A. ("Defendant" or "TD Bank" or "the Bank").  Plaintiffs' claims arise from Defendant's assessment and collection of improper and excessive overdraft fees and fall into five categories:  (1) assessment of overdraft fees when there are sufficient actual funds in the account; (2) assessment of overdraft fees as a result of reordering debit transactions from high to low; (3) assessment of overdraft fees on transactions intentionally authorized into overdraft without notice to customers; (4) assessment of overdraft fees on ATM and one-time debit transactions in violation of Regulation E ("Reg E"), 12 C.F.R. § 205.17, under the Electronic Funds Transfer Act ("EFTA"); and/or (5) damages arising from TD Bank's illegal practice of assessing its checking and money market account customers a purported "sustained" overdraft fee in violation of the National Bank Act, 12 U.S.C. §§ 85-86.

2.      As to the first category of improperly charged overdraft fees, Plaintiffs' claims arise from Defendant's systematic assessment and collection of overdraft fees from checking accounts for posted transactions that did not actually overdraw the account, in breach of Defendant's express written contracts with its account holders.  In particular, the Personal Deposit Account Agreement ("PDAA"), which sets forth terms and conditions governing Defendant's relationship with account holders, states "Overdraft" is an "advance of funds" and results in fees that "may be assessed on items presented for payment that bring your Account into a negative balance," (2011 Personal Deposit Account Agreement ("2011 PDAA"), Ex. A, p. 12.).  The PDAA also states that "overdraft fees are not charged on "pending" authorizations. (2011 PDAA, Ex. A, p. 13.)  Likewise, the TD Debit Card Advance Agreement – the program by which a customer may agree in writing to extend Defendant's checking account overdraft protection to debit card transactions (pursuant to Regulation E, 12 C.F.R. § 1005.17) – specifically states that "an overdraft occurs when you do not have enough *money* available in your account to cover a transaction."  (TD Debit Card Advance Agreement, Ex. B.)

3.      In breach of these express contract provisions, Defendant's system subtracts from actual account balances all amounts for "pending" debit transactions, which may not settle or be paid for several days (and may not settle for the authorized amount or at all), and then treats any item it pays that causes this artificially diminished "available balance" to fall below zero (or to remain below zero) as an "overdraft," against which Defendant assesses fees.  Defendant assesses these fees without regard to an account's actual balance.  In so doing, Defendant increases significantly the fees it harvests from customers' checking accounts, including subsequent fees assessed for overdrafts and negative balances that would not have occurred but for Defendant's prior and unlawful removal of funds from customer accounts.

4.      Furthermore, as to the second category of improperly charged overdraft fees, Plaintiffs' claims arise from Defendant's practice of reordering transactions from their chronological order to a high-to-low order, so as to increase the number of transactions that trigger overdraft fees in violation of the express and implied terms of its contract with Plaintiffs and the proposed class.  Though TD Bank made uniform changes to its contracts during the class period regarding disclosure of how it posted transactions, TD Bank never fully or properly explained its posting process in its contracts or other disclosures.

5.      As to the third category of improperly charged overdraft fees, Defendant had an automated practice in place of intentionally authorizing transactions into overdraft without notice to customers, and then charging an overdraft fee for the authorized transaction.  This practice is in violation of the express and implied terms of its contract with Plaintiffs and the proposed class.

6.      As to the fourth category of improperly charged overdraft fees, Defendant failed to comply with  Regulation E and the other EFTA requirements that must be met for Defendant to assess overdraft fees on ATM and one-time debit card transactions, yet still charged Plaintiffs and members of the proposed Class overdraft fees for ATM and one-time debit card transactions.

7.      Finally, as to the fifth category of claims for "sustained" fees against TD Bank, and as alleged below in detail, this purported "fee" is deducted from a customer's account in addition to an initial $35.00 overdraft fee if and when the customer's overdrawn status remains in effect for a period of ten (10) business days.  TD Bank, in reality, is charging its customers interest for the use, forbearance, or detention of money.  The amount charged far exceeds the permissible interest limit under the National Bank Act.

## II

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action under the Class Action

Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original

jurisdiction because the aggregated claims of the putative Class members exceed $5 million,

exclusive of interest and costs, there are at least 100 members of the putative Classes, and at

least one of the members of each of the proposed Classes is a citizen of a different state than

Defendant.  This Court also has original jurisdiction of this action under 28 U.S.C. §§ 1331 and

1337 because the claims arise under the laws of the United States, including EFTA, 15 U.S.C.

§§ 1693, *et seq.* and 12 U.S.C. §§ 85-86.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1407 because the subject

actions were transferred to this Court by the Judicial Panel on Multidistrict Litigation.

## III

## PARTIES

A.      **PLAINTIFFS**

10.      Each of the named Plaintiffs opened checking accounts with TD Bank, and are,

or were, customers of TD Bank.  Plaintiffs Shawn Balensiefen, Michael Goheen, Keith Irwin,

Jan Kasmir, James King, Jr., Joanne McClain, and Michael McClain were also customers of

Carolina First Bank ("Carolina First") or Mercantile Bank ("Mercantile"), which had branches

in Florida, North Carolina, and South Carolina until rebranding occurred in June 2011.

11.      In connection with their accounts, TD Bank issued a debit card or cards to each

of the Plaintiffs.  A debit card allows customers to access their checking account funds by using

the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

12.    Each of the Plaintiffs has been subjected to one or more of the actions by Defendant as described below, and has therefore been harmed by the actions of TD Bank.

13.    TD Bank's contracts with Plaintiffs provided that it could only assess overdraft fees on Plaintiffs' accounts when it had advanced funds to cover a transaction because there was no money in the account to cover the transaction (negative balance).  Accordingly, TD Bank could not assess and collect overdraft fees on transactions when there was money in the account (positive balance).  However, TD Bank assessed and collected from Plaintiffs overdraft fees for transactions in which there was money in the account to cover the transaction (positive balance).  Defendant wrongfully charged Plaintiffs multiple overdraft fees.  Defendant failed to notify Plaintiffs that they could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  Defendant never notified Plaintiffs, at the time they executed the purported insufficient funds transactions that Plaintiffs' checking accounts were or would be overdrawn or that Plaintiffs would be charged an overdraft fee as a result of the transactions.  Defendant paid, rather than returned, all debit card charges described above, even though Plaintiffs' accounts purportedly lacked sufficient funds to cover the transactions.

14.    TD Bank's contracts and former contracts with Plaintiffs – including contracts in the name of banking institutions that were merged into TD Bank – did not and do not permit it to manipulate and reorder Plaintiffs' transactions so as to increase the amount of fees assessed against Plaintiffs.  However, TD Bank did manipulate and reorder transactions from highest to lowest to increase overdraft fees it would assess Plaintiffs.  Defendant never notified Plaintiffs,

at the time Plaintiffs executed the purported insufficient funds transactions, that Plaintiffs' checking accounts were or would be overdrawn or that Plaintiffs would be charged an overdraft fee as a result of the transactions.  Defendant paid, rather than returned, all debit card charges described above, even though Plaintiffs' accounts purportedly lacked sufficient funds to cover the transactions.  Furthermore, if Defendant had not manipulated and reordered Plaintiffs' transactions from highest to lowest, Plaintiffs would have incurred fewer overdraft fees.

15.    TD Bank was required to comply with Regulation E relating to obtaining affirmative opt-ins before it could assess Plaintiffs overdraft fees on ATM and non-recurring debit card transactions.  However, TD Bank assessed certain Plaintiffs overdraft fees without obtaining affirmative opt-ins from those Plaintiffs.  As a result, these Plaintiffs were harmed and incurred overdraft fees.

16.    Based on information and belief, the overdraft charges incurred by Plaintiffs are representative of hundreds of millions of dollars of overdraft fees that Defendant wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that Defendant approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.  Plaintiffs were charged and paid overdrafts fees as a result of Defendant's breach of contract and unfair and/or deceptive practices described herein.

17.    Plaintiffs were charged an extended overdraft balance charge ("EOBC") – a type of charge that is usury.  To simplify, the EOBC is a *second* charge on overdrawn bank accounts *after* an initial overdraft fee has been charged and is based solely on the customer's account remaining in a negative balance for a specified period of time.

18.    Plaintiffs and members of the Classes have been harmed by one or more of above illustrated wrongful overdraft policies and practices of Defendant.

1.    **South Carolina**

    a.    **Michael Goheen**

19.     Plaintiff Michael Goheen is a resident and citizen of South Carolina and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Goheen was a TD Bank account holder.

20.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Goheen and the members of the Classes he seeks to represent.[1]

    b.    **Jan Kasmir**

21.    Plaintiff Jan Kasmir is a resident and citizen of South Carolina and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Kasmir was a TD Bank account holder.

22.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Kasmir and the members of the Classes she seeks to represent.

    c.    **James King, Jr.**

23.    Plaintiff James E. King, Jr. is a resident and citizen of South Carolina and a former customer of Defendant.  At all relevant times, Plaintiff King was a TD Bank account holder.

---

[1] For purposes of describing Plaintiffs, references to "TD Bank" include banking institutions purchased by or otherwise merged into TD Bank, such as Carolina First Bank.

24.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff King and the members of the Classes he seeks to represent.

### d.    <u>JoAnne McLain</u>

25.     Plaintiff JoAnne McLain is a resident and citizen of South Carolina and a current and/or former customer of Defendant.  At all relevant times, Plaintiff JoAnne McLain has been a TD Bank account holder.

26.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff JoAnne McLain and the members of the Classes she seeks to represent.

### e.    <u>Michael McLain</u>

27.     Plaintiff Michael McLain is a resident and citizen of South Carolina and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Michael McLain has been a TD Bank account holder.

28.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Michael McLain and the members of the Classes he seeks to represent.

### 2.    North Carolina

### a.    <u>Geoffrey Grant</u>

29.     Plaintiff Geoffrey Grant is a resident and citizen of North Carolina and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Grant has been a TD Bank account holder.

30.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Grant and the members of the Classes he seeks to represent.

8

b.    <u>**Keith Irwin**</u>

31.    Plaintiff Keith Irwin is a resident and citizen of North Carolina and a former customer of Defendant.  At all relevant time**s,** Plaintiff Irwin has been a TD Bank account holder.

32.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Irwin and the members of the Classes he seeks to represent.

**3.**    **Florida**

a.    <u>**Shawn Balensiefen**</u>

33.    Plaintiff Shawn Balensiefen is a resident and citizen of Florida and a former customer of Defendant.  At all relevant times, Plaintiff Balensiefen was a TD Bank account holder.

34.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Balensiefen and the members of the Classes he seeks to represent.

b.    <u>**Elizabeth Goodall**</u>

35.    Plaintiff Elizabeth Goodall is a resident and citizen of Florida and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Elizabeth Goodall has been a TD Bank account holder.

36.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Goodall and the members of the Classes she seeks to represent.

c.    **Kendall Robinson**

37.    Plaintiff Kendall Robinson is a resident and citizen of Florida and a current and/or former customer of Defendant. **A**t all relevant times, Plaintiff Robinson has been a TD Bank account holder and has had a checking account with Defendant TD Bank in Florida.

38.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Robinson and the members of the Classes she seeks to represent.

d.    **Ronald Ryan**

39.    Plaintiff Ronald Ryan is a resident and citizen of Florida and a current and/or former customer of Defendant. At all relevant times, Plaintiff Ryan has been a TD Bank account holder.

40.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Ryan and the members of the Classes he seeks to represent.

**4.    New York**

a.    **Tashina Drakeford**

41.    Plaintiff Tashina Drakeford is a resident and citizen of New York and a current and/or former customer of Defendant. At all relevant times, Plaintiff Tashina Drakeford has been a TD Bank account holder.

42.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Drakeford and the members of the Classes she seeks to represent.

b.    **John Koshgarian**

43.    Plaintiff John Koshgarian is a resident and citizen of New York and is a former customer of Defendant.  At all relevant times, Plaintiff Koshgarian has been a TD Bank account holder.

44.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Koshgarian and the members of the Classes he seeks to represent.

5.    **New Jersey**

a.    **John Hurel**

45.    Plaintiff John Hurel is an individual residing in New Jersey and is a former customer of Defendant.  At all relevant times, Plaintiff Hurel was a TD Bank account holder.

46.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Hurel and the members of the Classes he seeks to represent.

b.    **Frederick Klein**

47.    Plaintiff Frederick Klein is a resident and citizen of New Jersey and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Klein has been a TD Bank account holder.

48.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Klein and the members of the Classes he seeks to represent.

c.    **Dawn Ucciferri**

49.    Plaintiff Dawn Ucciferri was at all relevant times a resident and citizen of New Jersey and a customer of Defendant.  At all relevant times, Plaintiff Ucciferri has held, and holds, a TD Bank checking account at a New Jersey TD Bank branch.

11

50.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Ucciferri and the members of the Classes she seeks to represent.

**6.    Connecticut**

      a.    <u>**Caroline Austin**</u>

51.    Plaintiff Caroline Austin is a resident and citizen of Connecticut and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Austin has been a TD Bank account holder.

52.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Austin and the members of the Classes she seeks to represent.

      b.    <u>**Brittney Lawrence**</u>

53.    Plaintiff Brittney Lawrence is a resident and citizen of Connecticut and a current customer of Defendant.  At all relevant times, Plaintiff Lawrence has been a TD Bank account holder.

54.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Lawrence and the members of the Classes she seeks to represent.

**7.    Pennsylvania**

      a.    <u>**Emilio Padilla**</u>

55.    Plaintiff Emilio Padilla is a resident of and citizen of Pennsylvania and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Emilio Padilla has been a TD Bank account holder.

56.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Emilio Padilla and the members of the Classes he seeks to represent.

### b.    Sheila Padilla

57.    Plaintiff Sheila Padilla is a resident and citizen of Pennsylvania and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Sheila Padilla has been a TD Bank account holder.

58.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Sheila Padilla and the members of the Classes she seeks to represent.

### 8.    Massachusetts

### a.    Jennifer Bond

59.    Plaintiff Jennifer Bond is a resident of and citizen of New Hampshire and a current and/or former customer of Defendant.  Plaintiff Bond opened a TD Bank account in Massachusetts.  At all relevant times, Plaintiff Bond has been a TD Bank account holder.

60.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Bond and the members of the Classes she seeks to represent.

### b.    John LaFlamme

61.    Plaintiff John LaFlamme is a resident of and citizen of Massachusetts and a current and/or former customer of Defendant.  At all relevant times, Plaintiff LaFlamme has been a TD Bank account holder.

62.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff LaFlamme and the members of the Classes he seeks to represent.

**9.     New Hampshire**

    **a.     <u>Kevin Barry</u>**

63.     Plaintiff Kevin Barry is a resident of and citizen of New Hampshire and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Barry has been a TD Bank account holder.

64.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Barry and the members of the Classes he seeks to represent.

    **b.     <u>Jennifer Bond</u>**

65.     Plaintiff Jennifer Bond is a resident of and citizen of New Hampshire and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Bond has been a TD Bank account holder.

66.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Bond and the members of the Classes she seeks to represent.

    **c.     <u>Jonathan Partridge</u>**

67.     Plaintiff Jonathan Partridge is a resident of and citizen of New Hampshire and a current customer of Defendant.  At all relevant times, Plaintiff Partridge has been a TD Bank account holder.

68.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Partridge and the members of the Classes he seeks to represent.

**10.    District of Columbia**

  **a.    <u>Amos Jones</u>**

69.    Plaintiff Amos Jones is a resident of and citizen of the District of Columbia and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Jones has been a TD Bank account holder.

70.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Jones and the members of the Classes he seeks to represent.

**11.    Vermont**

  **a.    <u>Brittney Brooker</u>**

71.    Plaintiff Brittney Brooker is a resident of and citizen of Vermont and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Brooker has been a TD Bank account holder.

72.    One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Brooker and the members of the Classes she seeks to represent.

**12.    Maryland**

  **a.    <u>Marilyn Vailati</u>**

73.    Plaintiff Marilyn Vailati is a resident of and citizen of Maryland and a current and/or former customer of Defendant.  At all relevant times, Plaintiff Vailati has been a TD Bank account holder.

74.     One or more of Defendant's wrongful overdraft policies and practices described herein have caused harm to Plaintiff Vailati and the members of the Classes she seeks to represent.

**B.     DEFENDANT TD BANK, N.A.**

75.     Defendant TD Bank, N.A., a subsidiary of Toronto-Dominion Bank of Canada, is a national bank chartered and supervised by the federal Office of the Comptroller of Currency. TD Bank's principle and executive offices are located in Cherry Hill, New Jersey, with Delaware designated as its location in its organizational certificate.

76.     Prior to the year 2000, TD Bank did not have branches in the United States. Since 2000, TD Bank has undergone an aggressive expansion into the U.S. consumer market by acquiring other banks and converting those customers to the TD Bank system.

77.     TD Bank has approximately 1300 branches in the United States. By assets, TD Bank is now ranked in the top 10 of U.S. banks, providing banking services to its 6.5 million east coast customers extending from Maine to Florida through its 1,300 branches and 1,900 ATM machines.

78.     TD Bank acquired Carolina First Bank and Mercantile Bank on September 30, 2010, and assumed the liabilities of these entities. The holding company for Carolina First and Mercantile, the South Financial Group, Inc., merged into TD Bank's parent holding company, TD Bank US Holding Company, on that same date.

79.     Carolina First and Mercantile were wholly owned by The South Financial Group, Inc. ("South Financial"), which had approximately $10 billion in assets in 2010. Altogether South Financial owned and operated 172 branches in the Carolinas and Florida.

16

80.     Defendant has confirmed that the contracts and practices of South Financial were substantively identical for both Carolina First and Mercantile customers during the relevant time period.  Indeed, although there was a different name and logo for the Florida branches, Defendant concedes that Mercantile was merely a trade name used in Florida and all Mercantile-branded accounts were Carolina First accounts.

81.     Should Plaintiffs discover the identities and capacities of additional parties that are liable under the claims set forth herein, Plaintiffs will seek leave of Court to amend this Complaint to add these parties as additional Defendants.

## IV

## COMMON FACTUAL ALLEGATIONS

### A.     TD BANK AND OVERDRAFT FEES

82.     Defendant is in the business of providing customers with a variety of banking products and services.  Customers who open a checking account are provided with a debit card, also known as a check card or ATM card.  Through such debit cards, customers can engage in transactions using funds which are withdrawn from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at ATMs. Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.  As a result, Defendant is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

83.     In the era of electronic banking and the ubiquitous use of debit cards, the assessment of overdraft fees has become a major profit center for United States banks, including Defendant.  For years, banks covered customers who occasionally bounced checks, and even did so for a time for customers using debit cards, without charging their customers.  Since the early

1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  An FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  A 2014 study shows that the average overdraft fee hit a new high of $32.74.  Notably, TD Bank charges $35 for each overdraft fee, no matter what the amount of the transaction.

84.    Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

85.    The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  Automated teller machine ("ATM") transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and the customer chose to proceed nevertheless.  In fact, until the mid-2000's, most banks simply declined debit transactions that would overdraw an account.

86.    Instead of simply declining debit transactions when there are insufficient funds, or warning customers that an overdraft fee will be assessed if they proceed with the transaction,

Defendant's automated overdraft system routinely processes such transactions and does so without the described notification, and ultimately charges customers an overdraft fee.

87.     Defendant's automated overdraft system is intentionally designed to maximize overdraft fee revenue without regard to customers' particular financial circumstances.  In marketing its overdraft protection program, Defendant offers innocuous examples such as a person with a zero balance waiting for a payroll deposit to clear, who can pay for lunch without the embarrassment of her transaction being declined.  Defendant represents that before it exercises its "discretion" to decide whether to authorize an overdraft transaction, it takes into consideration the personal circumstances of the customer, creating the false impression of a bank assessing personal information and making individualized decisions on a case-by-case, transaction-by-transaction basis.

88.     In many instances, these overdraft fees cost TD Bank account holders hundreds of dollars in a matter of days, or even hours.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.  Defendant's improperly assessed overdraft fees can actually cause a negative balance in an account that had a positive balance, causing even more overdraft fees to be imposed on subsequent transactions.  In fact, if the customer's account has a negative balance for ten days, Defendant charges an additional sustained overdrawn account fee on top of the overdraft fees.  In this way, a customer's account can spiral out of control, incurring fee after fee even if there was no initial overdraft to trigger the sequence of events.

89.     Almost by definition, these overdraft fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft

fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a fee on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

90.    This overdraft fee income is critical to Defendant.  In 2013, Defendant earned more than $900 million in deposit account related service fees, roughly 68 percent of its non-interest income.  These fees include account maintenance fees, ATM fees, insufficient funds ("NSF") fees, and overdraft fees.  Of the ten largest U.S. consumer banks (measured by the number of accounts with balances under $250,000), Defendant earns more fees per account than any of its peers, by far: according to a Wall Street Journal study, in 2013 Defendant earned $139.50 in fees per account, versus an average of $71.29 per account for the group as a whole.

91.    Defendant can boast more than just being the one bank among the ten largest banks in America with the highest fees per account.  It is also on top ten lists for the most complained about banks, according to data in the Consumer Financial Protection Board's ("CFPB") consumer complaint database.  According to a study by New Jersey Public Interest Research Group ("NJPIRG"), Defendant is the subject of the sixth highest total number of complaints; the fifth most checking-account related complaints; the third most complaints related to low-funds problems including overdrafts; the fourth most complaints related to debit cards; and the sixth most unresolved complaints.

92.    Furthermore, unlike most of the major banks – which have stopped reordering transactions from their chronological order to high-to-low for the purpose of increasing the number overdraft fees – TD Bank continues this outrageous practice.  The way high-to-low ordering increases overdraft fees to the consumer versus chronological ordering is illustrated by

the following example where, under chronological posting, the customer would have received only one overdraft fee of $35, but with high-to-low posting, the customer received two overdraft fees of $35 ($70):

| | Chronological Order | Balance | Overdraft Fee |
|---|---|---|---|
| Beginning Bal. | | $10.00 | |
| Starbucks at 9:00 a.m. | $3.50 | $6.50 | $0 |
| Target at 12:30 p.m. | $12.00 | -$5.50 | $35 |
| Total Fees | | | $35 |
| | High to Low Order | Balance | Overdraft Fee |
| Beginning Bal. | | $10.00 | |
| Target at 12:30 p.m. | $12.00 | $-2.00 | $35 |
| Starbucks at 9:00 a.m. | $3.50 | -$5.50 | $35 |
| Total Fees | | | $70 |

93.    TD Bank has already been sued regarding its high-to-low posting overdraft practices.  The several cases filed against TD Bank were settled as part of a multidistrict litigation proceeding known as *In re Checking Account Overdraft Litigation* in the United States District Court for the Southern District of Florida.  (*See* Order of Final Approval of Settlement, Authorizing Service Awards, and Granting Application for Attorneys' Fees, and Final Judgment ("TD Bank Final Approval Order"), Ex. C.)  The cases alleged that TD Bank improperly assessed excessive overdraft fees by, for example, reordering debit card transactions from highest dollar amount to lowest dollar amount and assessing fees even when accounts were not actually overdrawn in violation of the bank's account agreements.  *Id*. at 8-9.  Claims were raised for breach of contract, including violations of good faith and fair dealing,

unconscionability, unjust enrichment, and conversion.  *Id*. at 5.  TD settled the case for $62,000,000, an amount paid to victims of the bank's practices during the accepted class period, from December 1, 2003, to August 15, 2010.  *Id*. at 9.

94.    Nevertheless, many of the complained of practices continued as before, even after the class action settlement.  For example, TD continues to assess overdraft fees based purely on the improper *reordering of debit card transactions from highest to lowest amount* and to assess fees even at times when customers have sufficient funds in their account to cover all requests for payment.  Unlike most of the other banks sued in the multidistrict litigation *In re Checking Account Overdraft Litigation*, TD Bank has continued these practices *even after it settled claims of wrongdoing based on some of the very same practices*.  (*See generally* Final Approval Order, Ex. C (failing to include non-monetary relief such as practice change); *also id.* at 9-11 (establishing that only monetary relief would be afforded as class-wide relief).)

95.    In response to the rampant abuse of overdraft charges by banks, the Board of Governors of the Federal Reserve System implemented Regulation E, 12 C.F.R. § 205.17, republished at 12 C.F.R. § 1005.17, to include notice requirements for banks concerning overdraft charges.

96.    Under Regulation E, a financial institution may not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the financial institution's overdraft program unless the financial institution provides the customer with written notice, separate from all other information, that describes the institution's overdraft program, obtains the customer's affirmative consent to the institution's payment of ATM or one-time debit card transactions that would incur an overdraft fee, and provides written

confirmation of the consumer's consent along with a statement *informing the consumer of the right to revoke this consent.*  12 C.F.R. § 205.17(b)(1).

97.     For consumers with an account at a financial institution prior to July 1, 2010, the institution *cannot ass*ess any fees on a consumer's account on or after August 15, 2010, for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1).  12 C.F.R. § 205.17(c)(1).

98.     For accounts opened on or after July 1, 2010, the financial institution cannot assess any fees on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1).  12 C.F.R. § 205.17(c)(2).

99.     The debit card transactions and point of sale transactions described herein qualify as an "electronic funds transfer" under EFTA.

100.     Defendant qualifies as a financial institution that provides an overdraft service as contemplated by EFTA.

**B.     DEFENDANT ASSESSES OVERDRAFT FEES DESPITE SUFFICIENT FUNDS**

101.      While most major banks have historically determined whether an account is overdrawn by considering whether the posted transaction will exceed the money in the account (ledger or "actual balance"), TD Bank deviates from this standard practice.  Instead, Defendant systematically assesses and collects overdraft fees for transactions[2] that do not actually overdraw the account, as there is actually enough money in the account to cover the transaction.

---

[2] Unless a specific type of transaction is indicated, "transaction" refers to the posting to a customer account of an "item," as defined by TD Bank's customer account agreement as including:

102.    In particular, Defendant assesses overdraft fees without regard to an account's "actual balance."  An account's "actual balance" is the actual amount of funds held in a demand account, which is an account with respect to which a bank must immediately pay over funds on deposit on demand, including for payment of the transactions Defendant treats as overdraft items.  Checking accounts are demand accounts.

103.    Instead of using the "actual balance" for determining if the account is overdrawn, as it is obligated to do under its contracts with its customers, TD Bank utilizes an artificial and anticipation balance (referred to as the "available balance") to determine whether it is going to assess an overdraft fee.

104.    "Available balance" is the actual balance minus "pending" credits and debit transactions, which may not settle or be paid for several days (and may not settle for the authorized amount or at all).  Defendant treats any item it pays that causes this artificially diminished "available balance" to fall below zero (or to remain below zero) as an "overdraft," against which Defendant assesses fees.  Since the available balance will always be equal to or lower than the actual balance, it has an important effect of increasing the number of overdraft fees assessed to the consumer when they make a mistake and overdraw their account.

---

a check, substitute check, purported substitute check, remotely created check or draft, electronic transaction, draft, demand draft, image replacement document, indemnified copy, ATM withdrawal or transfer, debit card point-of-sale transaction, pre-authorized debit card payment, automatic transfer, telephone-initiated transfer, ACH transaction, online banking transfer to accounts at TD Bank or external transfers to other institutions, online bill payment instruction, payment to other people (Popmoney® transaction), withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, wire transfer, and any other instruction or order for the payment, transfer or withdrawal of funds.

(2011 PDAA, Ex. A, p.13.)

105.    The effect of using the "available balance" instead of the "actual balance" is significant.  By using the "available balance" instead of the amount of actual money in the account (also known as the "ledger balance"), approximately 10-20% of the time that TD Bank is assessing overdraft fees, it is doing so on transactions when there are actual funds in the account sufficient to cover the transaction.  In other words, it is calling a transaction that does not overdraw the actual account balance an overdraft transaction for the purpose of assessing and collecting $35 from the customer.  As TD Bank assesses and collects hundreds of millions of dollars in overdraft fees from its customers through this practice, it provides itself with a windfall to the detriment of its customers.[3]

106.    While this overdraft practice is intrinsically unfair, this practice also conflicts with, and thus breaches, TD Bank's contracts with its customers relating to how it assesses overdraft fees.

107.    By assessing an overdraft fee on a transaction when there is actually enough money in the consumer's account to cover the transaction, Defendant breaches two TD Bank contracts with TD Bank customers.[4]

108.    The first contract is the PDAA, which is a contract that covers the general relationship between the customer and TD Bank.  This contract is also a contract of adhesion drafted by TD Bank.  The PDAA specifically addresses what constitutes an overdraft in a section entitled "Overdrafts" that defines an overdraft as an advance of funds by TD Bank:

---

[3] Carolina First, Mercantile, and South Financial also engaged in similar conduct of using "available balance" instead of the actual money in the account in assessing overdraft fees in order to increase and maximize overdraft fee revenue.

[4] Carolina First and Mercantile similarly breached their contracts with Plaintiffs and their customers by assessing an overdraft fee when there was actually enough money in the customer's account to cover the transaction in question.

> An overdraft is an **advance of funds** greater than the amount that
> has become available in accordance with the Bank's Fund
> Availability Policy[5]…Overdrafts may include advances to cover a
> check, in-person withdrawal, ATM withdrawal, or a withdrawal by
> other electronic means from your Account.

(2011 PDAA, Ex. A, p. 1 (emphasis added).)

109.    The PDAA has another section entitled "Processing Order of Payment of Checks

and Other Items."  While this section appears to be dealing with the order TD Bank processes

transactions, it contains language that suggests pending charges are deducted from available

balance and could influence the amount available to pay other items.  (2011 PDAA, Ex. A,

pp. 11-12.)  However, that same section states that "overdraft fees may be assessed on items

presented for payment that bring your Account into a **negative balance**."  (2011 PDAA, Ex. A,

p. 13 (emphasis added).)

110.    Throughout the PDAA, when the term "balance" is used without being

proceeded by "available," it refers to the actual or ledger balance.[6]  In contrast, when TD Bank

refers to an account balance other than a ledger balance, TD Bank consistently uses the term

"available balance" or "available account balance."  (2011 PDAA, Ex. A, pp. 12-14.)  Finally,

the PDAA states that "**[o]verdraft fees are not charged on 'pending' authorizations**,

although they reduce your available balance."  (2011 PDAA, Ex. A, p. 13 (emphasis added).)

Taking this section as a whole, TD Bank has promised, under the terms it drafted and presented

---

[5] "Funds Availability Policy" refers to when deposits clear in order for the depositor to be able to
access deposited funds.  It does not have anything to do with pending debit card or ATM
charges.  (2011 PDAA, Ex. A, p. 27)
[6] *E.g.,* "Minimum balance" for purposes of determining interest refers to the ledger balance,
(2011 PDAA, Ex. A, p.16); "Accounts with zero balance" may be closed after 45 days refers to
the ledger balance, (2011 PDAA, Ex. A, p.22); Balance Tier Structure refers to ledger balance
(2011 PDAA, Ex. A, p.24); Interest Payment on daily balances refers to ledger balance, (2011
PDAA, Ex. A, p. 26).

without negotiation to Plaintiffs and the putative Classes, that it would assess overdraft fees only when there is a negative actual or ledger balance.

111.    Accordingly, taking the PDAA as a whole, Plaintiffs and the putative Classes have contracted with TD Bank to allow it to assess overdraft fees when it advances funds to pay for a transaction because the customer does not have enough money in the account to cover the transaction (negative balance).  However, in reality, TD Bank implements an overdraft program that assesses overdraft fees even when it does not "advance funds" and the account has a positive balance even though the "available balance" is negative.  This overdraft practice is a breach of the PDAA contract.

112.    The second contract is the one that specifically authorizes TD Bank to charge overdraft fees on debit cards and ATM transactions if the customer signs an opt-in agreement, which TD Bank calls "TD Debit Card Advance."  Regulation E requires TD Bank to obtain the customer's agreement to opt-in, or else TD Bank is forbidden from charging overdraft fees even if it pays overdrafts on ATM and one-time debit card charges.  This is a contract of adhesion drafted by TD Bank.  In the TD Debit Card Advance Agreement, TD Bank describes that an overdraft occurs when there is not enough money in the account:

> An <u>overdraft</u> occurs **when you do not have enough money available in your account to cover a transaction** but we pay it anyway…We will charge you a $35 fee each time we pay an overdraft, up to 5 overdraft fees per day…**if your negative balance** exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account.

(TD Debit Card Advance Agreement, Ex. B (emphasis added).)

113.    The use of the terms "money" and "negative balance" instead of "available balance," makes clear to a reasonable consumer that this section refers to the actual balance – not a balance that factors in future transactions that may or may not occur.

27

114.    Specifically relating to ATM and one-time debit card transactions, Plaintiffs and the members of the putative classes who have opted-into the ATM and debit card overdraft program to Regulation E have contracted with TD Bank through the TD Debit Card Advance Agreement, that TD Bank is allowed to assess overdraft fees on ATM and one-time debit card transactions that overdraw an account (i.e., when the customer does not have enough money in the account to cover the ATM or one-time debit transaction), but in reality TD Bank implements an overdraft program that assesses overdraft fees even when there is a positive balance in the account, i.e., there is "enough money" in the account to cover the transaction. Thus, this overdraft practice is also a breach of the TD Debit Card Advance contract for ATM and one-time debit card transactions.

115.    By engaging in this particular overdraft practice, TD Bank breaches two of its customer agreements, which is particularly egregious and detrimental in light of additional factors that exist in this case.

116.    First, TD Bank has been aware that this practice is improper, as this practice has already been in the subject of previous litigation and several court rulings:

> In one example, Plaintiffs allege that TD Bank charged [one Plaintiff] two overdraft fees on May 13, 2011, yet the account displayed a positive balance. Plaintiffs assert that "TD Bank deducted pending transactions on subsequent days without reflecting those transactions on [the Plaintiff's] statement. Neither the parties nor the PDAA adequately explains how overdraft fees could accrue with a positive balance."

*Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 677 (D.N.J. 2012). Other courts have raised similar concerns about this practice, whether by TD or other banks. *E.g., White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008).

117.    However, despite this indication by the District Court that this practice is not permitted under TD Bank's customer account agreement, TD Bank has intentionally and willfully continued to utilize the same practice and use the same contract language, indicating that it is intentionally deceiving its customers and breaching its contract with customers.

118.    Second, not only does TD Bank fail to accurately and truthfully describe this overdraft practice in the terms of the customer agreements, it misrepresents in these agreements what it actually does by stating that the bank will only charge overdraft fees when there is not "enough money" in the account and the bank is required to "advance funds" to cover the transactions.

119.    Third, TD bank goes even further by concealing this overdraft practice in the monthly statements and online account tools provided to customers.  It does this with statements by listing in separate sections the deposits, debit transactions, fees, other withdrawals, and balance information, and then assessing the overdraft fee on a different day than the date of the supposed overdraft making it very difficult for the customer to figure out first that he or she is being charged an overdraft when there is money in the account, and even if the customer does somehow make that connection, to then figure out why he or she is being charged fees for transactions for which there is sufficient money in the account to cover that transaction.

120.    Finally, TD Bank's overdraft practice, in conjunction with its misrepresentations in the account agreements and concealing of material information in the statements and online tools, results in additional and consequential overdraft fees.  This is because the assessment of the overdraft fees itself further and immediately reduces the available balance so that subsequently posted transactions are more likely to be deemed overdrafts – in other words, the assessment of improper overdraft fees on non-overdraft transactions makes later non-overdraft

transactions into additional overdraft transactions, under both actual balance and available balance accounting methods.

## C.    DEFENDANT'S REORDERING OF CHECKING ACCOUNT TRANSACTIONS

121.    To maximize overdraft revenue, Defendant manipulated and reordered debits from highest to lowest during given periods of time.  The bank reordered debit card transactions for no reason other than to increase the number of exorbitant overdraft fees it could harvest from customer accounts.  This practice violates the parties' contracts and the covenant of good faith and fair dealing.

122.    This practice was the subject of previous lawsuits against TD Bank.  In connection with settling those lawsuits, TD Bank agreed to re-pay its customers $62 million (representing a fraction of the total amount it collected from high-to-low posting) and provide additional disclosures.  However, it did not change its practice of high-to-low posting.  TD Bank's practice of high-to-low posting is also relevant to illustrating its disputed overdraft practices such as charging overdraft fees when there is enough money in the account.

123.    Transactions involving debit cards, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically.  As a result, Defendant is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

124.    Notwithstanding the instantaneous nature of these electronic debit card transactions, under Defendant's posting system, charges are not posted in the order in which they are assessed or received.  Defendant developed a policy and employs a practice whereby debits are posted to customer accounts out of chronological order for the sole purpose of

maximizing the number of overdraft transactions and, therefore, the number of overdraft fees charged to customers.

125.    Instead of processing such transactions in chronological order, Defendant processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible number of overdraft fees.

126.    Defendant often posts debit card transactions that have accumulated over multiple days.  The bank posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, they are posted in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

127.    Defendant's policy of posting charges from largest to smallest, rather than chronologically or from smallest to largest, is specifically designed to maximize the number of overdraft fees generated by triggering overdraft fees for account charges that would not otherwise result in such fees.  Defendant would have no higher expenses and would face no greater risk if it were to order transactions chronologically or from smallest to largest.  Notably, as a result of litigation and increased regulatory oversight, most banks have adopted either chronological or lowest to highest ordering of debit card transactions since 2010.

128.    Defendant enforces the policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  These

processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Defendant with substantially higher service fee revenues than it would otherwise achieve absent these practices.

129.    The PDAA offers incomplete or unduly ambiguous disclosures as to its actual practices.  Defendant may contend that it may assess fees that are not authorized in the PDAA based on the provision which states: "You also agree to pay any additional reasonable charges we may impose for services you request which are not contemplated by this Agreement but are disclosed in our Personal Fee Schedule which may be amended from time to time."  (2011 PDAA, Ex. A, p. 2.)  The evidence will show, however, that TD's unanticipated charges are neither "reasonable" nor "requested" by customers.

130.    The PDAA repeatedly suggests that debit card transactions which would push the account below zero will not be approved.  For example, the PDAA states that the bank uses the "available balance" (which is always equal to or lower than the real balance) to "determine the amount available to pay other items presented against your account."  *Id.* at 12.  It also says that "WE MAY REFUSE TO PAY A CHECK OR OTHER ITEM WHICH: . . . b) is drawn in an amount of funds then available for withdrawal in your Account (see the Funds Availability Policy) or which would, if paid, create an overdraft . . . ."  *Id.* at 13.  The Funds Availability Policy does not vary these terms.  *Id.* at 31-33.  Although TD does ambiguously offer that some transactions may not be rejected, rather the bank may decide to "advance" funds and charge an overdraft fee, this pointedly does not refer to all items, including debit card transactions.  *Id.* at 14 ("advances" allowed only for "check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account"); *id.* at 12 (showing text when all items to be included: "all other items, including checks, ATM transactions, and debit card

32

transactions"). Despite these contractual provisions, TD has adopted a hidden practice of intentionally approving debit card transactions that it knows will result in overdraft fees. The bank may allege that these practices have been disclosed elsewhere, but such documents are not contractual in nature and cannot vary the parties' agreement.

131. In addition, Carolina First, which was acquired by TD Bank, followed nearly identical overdraft policies. One version of the Carolina First customer agreement which was entitled "Terms and Conditions of Your Account" (hereinafter "Carolina First Account Agreement") is attached hereto as Exhibit D. The Carolina First Account Agreement also states that "any other documents we give you pertaining to your account(s)" also constitute the "contract." (*See* Carolina First Account Agreement, Ex. D, p. 1.) Obviously a bank provides customers with dozens of documents over the course of a year – including monthly statements, inserts, marketing materials, and policies and disclosures – so discovery is needed to determine exactly which, if any, other documents are intended by the bank and customers to govern accounts.

132. The Carolina First Account Agreement includes the following text to govern overdrafts and overdraft fees:

> The fact that we may honor withdrawal requests that overdraw the available account balance does not obligate us to do so later. You agree that we may charge fees for overdrafts and use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

(*See Id.* at 1 (under "WITHDRAWALS"). The following provisions may also be relevant in this case – although found in the section entitled "CHECK PROCESSING":

> We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We

33

> need only make one determination, but if we choose to make a
> subsequent determination, the account balance at the subsequent
> time will determine whether there are insufficient available funds.

(*Id.* at 2.)  This case, of course, does not challenge Defendant's manipulation of check

transactions, but only the manipulation of debit card transactions.  Notably, debit card

transactions are approved by Defendant at the time of the transaction.

133.    The Carolina First Account Agreement offers no further guidance as to overdraft

fees, other than allowing the general assessment of banking fees:

> You authorize us to deduct these charges directly from the account
> balance as accrued.  You will pay any additional reasonable
> charges for services you request which are not covered by this
> agreement.

(*Id.* at 1 (under "LIABILITY").)  Because no fees for debit card overdrafts were contemplated at

the time of drafting of the agreement, they would appear to fall under the provision for

"additional reasonable charges for services you request."

134.    The Carolina First Account Agreement also allowed Defendant to "change any

term of this agreement."  Such changes are allowed as follows:

> Rules governing changes in interest rates are provided separately
> in the Truth-in-Savings disclosure or in another document.  For
> other changes, we will give you reasonable notice in writing or by
> any other method permitted by law.

(*Id.* at 2 (under "AMENDMENTS AND TERMINATION").)  Defendant has not provided any

such notices as to the various overdraft practices at issue in this case – such as the allowance of

debit card overdrafts, even though Defendant was aware of account balances at the time of

transaction approval, or the intentional approval of debit card transactions when no balance

remains – and none are known to exist.

135.    As a result of these and other practices, Plaintiffs and members of the putative classes have incurred overdraft fees when they actually had sufficient funds in their accounts to cover the transactions in question.

**D.    DEFENDANT VIOLATES EFTA**

136.    As of July 1, 2010, if an account was opened on or after July 1, 2010, or August 15, 2010, if an account was opened prior to July 1, 2010, financial institutions holding a consumer's account may not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's standard overdraft service, unless the institution first (i) provides the customer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service; (ii) provides the customer with a reasonable opportunity for the consumer to affirmatively consent, or opt-in, to such service, (iii) obtains the customer's affirmative consent, or opt-in; and (iv) provides confirmation of the customer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent. *E.g.*, 12 C.F.R. § 205.17(b)(1)(i)-(iv).

137.    Defendant failed to comply with these and other EFTA requirements. *See* 15 U.S.C. §§ 1693b, 1693c; 12 C.F.R. § 205.17.

138.    For example, in violation of the EFTA and regulations related thereto, Defendant, a financial institution,:

a.    fails and has failed to provide consumers who have not affirmatively opted into TD Debit Card Advance with a notice in writing, or if the consumer agrees, electronically, *segregated from all other information*, describing the institution's overdraft service;

35

b.  charges and has charged overdraft fees and charges on ATM transactions and one-time debit card transactions to consumers who have not affirmatively opted-in or provided affirmative consent to enrollment into TD Bank's overdraft service known as TD Debit Card Advance; and

c.  fails and has failed to provide the consumer with confirmation of the consumer's consent in writing, or if the consumer agreed, electronically, which includes a statement informing the consumer of the right to revoke such consent.

139.    Nonetheless, after the Effective Dates, Defendant, in direct violation of EFTA and the regulations promulgated thereunder and to the detriment of Plaintiffs and the EFTA Class, has continued to assess overdraft fees on ATM and one-time debit card transactions.

140.    All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

**E.    DEFENDANT'S OVERDRAFT POLICIES AND PRACTICES ARE CONTRARY TO BEST PRACTICES**

141.    By engaging in the conduct described herein, Defendant has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively the "Agencies").  (Joint Guidance on Overdraft Protection Programs" ("Joint Guidance"), Ex. E.)  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive

overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

142.    According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits . . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

143.    The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

144.    Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  (Overdraft Protection: A Guide for Bankers, Ex. F.)

145.    Defendant's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that injury resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R.

28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

146.    On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion: Bank Fees for Overdrafts Increase 35% in Two Years."  (Bank Fees for Overdrafts Increase 35% in Two Years, Ex. G.)  The report found that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12-month period, with 27 million accounts incurring five or more overdraft fees.

147.    A chart from the research company Moebs Services shows that, in every year from 1992 to 2009, banks gained increased revenues from overdraft fees:



148.    An April 2014 report from the Pew Charitable Trusts confirmed that some banks continued utilizing improper practices.  Indeed, the report reveals that TD Bank's April 2014 overdraft practices finished 40th among the 44 banks that responded to the survey, adhering to *zero* out of four "best practices" and two out of four "good practices."  (Checks and Balances: 2014 Update, Ex. H.)  Among other reasons, TD Bank was criticized for still reordering transactions from highest amount to lowest amount.  Far from "best practices," it is clear that TD Bank's overdraft fee practices are among the industry's worst, inflicting tremendous harm upon its customers, who entrust it to safeguard their money.

**F.    DEFENDANT'S UNCONSCIONABLE PROVISIONS AND POLICIES**

149.    Defendant's overdraft policies and practices, to the extent purportedly authorized by the PDAA, are unconscionable in the following respects, among others:

a.    Prior to the Effective Date, Defendant did not attempt to obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee.  This either violated the PDAA, or was allowed by an unconscionable provision thereof;

b.    Defendant did not, and does not, alert its customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee.  This either violated the PDAA or was allowed by unconscionable provisions thereof;

c.    Defendant used, and uses, unduly discretionary power to assess fees even at times when no economic argument could be made for such fees.  This violated the PDAA or was allowed by unconscionable provisions thereof;

d.    PDAA and perhaps the related documents referenced therein are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendant, which has vastly superior bargaining strength, and only allow customers the opportunity to adhere to them or reject them entirely; and

e.    The PDAA are ambiguous, deceptive, unfair, and misleading to any extent they allowed Defendant to perpetrate the grossly improper acts described herein.

40

G.    **DEFENDANT'S OVERDRAFT PRACTICES HARMED PLAINTIFFS AND THE MEMBERS OF THE PUTATIVE CLASSES**

150.    Defendant's wrongful overdraft policies and practices described above harmed Plaintiffs and members of the putative Classes.

151.    But for Defendant's improper conduct in violation of the parties' agreements and common law, Plaintiffs would not have been assessed as many overdraft fees.

152.    Plaintiffs have been assessed overdrafts in violation of the plain terms of EFTA. If Defendant had not violated EFTA, Plaintiffs would not have been assessed as many overdraft fees.

153.    In this lawsuit, Plaintiffs do not challenge all of the overdraft fees assessed.  Nor do Plaintiffs challenge the amount of the fees TD Bank charges.  Rather, they challenge only those fees that occurred as a direct result of improper practices of Defendant.

154.    Defendant never notified Plaintiffs at the time it executed the purported insufficient funds transactions that their checking account was overdrawn or that they would be charged an overdraft fee as a result of the transactions.  Furthermore, Defendant paid, rather than returned, all of the debit card transactions described above, even though Plaintiffs' accounts purportedly lacked sufficient funds to cover the transactions.

155.    The overdraft fees assessed upon Plaintiffs are representative of millions of dollars of overdraft fees that Defendant wrongfully assessed and deducted from customer accounts.  These wrongful takings are especially egregious considering the fact that Defendant approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

H.    THE "SUSTAINED" OVERDRAFT PRACTICE

156.    The gist of the sustained overdraft practice is as follows:  If Customer "A" were to overdraft his or her account by $50.00, the bank first charges an overdraft fee of $35.00 per transaction.  However, if Customer "A" fails to replenish his or her account to bring the balance to a positive figure within ten (10) days, then the bank deducts yet another $20.00 from the account of Customer "A" for having extended this credit.

157.    Unlike an initial overdraft fee, the extended overdrawn balance charge is an *additional* charge to a customer based solely on the alleged indebtedness to the bank remaining unpaid by the customer for a period of time.

158.    As stated above, overdraft fees have been a substantial source of revenue for banks, and today those numbers are proliferating with the rapid growth of technology.  Recent reports from the federal Consumer Financial Protection Bureau ("CFPB"), for example, show that a broad investigation has been launched regarding bank overdraft practices and procedures due to its concern that the growing cost of overdraft practices could place banking customers at unnecessary risk.  In 2012 alone, banks took in approximately $32 billion in overdraft-related fees.

159.    As a recent CFPB report reflects, "sustained negative balance" fees are becoming popular with banks and account for nearly 10% of total overdraft-related fees collected by banks which impose such charges.  According to its latest report issued in July of 2014, most negative balance episodes last for a very short time and drop off substantially after ten days.  Once a bank charges its customer a sustained overdraft fee on day ten, the negative balance is likely cured by the customer within just a few days, rather than weeks.  As such, the bank's extension of credit to its overdrawn customer is typically very short-term.  Moreover, most negative balances

created by an overdraft are not high figures.  Nearly two-thirds of transactions that cause overdrafts were for $50 or less.  As these statistics highlight, a bank's exposure for carrying a customer's overdraft is ordinarily very small and limited.  But rather than charging legally permissible interest until its customer cures the overdraft balance, the bank instead charges a purported "fee" that in reality is interest at an illegal rate.

160.    The specific issue in this case is TD Bank's practice of deducting sustained overdraft fees from the accounts of its customers.  Under this practice, if the customer fails to repay the full amount of the overdraft within ten (10) days, the bank then charges a sustained overdraft fee of $20.00 – as reflected on TD Bank's Personal Fee Schedule.  TD Bank renders no service to its customers in exchange for charging this extra fee other than advancing money to a customer's account in an amount to cover the overdraft.  TD Bank uses the fact that it has loaned funds to its customer as a pretext to justify charging that customer a secondary service charge that exceeds lawful limits.

161.    In TD Bank's written "Personal Deposit Account Agreement" with its customers, the overdraft provisions start on page 9 – with the operative provision relating to sustained overdraft fees appearing on page 10.  That provision states as follows:

### Sustained Fee for Overdrawn Accounts

> We may charge you a fee, as disclosed on the Personal Fee Schedule, for any Checking or Money Market Account that remains in overdrawn status for ten (10) consecutive Business Days.  We will notify you if your Checking or Money Market Account is in overdrawn status.  If your Checking or Money Market Account is in overdrawn status because of an overdraft, check returned for insufficient funds or for any other reason and the Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.  If you have overdraft protection and you have exceeded your limit and the Check or Money Market Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.

> If the Checking or Money Market Account remains in overdrawn
> status for sixty (60) Calendar Days, or such earlier time that we
> determine that the overdraft balance is uncollectable, the Bank will
> close and place the Checking or Money Market Account in
> collection status.

162.    Under this provision TD Bank allows itself to charge a fee against any checking

or money market account merely by virtue of the customer failing to pay the bank a specific sum

of money (the amount of the overdraft) for a period of ten (10) days.  If the overdraft episode

then continues for a period of sixty (60) days, then TD Bank sends this debt to collection.  There

is nothing in TD Bank's written materials disclosing that this additional "fee" is in reality a

charge of interest on extended credit.

163.    In Plaintiff Robinson's case, her monthly bank statements for her "TD Simple

Checking Account" show that she went into "overdraft" status on September 22, 2014, and

remained in that status for ten consecutive days.  On day eleven (October 3, 2014), TD Bank

charged her a sustained overdraft fee of $20.00.  During that limited period, Robinson's negative

account balance fluctuated from ($147.10) to ($439.42).

164.    The $20.00 sustained overdraft fee that TD Bank charged plaintiff was *in addition
to* two overdraft charges totaling $70.00 that TD Bank also charged her during this same time

period for the two transactions which created her "overdraft" status.

I.    **DEFENDANT'S POLICIES AND/OR PRACTICES CONSTITUTE UNFAIR OR
DECEPTIVE TRADE PRACTICES**

165.    The Opt-In Rule prohibits depository institution**s** from assessing a "fee or charge

on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the

institution's overdraft service" without "obtain[ing] the consumer's affirmative consent, or opt-

in, to the institution's payment of ATM or one time debit card transactions[.]" 12 C.F.R. § 1005.17(b)(1).

166.    Defendant failed to obtain an affirmative "opt-in" from certain of its customers before charging them overdraft fees (as defined below) in connection with ATM and one-time debit card transactions, in violation of Regulation E.

167.    Defendant continued to charge overdraft fees in connection with ATM and one-time debit card transactions when customers revoked their affirmative "opt-in", in violation of Regulation E, 12 C.F.R. § 1005.17.

168.    In connection with the advertising, marketing, promoting, or offering of its overdraft product, in numerous instances, Defendant has represented, expressly or impliedly, that it would not "authorize and pay" transactions in connection with ATM or one-time debit card transactions unless the consumer opted in to the program.

169.    However, in reality, Defendant does authorize and/or pay transactions in connection with ATM or one-time debit card transactions.  In fact, Defendant states in its PDAA:

> An overdraft is an advance of funds greater than the amount that has become available in accordance with the Bank's Funds Availability Policy, made by us to you, at our sole discretion. Overdrafts may include advances to cover a check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account. We may demand immediate repayment of any overdraft and charge you an overdraft fee (see Personal Fee Schedule).

170.    In fact, in the PDAA, hidden at the bottom of page 43 of 55: "If a merchant receives authorization for a purchase, TD Bank cannot return that transaction unpaid even if your account is not in good standing."

171.    Defendant deceptively represented in advertisements and in information provided to consumers that it would not authorize and pay overdrafts in connection with ATM and one-time debit card transactions absent an opt-in.

172.    Defendant charges overdraft fees on one-time debit card transactions and ATM transactions to consumers who had not opted-in for one-time debit card transaction and ATM transaction overdraft coverage.

173.    Furthermore, Defendant markets its overdraft program in a manner that encourages routine or intentional overdrafts.  Defendant does not present the program as a customer service that may cover inadvertent consumer overdrafts.

174.    For example, in its TD Debit Card Advance advertising materials, TD Bank states: "Picking up the check: You're out to lunch with co-workers and forgot that your mortgage check brought your account to a zero balance.  With TD Debit Card Advance your lunch purchase may be covered at our discretion."

175.    Defendant markets its accounts as simple, when in fact the account is confusing and it is difficult to avoid overdraft fees.

176.    Defendant does not alert consumers before a transaction triggers an overdraft fee.

177.    In fact, Defendant further obscures the problem by failing to provide an accurate accounting of its overdraft fee assessments in customer account statements, which are supposed to be an accurate representation of account activity.  Defendant omits information necessary to: i) identify which transaction is connected to a particular overdraft fee, and ii) reveal its off-ledger "available balance" calculations at the time of each purported overdraft.  Masking this information furthers Defendant's purpose of maximizing overdraft fee income by making it more difficult for customers to understand and challenge improper overdraft fee assessments.

J.     **THE DAMAGE SUSTAINED BY PLAINTIFFS AND THE CLASSES**

178.     As a consequence of Defendant's overdraft policies and practices, Plaintiffs and the members of the putative Classes have been wrongfully forced to pay overdraft fees. Defendant has improperly deprived Plaintiffs and the members of the putative classes of significant funds, causing ascertainable monetary losses and damages.

179.     As a consequence of Defendant's improper overdraft fees, Plaintiffs and the members of the putative Classes have been wrongfully deprived of funds to which Defendant had no legitimate claim.

180.     Plaintiffs had sufficient funds to cover at least some of the transactions for which they and the members of the putative Classes were charged overdraft fees. Plaintiffs and the members of the putative Classes either had adequate funds to cover transactions posted to their accounts, or the accounts were allowed to become overdrawn exclusively so that Defendant could impose these wrongful charges. In many instances, Defendant's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges collected from Plaintiffs and the members of the putative Classes.

**V**

**CLASS ALLEGATIONS**

181.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

182.     Plaintiffs propose the following classes, defined as:

> All customers of TD Bank that either opened a checking account after August 15, 2010, or have claims not released in the settlement class in *In re Checking Account Overdraft Litigation,* who, from August 16, 2010, to the date of class certification, incurred an overdraft fee as a result of TD

Bank's practices of re-sequencing debit card transactions from highest to lowest and debiting items for which no time-stamp exists before debit card transactions for which a time-stamp exists ("TD High-to-Low Class").

All customers of TD Bank that either opened a checking account after August 15, 2010, or have claims not released in the settlement class in *In re Checking Account Overdraft Litigation,* who, from August 16, 2010, to the date of class certification, incurred an overdraft fee as a result of TD Bank's practice of assessing overdraft fees even when a customer had sufficient funds/money in their account to pay the amount of the posted transaction ("TD Sufficient Funds Class").

All customers of TD Bank that either opened a checking account after August 15, 2010, or have claims not released in the settlement class in *In re Checking Account Overdraft Litigation,* who were assessed an overdraft fee for an ATM or debit card transaction after July 1, 2010, if the account was opened on or after July 1, 2010, or August 15, 2010, if the account was opened prior to July 1, 2010, even though TD Bank failed to comply with the Electronic Funds Transfer Act ("EFTA Class").

All customers of Carolina First, Mercantile, and/or South Financial who, within the applicable statute of limitations preceding the merger of accounts onto the TD system in June 2011 to the date of class certification, incurred an overdraft fee as a result of Carolina First's, Mercantile's, and/or South Financial's practices of (1) re-sequencing debit card transactions from highest to lowest and debiting items for which no time-stamp exists before debit card transactions for which a time-stamp exists, or (2) assessing overdraft fees even when a customer has sufficient funds in their account to cover all merchant requests for payment ("South Financial Class").

All customers of TD Bank that either opened a checking and/or money market account after August 15, 2010, or have claims not released in the settlement class in *In re Checking Account Overdraft Litigation,* who, within two years preceding the filing of this lawsuit up to the date of class certification, incurred one or more sustained overdraft fees ("Usury Class").

183.    Plaintiffs reserve the right to modify or amend the definitions of the proposed

Classes before the Court determines whether certification is appropriate and as the Court may

otherwise allow.

184.    Excluded from the Classes are:

a.    Defendant and any entities in which Defendant has a controlling interest;

48

b.      Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;

c.      All current employees of Defendant;

d.      The Judge(s) to whom this case or any transferred case is assigned and any member of the Judges' immediate family and any other judicial officer assigned to this case or any transferred case;

e.      Any attorneys representing Plaintiffs or the Classes; and

f.      All governmental entities.

185.    Numerosity – Fed. R. Civ. P. 23(a)(1).  The members of the Classes are so numerous that joinder of all members would be impracticable.  The Classes each consist of thousands of members and the identity of those persons is within the knowledge of, and can be ascertained by resorting to, Defendant's records.

186.    Commonality – Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class members.

187.    Among the questions of law and fact common to the TD High-to-Low Class, TD Sufficient Funds Class, and South Financial Class are whether Defendant:

a.      required customers to enter into standardized account agreements that included unconscionable provisions and provisions that governed one or more of the claims;

b.      approved debit card transactions, including cash transactions at ATMs owned by Defendant, which were going to trigger an overdraft fee;

c.    failed to inform customers that an authorized transaction would trigger an overdraft fee or provide customers with an opportunity to cancel such transactions;

d.    reordered transactions causing an increase in the number of overdraft fees imposed on customers;

e.    reordered debit transactions from the highest monetary value to lowest monetary value in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees charged to customers;

f.    charged overdrafts and overdraft fees even when there were sufficient funds in customer accounts;

g.    failed to provide customers with accurate balance information, which encouraged debit card transactions even when Defendant knew an overdraft would occur based on the bank's calculation of "available balance";

h.    breached its contract with its customers and/or the covenant of good faith and fair dealing through its overdraft policies and practices;

i.    failed to obtain affirmative consent from customers prior to processing transactions that would result in overdraft fees;

j.    converted money belonging to Plaintiffs and other members of the Classes through its overdraft policies and practices; and

k.    was unjustly enriched through its overdraft policies and practices.

188.    Among the questions of law and fact common to the to the EFTA Class are whether Defendant:

a.     provided customers with a notice describing its overdraft services that complied with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

b.     provided customers with a reasonable opportunity to affirmatively consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

c.     obtained customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1(iii);

d.     provided customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv); and

e.     assessed overdraft fees in violation of EFTA.

189.    Among the questions of law and fact common to the Usury Class are whether Defendant:

a.     charged interest to its customers under the guise of a "sustained" overdraft fee in amounts that violate applicable usury laws;

b.     developed and engaged in an unlawful practice that mischaracterized or concealed the true usurious nature of the "sustained" overdraft fee; and

c.     imposed a "fee" on its customers that bears no relationship to the actual costs and risks of covering insufficient funds transactions.

190.    Typicality – Fed. R. Civ. P. 23(a)(3).  Plaintiffs assert claims that are typical of the Classes they purport to represent, having all been targeted by Defendant as consumers who were improperly assessed one or more overdraft charges and overdraft fees whether by reordering transactions, by charging overdraft fees when there was sufficient funds/money in the account to cover the transaction, by failing to notify consumers that approving a debit would

result in an overdraft charge, by failing to comply with the Electronic Funds Transfer Act, or by charging illegal extended overdraft fees.  Plaintiffs and the Class members have similarly suffered harm arising from Defendant's violations of one or more laws as alleged in this Complaint.

191.    Adequacy of Representation – Fed. R. Civ. P. 23(a)(4), 23(g)(1).  Plaintiffs are adequate representatives of the Classes because Plaintiffs fit within the class definitions and Plaintiffs' interests do not conflict with the interests of the members of the Classes Plaintiffs seek to represent.  Plaintiffs will prosecute this action vigorously for the benefit of the entire Class. Plaintiffs are represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as class counsel.  Class counsel have litigated numerous class actions, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and class counsel can fairly and adequately protect the interests of all of the Members of the Class.

192.    Superiority of Class Action – Fed. R. Civ. P. 23(b)(3).  The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Plaintiffs and members of the Classes have suffered irreparable harm as a result of Defendant's unlawful and unfair conduct.  Because of the size of the individual Class members' claims, no Class members could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class members would have no reasonable remedy and would continue to suffer losses, as Defendant's continue to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint, and Defendant would be permitted to retain the proceeds from their continued violations of law.

Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  There will be no difficulty in the management of this action as a class action.

193.    Injunctive and Declaratory Relief – Fed. R. Civ. P. 23(b)(2).  Defendant's omissions are uniform as to all members of the Classes.  Defendant has refused to act on grounds that apply generally to the Classes, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## VI

## VIOLATIONS ALLEGED

## COUNT I
## BREACH OF CONTRACT

(On Behalf of Plaintiffs and TD High-to-Low, TD Sufficient Funds, and South Financial Classes)

194.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

195.    Plaintiffs and Defendant have contracted for bank account deposit, checking, ATM, and debit card services.  As described above, the actions taken by Defendant have violated the specific terms of the agreements with its customers, including other documents referenced therein.  Defendant is liable for the losses of Plaintiffs and the Classes that have resulted from Defendant's breaches of the parties' contractual agreements.

196.    Defendant breached the express terms of the Personal Deposit Account Agreement and TD Debit Card Advance Agreement, or the Carolina First Account Agreement, by charging overdraft fees on transactions when there were sufficient funds and money to cover the transactions.

197.     Defendant violated the Personal Deposit Account Agreement or the Carolina First Account Agreement by instituting a range of overdraft practices that were never disclosed to customers nor "requested" as required by contract.  Fees resulting from such practice changes were neither "reasonable" nor subject to "reasonable notice" as required by the Personal Deposit Account Agreement or the Carolina First Account Agreement.  These secretive practices included, but are by no means limited to:

        a.       the authorization of debit card transactions that Defendant knew would result in an overdraft fee;

        b.       the adoption of a line of credit or spending limit up to which Defendant would authorize debit card transactions;

        c.       the manipulation of debit card transactions by Defendant's posting software to increase overdraft fees; and

        d.       the decision to assess overdraft fees even when there were funds in customer accounts sufficient to cover the transaction.

198.     Plaintiffs and members of the Classes have sustained damages as a result of Defendant's breaches of the Personal Deposit Account Agreement, TD Debit Card Advance Agreement, and Carolina First Account Agreement.

## COUNT II
## BREACH OF CONTRACT – THE DUTY OF GOOD FAITH AND FAIR DEALING

(On Behalf of Plaintiffs and TD High-to-Low, TD Sufficient Funds, and South Financial Classes)

199.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

200.    Under the laws of the states where Defendant does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

201.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

202.    Defendant has breached the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.  For example, to the extent Defendant argues that it was allowed to impose fees based on new overdraft policies related to debit cards based on language such as "[y]ou will pay any additional reasonable charges for services you request" or "you agree that we may charge fees for overdrafts," it will be shown that such an interpretation of the contract violates the covenant of good faith and fair dealing.  By way of further example, the assessment of overdraft fees based on anything but the customer's balance of actual funds is not permitted in light of the covenant of good faith and fair dealing, even where language such as "[w]e may determine the amount of available funds in your account" or "[o]verdraft fees may be

assessed on items presented for payment that bring your Account into a negative balance" exists. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

203. Plaintiffs and the Classes have performed all, or substantially all, of the obligations imposed on them under the Personal Deposit Account Agreement, TD Debit Card Advance Agreement, or the Carolina First Account Agreement.

204. Plaintiffs and members of the Classes have sustained damages as a result of Defendant's breaches of the account agreements as modified by the covenant of good faith and fair dealing.

## COUNT III
## UNCONSCIONABILITY

(On Behalf of Plaintiffs and TD High-to-Low, TD Sufficient Funds, and South Financial Classes)

205. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206. Defendant's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a. Prior to the Effective Date, Defendant did not attempt to obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee. This violated the Personal Deposit Account Agreement, Carolina First Account Agreement, and/or TD Debit Card Advance Agreement, or was allowed by an unconscionable provision thereof.

b. Defendant did not and does not alert customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to

56

cancel that transaction before incurring an overdraft fee.  This violated the Personal Deposit Account Agreement, Carolina First Account Agreement, and/or TD Debit Card Advance Agreement, or was allowed by unconscionable provisions thereof.

       c.     Defendant used, and uses, unduly discretionary power to assess fees even at a time when no economic argument could be made for such fees.  This violated the Personal Deposit Account Agreement, Carolina First Account Agreement, and/or TD Debit Card Advance Agreement, or was allowed by unconscionable provisions thereof.

207.    The Personal Deposit Account Agreement, Carolina First Account Agreement, and/or TD Debit Card Advance Agreement are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendant, which is a party of vastly superior bargaining strength, and only allows the customer the opportunity to adhere to them or reject them entirely.

208.    The Personal Deposit Account Agreement, Carolina First Account Agreement, and/or TD Debit Card Advance Agreement are ambiguous, deceptive, unfair, and misleading to any extent they allowed Defendant to perpetrate the grossly improper acts described herein.

209.    Considering the great business acumen and experience of Defendant in relation to Plaintiffs and the members of the Classes, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

210.    Plaintiffs and members of the Classes have sustained damages as a result of Defendant's unconscionable policies and practices as alleged herein.

## COUNT IV
## CONVERSION

### (On Behalf of Plaintiffs and All Classes)

211.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

212.    Defendant had, and continues to have, a duty to maintain and preserve customers' checking accounts and to prevent their diminishment through wrongful acts.

213.    Defendant wrongfully has collected overdraft fees from Plaintiffs and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

214.    Defendant has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Classes, without legal justification.

215.    Defendant continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Classes.

216.    Defendant intends to permanently deprive Plaintiffs and the members of the Classes of these funds.

217.    These funds are properly owned by Plaintiffs and the members of the Classes, not Defendant, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the Classes.

218.    Plaintiffs and the members of the Classes are entitled to the immediate possession of these funds.

219.    Defendant has wrongfully converted these specific and readily identifiable funds.

220.    Defendant's wrongful conduct is continuing.

221.    As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the Classes have suffered, and continue to suffer, damages.

222.    By reason of the foregoing, Plaintiffs and the members of the Classes are entitled to recover from Defendant all damages and costs permitted by law, including all amounts that Defendant has wrongfully converted.

## COUNT V
## UNJUST ENRICHMENT

(On Behalf of Plaintiffs and All Classes)

223.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

224.    Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment.

225.    By means of Defendant's wrongful conduct alleged herein, it knowingly provided banking services to Plaintiffs and members of the Classes that are unfair, unconscionable, and oppressive.

226.    Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes.  In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

227.    As a result of Defendant's wrongful conduct as alleged herein, it has been unjustly enriched at the expense, and to the detriment, of Plaintiffs and members of the Classes.

228.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

229.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without

justification, from the imposition of overdraft fees on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner.  Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

230.    The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Classes.  Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by it.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiffs and the members of the Classes.

## COUNT VI
## VIOLATION OF STATE STATUTES PROHIBITING UNFAIR AND DECEPTIVE ACTS AND PRACTICES

(On Behalf of Plaintiffs and the EFTA Classes)

231.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

232.     The state deceptive trade practices acts were enacted by the various states to protect consumers from unfair, unconscionable and deceptive business practices.

233.    Certain of Defendant's policies and/or practices described in this Complaint constitute unfair, unconscionable or deceptive trade or business practices.  Defendant engages in such conduct as a general business practice, uniformly and as a matter of policy assessing and collecting overdraft fees where it is not legally permitted to do so.  In addition, Defendant has done so through substantially aggravating circumstances in which it intentionally and knowingly engaged in this unlawful practice that was targeted and directed at the poorest and most financially vulnerable customers.  As a result of the unlawful collection of overdraft fees,

Plaintiffs and the class have been harmed and Defendant has been improperly and unjustly enriched.

234.    The violations of the various state consumer protection acts are: Connecticut: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a *et seq.*); Delaware: the Delaware Uniform Deceptive Trade Practices Act, (6 Del. C. §2531 *et seq.*); Maryland: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§13-101 *et seq.*, 14-101 *et seq.*); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A); New Hampshire: the Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. §358-A:1 *et seq.*); New Jersey: the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §56:8-1 *et seq.* (West)); New York: New York Consumer Protection Act (N.Y. Gen. Bus. Law §§349, 350 (Consol.)); North Carolina: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 *et seq.*); Pennsylvania: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 §201-1 *et seq.* (Purdon)); South Carolina: South Carolina Unfair Trade Practices Act (S.C. Code Ann. §39-5-10 *et seq.*); Vermont: Vermont Consumer Fraud Statute (Vt. Stat. Ann. Tit. 9, §2451 *et seq.*); and Washington, D.C. the Consumer Protection Procedures Act (D.C. Code Ann. §28-3901 *et seq.*).  These violations have directly, foreseeably, and proximately caused damages to Plaintiffs and the proposed Classes in amounts yet to be determined.  They have also unjustly enriched Defendant by an amount yet to be determined.

235.    As a result of Defendant's violations of the Deceptive Trade Practices Acts of the various states prohibiting unfair and deceptive acts and practices, Plaintiffs and members of the proposed Classes have suffered actual damages for which Defendant is liable in an amount up to and equal to threefold damages.  Plaintiffs and the Classes are likewise entitled to recover by disgorgement an amount sufficient to restore to Plaintiffs and the Classes all monies improperly

taken from them.  In addition, Plaintiffs and the Classes are entitled to injunctive relief to prevent Defendant from continuing to harm them through its wrongful actions and conduct.

## COUNT VII
## VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT AND REGULATIONS SUCH AS 15 U.S.C. § 1693 AND 12 C.F.C. § 205

(On Behalf of Plaintiffs and the EFTA Class)

236.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

237.    Plaintiffs allege this claim on behalf of themselves and the EFTA Class members who have been assessed one or more overdraft fees or charges based on ATM or debit card transactions.

238.    Plaintiffs, on behalf of themselves and the EFTA Class, assert that Defendant failed to:

    a.    provide customers with a notice describing its overdraft services that complies with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

    b.    provide customers with a reasonable opportunity to affirmatively consent, or opt in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

    c.    obtain customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(iii); or

    d.    provide customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv).

239.    Nonetheless, Defendant imposed overdraft fees on them based on ATM or debit card transactions, in violation of 12 C.F.R. §§ 205.17(b), (c).

240.    As a result of Defendant's violations of EFTA, Defendant is liable to Plaintiffs and the EFTA Class for actual and statutory damages, pursuant to 15 U.S.C. § 1693m.

241.    As a result of Defendant's violations of EFTA, Defendant is liable to Plaintiffs and the EFTA Class for actual and statutory damages and Plaintiffs and the Classes are entitled to recover costs of suit and their reasonable attorneys' fees.

## COUNT VIII
## VIOLATION OF NATIONAL BANK ACT, 12 U.S.C. §§ 85-86 AND USURY

(On Behalf of Plaintiffs and the Usury Class)

242.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

243.    Interest, by definition, is compensation for the use or forbearance of money or as damages for its detention.  That is exactly the nature of and basis for Defendant's "sustained" overdraft fee.  Any such charges imposed on a customer for use or forbearance of money or as damages for its detention – no matter how labeled by Defendant – are in fact interest and, in this case, usurious, as explained more fully below.

244.    Claims for usury against a national bank such as Defendant are governed exclusively by certain provisions in the National Bank Act – specifically, 12 U.S.C. §§ 85-86. Under § 85, a national bank may charge interest on any loan or debt at the greater of two options. Option (1) is "the rate allowed by the laws of the State . . . where the bank is located."  Option (2) is "1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located."

245.    Under option (1), the maximum allowable interest rate that TD Bank would be allowed to charge its customers would be 6.25%.   The steps to reach this calculation are as follows:

a.    Under controlling law, a bank is "located" only in the state that is designated in its organization certificate.  Upon information and belief, TD Bank is located in Delaware.

b.    Under Delaware law, the maximum allowable interest rate where no specific rate has been agreed to is "5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due."  6 Del. Code § 2301.

c.    Upon information and belief, the discount rate for the Federal Reserve Bank of Philadelphia (which covers the entire Third Circuit, including Delaware) was .75% for primary credit and 1.25% for secondary credit.  The acknowledged purpose of the rate structure is to help ensure the basic stability of the federal payment system by supplying liquidity during times of systemic stress.

d.    Using the higher figure of 1.25%, the maximum interest rate allowable under Delaware law – and therefore under option (1) of the federal act – would be 6.25%.

246.    This 6.25% interest figure under option (1) – which includes a 5% bump-up from the federal discount rate – necessarily exceeds option (2) of the federal act which only allows for a 1% bump-up from the discount rate.   As such, under 12 U.S.C. § 85, 6.25% would be the maximum interest rate that TD Bank could legally charge its customers in this context.

247.    By covering overdrafts, TD Bank has knowingly extended credit to Plaintiffs and others similarly situated for use in their checking and/or money market accounts.   Such extensions of credit are *de facto* loans made without a specific loan agreement.  In fact, 12 U.S.C. § 84 defines the term "loans and extensions of credit" as including any and all direct or indirect advances of funds to a person made on the basis of any obligation of that person to repay the funds.

64

248.    Although TD Bank is only permitted to charge Plaintiffs and others similarly situated a *maximum* of 6.25% annualized interest on these *de facto* loans and extensions of credit, TD Bank has knowingly charged and collected "sustained" overdraft fees from Plaintiffs and others similarly situated that far exceeded this permissible rate.

249.    For example, using the maximum amount of Plaintiff Robinson's overdraft during the relevant period ($439.42) and applying a 6.25% annual interest rate over a 10-day period, the maximum amount that TD Bank was legally permitted to charge Plaintiff Robinson was only 76¢.  Instead, TD Bank charged her $20.00 for that 10-day period – which is *over 26 times* the maximum legal amount.

250.    A charge of $20.00 for a 10-day period on Plaintiff Robinson's negative balance (which fluctuated from $147.10 to $439.42) translates to an effective annualized interest rate of between 166 percent and 496 percent.

251.    The sustained overdraft fees charged to Plaintiffs and others similarly situated for such advances of money are egregiously high, usurious and illegal.

252.    By labeling its charge as a "fee," TD Bank cannot mask the true nature of the charge.

253.    As a direct and proximate result of TD Bank's statutory breaches, Plaintiffs and those similarly situated have sustained damages.

254.    The usurious transactions at issue all occurred less than two years prior to the date of this action.

255.    Plaintiffs and those similarly situated are entitled to recover twice the amount of the usurious interest they have paid under 12 U.S.C. § 86, which provides:

> In case the greater rate of interest has been paid, the person by
> whom it has been paid, or his legal representatives, may recover

back, in an action in the nature of an action of debt, *twice the amount of interest thus paid from the association taking or receiving the same*…. (Emphasis added)

256.    Plaintiffs and those similarly situated hereby demand recovery of the amounts owed to them as a result of the violations asserted herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Declaring Defendant's overdraft fee policies and practices to be violative of the account agreements, wrongful, unconscionable, and in violation of EFTA;

2.    Awarding Plaintiffs and the Usury Class damages, including twice the amount of the usurious interest paid, in violation of the National Bank Act;

3.    Awarding restitution of all overdraft fees at issue paid to Defendant by Plaintiffs and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

4.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

5.    Awarding actual damages in an amount according to proof;

6.    Awarding punitive and exemplary damages;

7.    Awarding treble damages pursuant to the New Jersey Consumer Fraud Act;

8.    Awarding statutory damages;

9.    Awarding pre-judgment interest at the maximum rate permitted by applicable law;

10.    Reimbursing all costs and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law and the contracts with Defendant; and

     11.    Awarding such other relief as this Court deems just and proper.

DATED this 19th day of June, 2015.

Respectfully submitted by,

*/s/ Mark C. Tanenbaum*

| | |
|---|---|
| Mark C. Tanenbaum | William E. Hopkins, Jr. |
| **LAW OFFICE OF MARK C. TANENBAUM** | **HOPKINS LAW FIRM, LLC** |
| 120 Church Street | 12019 Ocean Highway |
| Charleston, SC 29413 | Pawleys Island, SC 29585 |
| Telephone: (843) 577-5100 | Telephone: (843) 314-4202 |
| mark@tanenbaumlaw.com | bill@hopkinslawfirm.com |

*Liaison Counsel for Plaintiffs*

| | |
|---|---|
| E. Adam Webb | Richard D. McCune |
| **WEBB, KLASE & LEMOND, LLC** | **McCUNEWRIGHT LLP** |
| 1900 The Exchange, SE, Suite 480 | 2068 Orange Tree Lane, Suite 216 |
| Atlanta, GA 30339 | Redlands, CA 92374 |
| Telephone: (770) 444-0773 | Telephone: (909) 557-1250 |
| Adam@WebbLLC.com | rdm@mccunewright.com |

*Co-Lead Counsel for Plaintiffs*

| | |
|---|---|
| Richard M. Golomb | Hassan A. Zavareei |
| **GOLOMB & HONIK, P.C.** | **TYCKO & ZAVAREEI LLP** |
| 1515 Market Street, Suite 1100 | 2000 L Street, N.W., Suite 808 |
| Philadelphia, PA 19102 | Washington, D.C. 20036 |
| Telephone: (215) 985-9177 | Telephone: (202) 973-0900 |
| rgolomb@golombhonik.com | hzavareei@tzlegal.com |
| | |
| Joseph C. Kohn | Francis J. "Casey" Flynn, Jr. |
| **KOHN, SWIFT & GRAF, P.C.** | **CAREY, DANIS & LOWE** |
| One South Broad Street, Suite 2100 | 8235 Forsyth Boulevard, Suite 1100 |
| Philadelphia, PA 19107 | Saint Louis, MO 63105 |
| Telephone: (215) 238-1700 | Telephone: (800) 721-2519 |
| jkohn@kohnswift.com | francisflynn@careydanis.com |
| | |
| John R. Hargrove | |
| **HARGROVE PIERSON & BROWN, P.A.** | |
| 21 SE 5th Street, Suite 200 | |
| Boca Raton, FL 33432 | |
| Telephone: (561) 300-3900 | |
| JRH@HargroveLawGroup.com | |

*Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 19, 2015, I electronically filed a Consolidated
Amended Class Action Complaint with the Clerk of the Court using the CM/ECF system, which
will cause a true and correct copy to be served via e-mail on all ECF-registered counsel of
record.

I HEREBY FURTHER CERTIFY that on June 19, 2015, I was advised by co-lead
counsel, McCuneWright, LLP, that a copy of the above-referenced document has been placed in
the United States mail addressed to the non-ECF-registered counsel of record listed below.

*/s/ Mark C. Tanenbaum*
Mark C. Tanenbaum

Alan Frederick Wagner
Wagner, Vaughan & McLaughlin, PA
601 Bayshore Boulevard, Suite 910
Tampa, FL  33606
Counsel in *Goodall v. Toronto-Dominion
Bank, et al.*
6:15-cv-01538-BHH

Andrew J. Soven
Debra A. Djupman
REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA  19103
Counsel in *Padilla v. TD Bank, N.A.*
6:15-cv-01563-BHH

Elizabeth M. Lacombe
Duane Morris LLP – Htfd, CT
100 Pearl Street, Suite 1415
Hartford, CT  06103
Counsel in *Austin v. TD Bank, N.A.*
6:15-cv-01559-BHH

Robert Y. Lewis
Freeman Lewis LLP
228 East 45th Street, 17th Floor
New York, NY  10017
Counsel in *Mingrone v. TD Bank, N.A.*
6:15-cv-02293-BHH

Mark P. Kindall
Izard Nobel, LLP
29 South Main Street, Suite 305
West Hartford, CT  06101
Counsel in *Austin v. TD Bank, N.A.*
6:15-cv-01559-BHH