UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: TD BANK, N.A. DEBIT CARD OVERDRAFT FEE LITIGATION | ) ) ) | Civil Action No.: 6:15-MN-2613-BHH ALL CASES |
| MDL No. 2613 | ) ) ) | **Opinion and Order** |
| _____ | ) | |

This matter is before the Court on the defendant's motion to dismiss counts I-VI and VIII of the plaintiffs' consolidated amended class action complaint ("CAC") for failure to state a claim upon which relief can be granted. (ECF No. 53.) For the reasons set forth in this order, the defendant's motion is granted in part and denied in part.

## PROCEDERUAL BACKGROUND

In this litigation, the plaintiffs challenge the manner in which the defendant, TD Bank, N.A., and some smaller state banks that it has acquired (collectively "TD Bank" or "the Bank"), assessed overdraft fees, posted debit transactions, and assessed "sustained" overdraft fees.

Eight putative class actions, *King, et al. v. TD Bank, N.A.*, D.S.C. C.A. No. 6:13-cv-02264; *Padilla, et al. v. TD Bank, N.A.*, E.D. Pa. C.A. No. 2:14-cv-01276; *Hurel v. TD Bank, N.A., et al.*, D.N.J. C.A. No. 1:14-cv-07621; *Koshgarian v. TD Bank, N.A., et al.*, S.D.N.Y. C.A. No. 1:14-cv-10250; *Goodall v. Toronto-Dominion Bank, et al.*, M.D. Fla. C.A. No. 8:15-cv-00023; *Klein, et al. v. TD Bank, N.A.*, D.N.J. C.A. No. 1:15-cv-00179; *Ucciferri v. TD Bank, N.A.*, D.N.J. C.A. No. 1:15-cv-00424; and *Austin v. TD Bank, N.A.*, D. Conn. C.A. No. 3:15-cv-00088, were filed against TD Bank in federal court. On April 2, 2015, the Judicial Panel on Multidistrict Litigation ("MDL") centralized these actions and assigned them to this Court. On April 15, 2015, the MDL Panel transferred an

additional putative class action, *Robinson v. TD Bank, N.A.*, S.D. Fla. C.A. No. 15-cv-60469, to this Court for inclusion in this litigation, MDL No. 2613. On May 20, 2015, the Court appointed co-lead counsel, the plaintiffs' executive committee, and liaison counsel. On May 22, 2015, the Court consolidated all nine actions for pretrial purposes and directed the plaintiffs to file an amended or consolidated complaint within thirty days of the date of that order.

The plaintiffs' CAC was filed on June 19, 2015. (ECF No. 37.) TD Bank filed a motion to dismiss the plaintiffs' CAC for failure to state a claim on August 3, 2015. (ECF No. 53.) The plaintiffs filed a response in opposition to the motion (ECF No. 59) on September 2, 2015, and TD Bank filed a reply on September 23, 2015 (ECF No. 60). A hearing was held on the motion to dismiss on October 14, 2015, and the Court took the matter under advisement. TD Bank filed a notice of supplemental authority in support of the motion to dismiss on October 22, 2015. (ECF No. 63.) The plaintiffs filed a response to the notice of supplemental authority on October 23, 2015. (ECF No. 64.) On November 30, 2015, the plaintiffs filed a notice of supplemental authority. (ECF No. 66.) TD Bank filed an objection to the plaintiffs' notice of supplemental authority on December 4, 2015. (ECF No. 67.)

## **FACTUAL BACKGROUND**

Unless otherwise indicated, the following facts are drawn from the CAC and construed in the light most favorable to the plaintiffs.

### I. TD Bank's Overdraft Program

The plaintiffs' claims arise from TD Bank's assessment and collection of allegedly improper and excessive overdraft fees. The claims can be grouped into five categories

2

of alleged behavior by the Bank: (1) assessment of overdraft fees when there are sufficient actual funds in the account; (2) assessment of overdraft fees as a result of reordering debit transactions from high to low; (3) assessment of overdraft fees on transactions intentionally authorized into overdraft without notice to customers; (4) assessment of overdraft fees on ATM and one-time debit transactions in violation of Regulation E, 12 C.F.R. § 205.17, under the Electronic Funds Transfer Act ("EFTA"); and (5) assessment of "sustained" overdraft fees on checking and money market account customers in violation of the National Bank Act's prohibition on the collection of usurious interest (12 U.S.C. §§ 85-86).

TD Bank provides debit cards to its checking account customers. Customers can use their debit cards to access their checking account funds by making purchases or withdrawing money from ATM machines. The Bank is instantaneously notified of debit card transactions and has the option to accept or decline the transaction at the point of sale. According to the plaintiffs, TD Bank can immediately determine whether customers have sufficient funds in their accounts to cover the transactions. The Bank's contracts with its customers provide that the Bank can assess overdraft fees on their accounts when it has advanced funds because there was insufficient money in the account to cover the transaction. If a customer does not have sufficient funds in his or her account to pay for a transaction, the transaction is considered an "overdraft."

Instead of declining such transactions or informing customers that they will result in overdraft fees, TD Bank will, in its discretion, honor transactions that result in overdraft. However, if TD Bank honors an overdraft, it charges the customer a $35 fee for each overdraft, up to five charges per day. At the time of the transaction, TD Bank

3

does not alert its customers that it will cause an overdraft. The plaintiffs aver that TD Bank paid, rather than returned or declined, nearly all debit card charges resulting in overdraft, even though the accounts in question purportedly lacked sufficient funds to cover the relevant transactions. The Bank charged customers the same $35 fee for each overdraft regardless of the amount of the transaction.

TD Bank's automated overdraft system is allegedly designed to maximize overdraft fee revenue without regard to customers' particular financial circumstances. The plaintiffs assert that when marketing its overdraft protection program, TD Bank represents that it takes the personal circumstances of each customer into account before exercising its discretion in deciding whether to authorize an overdraft transaction. This allegedly creates a false impression in the mind of the consumer that the Bank assesses personal information before making individualized decisions on a case-by-case, transaction-by-transaction basis. In reality, claim the plaintiffs, the Bank simply honors nearly every transaction that will create an overdraft, thus increasing the number of fees it can charge.

Next, the plaintiffs allege that TD Bank assessed overdraft fees on customers' accounts even when there was still enough money in the account to cover the transaction. The Bank purportedly did not notify plaintiffs that it was possible to incur overdraft fees on transactions even when there were sufficient funds in the checking account to cover the transaction at the time it was executed. At the time such transactions were executed, TD Bank also did not notify customers that their checking accounts were or would be overdrawn, or that they would be charged an overdraft fee as a result of the transaction. The plaintiffs assert that TD Bank deemed accounts to be

4

overdrawn when sufficient funds still remained in the account by using a calculation called "available balance." Instead of using the actual balance of money in the account to determine when it was overdrawn and when a fee should be triggered, TD Bank used a reduced balance calculated by subtracting "pending" debit transactions, which may not settle or be paid for several days and may not settle for the authorized amount or at all. This reduced balance is the "available balance." TD Bank treated transactions that caused the "available balance" to fall below zero, or to remain below zero, as an "overdraft." TD Bank then assessed the associated overdraft fees without regard to the actual balance, which was still positive. By so doing, claim the plaintiffs, TD Bank increased the number of fees it charged to its customers because fees that would not otherwise have been assessed if the actual balance was considered were triggered by the use of a negative available balance for accounting purposes.

The plaintiffs further allege that TD Bank manipulated and reordered transactions on customers' deposit accounts from highest to lowest in order to increase the overdraft fees it assessed its customers. This practice is commonly called "high-to-low" posting. A transaction is "posted" when TD Bank either debits an expenditure from the customer's account or credits a deposit to a customer's account. (Ex. A, ECF No. 37-1 at 8-9.) TD Bank does not debit funds from a customer's account at the moment a transaction is made. Instead, TD Bank purportedly batches together several days' worth of transactions and orders them from the highest to the lowest dollar amount before posting them to the customer's account. The plaintiffs claim that the manipulation of posting order from chronological to high-to-low caused them to incur more overdraft fees than they otherwise might, because the balance in the account was depleted more

rapidly when the highest expenditures were applied first. Moreover, they assert that customers were unable to easily avoid these overdraft fees even if they closely tracked their income and spending because TD Bank's monthly account statements and online account tools obfuscate the connection between a particular transaction and the overdraft fee that transaction has triggered. (*See* CAC, ECF No. 37 at ¶ 119.)

TD Bank has already been sued regarding its high-to-low posting overdraft practices. Several cases filed against TD Bank were settled as part of a multidistrict litigation proceeding known as *In re Checking Account Overdraft Litigation* in the United States District Court for the Southern District of Florida ("MDL No. 2036). (*See* Order of Final Approval of Settlement, Authorizing Service Awards, and Granting Application for Attorneys' Fees, Ex. C., ECF No. 37-3.) TD Bank settled the case for $62,000,000, an amount paid to customers whose accounts had been subject to overdraft fees as a result of the high-to-low posting practice from December 1, 2003 to August 15, 2010. (*Id.* at 8-9.) The plaintiffs allege that many of the overdraft fee practices complained of in the instant proceeding have continued unchanged despite the class action settlement in that prior case.

TD Bank was required to comply with Regulation E, 12 C.F.R. § 205.17, relating to obtaining affirmative opt-ins before it could assess its customers overdraft fees on ATM and non-recurring debit card transactions. According to the plaintiffs, TD Bank assessed certain customers overdraft fees for these types of transactions without obtaining the requisite affirmative opt-ins.

TD Bank charged its customers an extended overdraft balance charge, or "sustained overdraft fee," in the amount of $20 when a customer failed to bring an

overdrawn account back into a positive balance within ten business days. This sustained overdraft fee is a secondary fee that is applied to overdrawn accounts after the initial overdraft fees have been charged. The plaintiffs assert that the sustained overdraft fee is premised on a customer's account remaining in a negative balance for a specified period of time. They claim that the sustained overdraft fee is therefore an interest charge, and that the rate of interest vastly exceeds permissible limits as set forth in the National Bank Act, 12 U.S.C. §§ 85-86.

Each of the named plaintiffs opened checking accounts with TD Bank, and are, or were, customers of TD Bank. Shawn Balensiefen, Michael Goheen, Keith Irwin, Jan Kasmir, James King, Jr., Joanne McClain, and Michael McClain were also customers of Carolina First Bank or Mercantile Bank. TD Bank acquired Carolina First Bank and Mercantile Bank on September 30, 2010, and assumed the liabilities of those entities. The holding company for Carolina First Bank and Mercantile Bank, the South Financial Group, Inc., merged into TD Bank's parent holding company, TD Bank US Holding Company, on that same date. Carolina First Bank and Mercantile Bank had branches in Florida, North Carolina, and South Carolina until rebranding occurred in June 2011. The plaintiffs assert that TD Bank has confirmed that the contracts and practices of South Financial were substantively identical for Carolina First Bank and Mercantile Bank customers during the relevant time period.

## II. The Account Holder Agreements

The Personal Deposit Account Agreement ("PDAA") sets forth terms and conditions governing TD Bank's relationship with account holders. The PDAA contains an extensive section that explains the mechanics of how items are processed and

posted to customers' accounts, entitled, "PROCESSING ORDER FOR PAYMENT OF CHECKS AND OTHER ITEMS." (Ex. A, ECF No. 37-1 at 8-9.) The PDAA states, "Overdraft fees may be assessed on items presented for payment that bring your Account into a negative balance, as well as any subsequent transactions presented for payment while the Account has a negative balance." (*Id.* at 9.) The PDAA defines an overdraft as an "advance of funds greater than the amount that has become available in accordance with the Bank's Funds Availability Policy, made by us to you, at our sole discretion." (*Id.* at 10.) The PDAA indicates that overdrafts may include "advances to cover a check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account," and warns, "[w]e may demand immediate repayment of any overdraft and charge you an overdraft fee." (*Id.*) The PDAA states that "overdraft fees are not charged on 'pending' authorizations, although they reduce your available balance." (*Id.* at 9.) The PDAA further states, "You may overdraw your account by up to $5 per day without being charged a fee. If your negative available balance exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account . . . ." (*Id.* at 10.)

The plaintiffs allege that Carolina First Bank and Mercantile Bank followed overdraft policies nearly identical to those of TD Bank, including the use of "available balance" instead of actual balance to assess overdraft fees when there was sufficient money in the customer's account to cover the transaction in question. One version of the Carolina First Bank customer agreement entitled, "Terms and Conditions of Your Account" ("Carolina First Account Agreement"), governed various aspects of the state banks' relationship with account holders. The Carolina First Account Agreement states,

"This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us." (Ex. D, ECF No. 37-4 at 2.) The Carolina First Account Agreement is not as specific as the PDAA regarding item posting and overdraft procedures. However, the Carolina First Account Agreement includes the following language related to overdrafts and overdraft fees:

> The fact that we may honor withdrawal requests that overdraw the available account balance does not obligate us to do so later. You agree that we may charge fees for overdrafts and use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

(*Id.* (under "WITHDRAWALS")) In a section entitled "CHECK PROCESSING," the Carolina First Account Agreement states:

> We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

(*Id.* at 3.)

## STANDARD OF REVIEW

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556)). In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court should grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

As previously noted, to survive a Rule 12(b)(6) motion to dismiss a complaint must state "a *plausible* claim for relief." *Iqbal*, 556 U.S. at 679 (emphasis added). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Colon Health Centers of Am., LLC v.*

*Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010).

## DISCUSSION

### I. Federal Preemption

The first question to be answered by the Court is whether the National Bank Act of 1864 ("NBA"), 12 U.S.C. § 1 *et seq.*, and its attendant regulations preempt some or all of the plaintiffs' state law claims.[1] The CAC is pled in a manner that imprecisely consolidates a plethora of factual allegations into each theory of liability. For example, count II states, "Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein" (referencing the prior 53 pages of the CAC), then goes on to advance broad notions of "preserving the spirit – not merely the letter – of the bargain" and abuse of bargaining power. (CAC, ECF No. 37 at 59-60.) Count VI similarly incorporates all foregoing allegations in the CAC and states, "Certain of

---

[1] As an initial matter, the Court notes that Judge Cain's ruling on the preemption issue in *King v. Carolina First Bank*, 26 F.Supp.3d 510 (D.S.C. 2014), one of the cases consolidated in this multi-district litigation ("MDL"), does not control the outcome of the preemption question in this proceeding. *See Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005) (traditional constraints of law of the case do not apply "in the multidistrict litigation context, where there is a need for consistent treatment of consolidated cases"); *see also Astarte Shipping Co. v. Allied Steel & Export Svc.*, 767 F.2d 86, 87 (5th Cir. 1985) ("The transferee court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect."). Having identified *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012) and *In re Checking Acct. Overdraft Litigation* ("MDL 2036"), 694 F.Supp.2d 1302 (S.D. Fla. 2010) as the two most relevant decisions on whether claims similar to those asserted by the plaintiffs are preempted, Judge Cain concluded that MDL 2036 was persuasive, that "[the plaintiffs'] claims as alleged only incidentally affect TD Bank's deposit-taking powers," and that "TD Bank has not established that refraining from the challenged wrongful conduct would prevent or significantly interfere with its ability to engage in the business of banking." *King*, 26 F.Supp.3d at 517. However, the opinion in *King* did not explain why *Gutierrez*, a Ninth Circuit opinion that post-dates the Southern District of Florida MDL opinion by two years, was any less applicable or persuasive. In *King*, Judge Cain stated that "the court cannot conclude at this time that preemption applies as a matter of law," and that TD Bank's motion to dismiss based on preemption was denied "at this stage in the litigation." *Id.* (ECF No. 47 at 9.) This Court reads *Gutierrez* as both applicable and persuasive, and thus finds that counts II-VI are preempted to the extent detailed below.

Defendant's policies and/or practices described in this Complaint constitute unfair, unconscionable or deceptive trade or business practices. Defendant engages in such conduct as a general business practice, uniformly and as a matter of policy assessing and collecting overdraft fees where it is not legally permitted to do so." (CAC, ECF No. 37 at 65.) Yet count VI is purportedly asserted on behalf of the named plaintiffs and the "EFTA Class" only. (*Id.*; *see also* Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 27 ("[M]uch of the basis [for count VI] is TD's violation of EFTA, a claim which TD has not argued is preemptible.").) Meanwhile, counts IV and V are asserted on behalf of the named plaintiffs and "All Classes." (CAC, ECF No. 37 at 63-64.) From the facts as asserted, the Court has distilled three sources of putative liability at issue in counts II-VI to which the preemption analysis applies: 1. high-to-low posting order, 2. intentional honoring of debit transactions into overdraft without notice to customers, and 3. assessment of overdraft fees despite sufficient funds. Indeed, the plaintiffs have defined two of their five putative classes by way of these categories ("TD High-to-Low Class" and "TD Sufficient Funds Class"). (CAC, ECF No. 37 at 52-53.) The theory regarding intentional authorization of transactions into overdraft is not included in any of the putative class definitions, but is specifically incorporated into count I. (CAC, ECF No. 37 at 59.) There are other alleged sources of liability (EFTA and usury theories) raised within counts VII and VIII specifically. However, the Court will address the preemption issue with respect to the foregoing three categories as they constitute the gravamen of the plaintiffs' claims in counts II-VI. To the extent the EFTA and usury theories are incorporated into counts II-VI, preemption does not apply. The Court finds that counts II-VI of the CAC are preempted as they relate to high-to-low posting order and

intentionally honoring debit transactions into overdraft, but not preempted as they relate to assessment of overdraft fees when there are sufficient funds in the account.

Under the Supremacy Clause, Article VI, Clause II of the United States Constitution, state law that conflicts with federal law is of no effect and the applicable federal law controls. Federal law may supersede state law in three different ways: (1) when Congress expressly preempts state law by so stating in express terms, (2) where a scheme of federal regulation is sufficiently comprehensive to invoke a reasonable inference that Congress left no room within the field for supplementary state regulation, and (3) where federal and state law actually conflict. *See California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987). The third category, so called "conflict" preemption, may arise either because "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963), or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

In the context of the national banking industry, the question of conflict preemption is more refined. "Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (citing *Davis v. Elmira Savings Bank*, 161 U.S. 275, 290 (1896)). However, "when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the [s]tate's regulations must give way." *Id.* at 12 (citing *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 32-34 (1996) (federal law

permitting national banks to sell insurance in small towns preempted state statute prohibiting banks from selling most types of insurance); *Franklin Nat. Bank of Franklin Square v. New York*, 347 U.S. 373, 375-379 (1954) (local restrictions preempted because they burdened exercise of national banks' incidental power to advertise)). Thus, in defining the preemptive scope of statutes and regulations that grant power to national banks, the United States Supreme Court takes the view that "Congress would not want States to forbid, or to *impair significantly*, the exercise of a power that Congress explicitly granted." *Barnett Bank*, 517 U.S. at 33 (emphasis added). The history of national bank legislation "is one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Id.* at 32. Nevertheless, "[s]tate laws on the [ ] subjects [of contracts and torts] are not inconsistent with the deposit-taking powers of national banks to the extent consistent with the decision of the Supreme Court in [*Barnett Bank*]." 12 C.F.R. § 7.4007(c). The resultant question operative wherever state law conflicts with federal law regarding a national bank's authorized powers, is whether that state law "significantly interferes" with the bank's exercise of those powers. *See Barnett Bank*, 517 U.S. at 33.

For the sake of clarity, the Court specifically considered whether the fact that the preemption question in the instant case includes state common law causes of action, rather than state statutes or regulations only, should have any bearing on the preemption outcome. The Court finds no distinction between state common law and state statutory or regulatory law with respect to their proclivity to impair a bank from carrying out the business of banking, or lack thereof. As such, the Court considers the

14

applicable case law dealing with preemption in the context of state statutes (e.g. *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012)) to be of the same persuasive and precedential value as if it dealt with common law claims specifically. Where federal preemption applies, it bars both a direct assertion of state law by a state legislature, *see Barnett Bank*, 517 U.S. at 31, and the assertion of state law causes of action by private plaintiffs based on laws of general applicability, *see Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 738 & n.1, 747 (1996). *See also Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 341 (4th Cir. 2007) (reasoning that parties may not avoid the preemptive reach of federal law by recasting otherwise preempted claims as state law contract and tort claims). The operative question of "significant interference" is the same in both contexts. *See Hawthorne v. Umpqua Bank*, 2013 WL 5781608, at *11-13 (N.D. Cal. Oct. 25, 2013) (state statutory unfair trade practices, implied covenant of good faith, and unjust enrichment claims premised on bank's high-to-low posting order preempted); *Mann v. TD Bank, N.A.*, 2009 WL 3818128, at *4 (D.N.J. Nov. 12, 2009) (breach of contract, implied covenant of good faith, unconscionability, and state statutory unfair trade practices claims premised on bank's gift card fees preempted).

### A. Counts II-VI Challenge Actions by TD Bank That Constitute Federally Conferred Powers

The NBA authorizes national banks to receive deposits and perform "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24. The Office of the Comptroller of the Currency ("OCC") possesses regulatory oversight of national banks' exercise of their federally authorized powers, and Congress has delegated to the OCC authority to determine the scope of national banks' incidental

powers. *See* 12 U.S.C. § 93a; 12 C.F.R. § 7.4000.[2] The OCC has promulgated regulations recognizing that "national bank[s] may receive deposits and engage in any activity incidental to receiving deposits . . . subject to . . . limitations prescribed by the [OCC] and any other applicable Federal law." 12 C.F.R. § 7.4007(a). The power to receive deposits includes a national bank's authority to "charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). OCC regulations further provide, "The establishment of non-interest charges and fees, their amounts, and the *method of calculating them* are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b) (emphasis added).

National banks' powers to receive deposits and to establish non-interest charges and fees include the power to decide the order in which transactions will be posted, to honor overdrafts, and to assess overdraft fees. OCC Interp. Ltr. No. 1082, 2007 WL 5393636 at *3 (May 17, 2007); OCC Interp. Ltr. No. 997, 2002 WL 32872368, at *2 (Apr. 15, 2002); OCC Interp. Ltr. No. 916, 2001 WL 1285359, at *2 (May 22, 2001). When considering the question of transaction posting order in the context of checks, the OCC stated "[a] bank's authorization to establish fees pursuant to 12 C.F.R. 7.4002(a) necessarily includes the authorization to decide how they are computed," and "posting order is one component that affects the Bank's NSF fee-setting computation." OCC

---

[2] OCC regulations carry the same preemptive weight as Congressional enactments. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."). "Congress has expressly recognized the OCC's power to preempt particular state laws by issuing opinion letters and interpretive rulings, subject to certain notice-and-comment procedures." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005). "It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 403 (1987). Moreover, "[t]he [OCC] is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to [its] deliberative conclusions as to the meaning of these laws." *Id.* at 403-04.

Interp. Ltr. No. 916, 2001 WL 1285359, at *2 (May 22, 2001). When considering the question of honoring items for which there are insufficient funds in depositors' accounts and recovering overdraft fees for doing the same, the OCC concluded that national banks are "authorized under 12 U.S.C. § 24(Seventh) and 12 C.F.R. § 7.4007(a), to honor overdrafts and recover overdraft amounts from depositors' accounts," and "authorized by Section 24(Seventh) and 12 C.F.R. § 7.4002 to charge and recover fees for processing overdrafts." OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *4 (May 17, 2007).

The challenges raised by the plaintiffs in counts II-VI of the CAC directly implicate TD Bank's practices with regard to the order of posting debit transactions, honoring transactions that will drive depositors' accounts into overdraft, and charging fees in the event of such overdraft. By way of their claims sounding in the implied covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and alleged violation of various state statutes prohibiting unfair and deceptive trade practices, the plaintiffs have mounted diverse attacks on the same corpus of activities by TD Bank. As such, counts II-VI all relate to TD Bank's exercise of federally-conferred incidental powers.

### B. The Common Law and Statutory Claims in Counts II-VI Significantly Interfere With TD Bank's Incidental Powers as They Relate to High-to Low Posting and Intentionally Honoring Transactions into Overdraft

The question of whether state law, be it in the form of common law causes of action or statutory claims, *significantly interferes* with a national bank's exercise of its incidental powers necessarily turns on the *degree* to which that state law constrains the bank's ability to carry on the business of banking. Where the state and federal law are

not in irreconcilable conflict, and the degree of interference imposed by state law is merely incidental, preemption does not apply. Where, however, the degree of interference is severe, the state law, in whatever form, must yield. *See Watters*, 550 U.S. at 12.

The plaintiffs argue that TD Bank bears a heavy burden of proof in order to establish preemption and that there is a presumption against Congressional preemption of state law. (*See* Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 22-23 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (Medical Device Act preemption).) However, "[t]he doctrine of federal preemption, which regulates the interplay between federal and state laws when they conflict or appear to conflict, tilts in favor of the federal government in the arena of national banking." *Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012). Moreover, Fourth Circuit Court of Appeals' precedent is clear "that the presumption against preemption, which governs fields traditionally regulated by the states, *does not apply to the NBA*." *Id.* at 222-23 (emphasis added) (citing *Nat'l. City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330-31 (4th Cir. 2006) (holding the presumption against preemption does not apply to state regulation of federally chartered banks)).

The only federal appellate court to have addressed NBA preemption in the context of overdraft fees is *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012). The question considered by the Ninth Circuit Court of Appeals was "the extent to which overdraft fees imposed by a national bank are subject to state regulation." *Id.* at 715-16. In *Gutierrez* a group of consumers sued Wells Fargo Bank under California's Unfair Competition Law ("UCL") for engaging in unfair business practices by imposing

overdraft fees based on high-to-low posting order of deposit-account transactions, and for engaging in fraudulent business practices by misleading clients regarding the bank's posting order procedures. *Id.* at 716. The case went to trial, and the district court found that Wells Fargo's high-to-low posting policy violated the UCL because it was both unfair, in that the bank's motive was to maximize the number of overdrafts and associated fees, and fraudulent, in that the bank had affirmatively reinforced the expectation in its customers that transactions were posted in chronological sequence and obfuscated its true high-to-low posting practices. The district court issued a permanent injunction against high-to-low posting and ordered $203 million in restitution. *Id.* The Ninth Circuit held that federal law preempted state regulation of debit-account transaction posting order as well as any obligation on the part of the bank to make affirmative disclosures to account holders regarding posting procedures, but that federal law *did not* preempt state law with respect to fraudulent or misleading misrepresentations about posting practices. *Id.*

The *Gutierrez* court stated that the determination of whether the NBA and its attendant regulations preempt the applicable state law "turns on whether state law can dictate [the bank's] choice of posting *method*," and held "that it cannot." *Id.* at 723 (emphasis added). The Ninth Circuit reasoned that "the deposit and withdrawal of funds 'are services provided by banks since the days of their creation. Indeed, such activities define the business of banking.'" *Id.* (citing *Bank of Am. v. City and Cnty. of San Francisco*, 309 F.3d 551, 563 (9th Cir. 2002). Moreover, both the business of banking and the power to receive deposits "necessarily include the power to post transactions— i.e., tally deposits and withdrawals—to *determine the balance in customer's account*."

*Id.* (citing 12 U.S.C. § 24 (Seventh)) (emphasis added). The Ninth Circuit noted, "the OCC has determined that '[t]he establishment of non-interest charges and fees, their amounts, and *the method of calculating them* are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles.'" *Id.* at 724 (quoting 12 C.F.R. § 7.4002(b)(2)) (emphasis in original). Furthermore, the court relied on the OCC's determination that "'a bank's authorization to establish fees pursuant to 12 C.F.R. 7.4002(a) necessarily includes the authorization to decide *how they are computed.*'" *Id.* (quoting OCC Interp. Ltr. No. 916, 2001 WL 1285359, at *2 (May 22, 2001) (emphasis added). Additionally, "the OCC has determined that a national bank 'may establish a given order of posting as a pricing decision pursuant to section 24 (seventh) and section 7.4002.'" *Id.* (quoting OCC Interp. Ltr. No. 916). "In sum," the court concluded, "federal law authorizes national banks to establish a posting order as part and parcel of setting fees, which is a pricing decision." *Id.*

The *Gutierrez* court reversed the district court's holding that the bank's choice of posting order was not a pricing decision because, in the district court's view, the bank did not follow the four factor decision making process for safe and sound banking principles required by the OCC in 12 C.F.R. § 7.4002(b). *Id.* On this point, the Ninth Circuit stated, "[w]hether Wells Fargo's internal decision making processes regarding posting orders complied with the 'safe and sound banking principles' under § 7.4002(b)(2) is an inquiry that falls squarely within the OCC's supervisory powers," and "'is within the exclusive purview of the OCC.'" *Id.* at 724-25 (quoting *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 556 (9th Cir. 2010)). Finally, the *Gutierrez* court

held that, "a 'good faith' limitation applied through [the UCL] is preempted when applied in a manner that prevents or significantly interferes with a national bank's federally authorized power to choose a posting order." *Id.* at 725 (citing *Barnett Bank*, 517 U.S. at 37). "The federal court cannot mandate the order in which [a national bank] posts its transactions . . . . The district court premised both [the permanent injunction and the restitution award] on only a violation of the 'unfair' business practice prong of the [UCL] tethered to the 'good faith' requirement of [the California Commercial Code]." *Id.*

In the case *sub judice*, the Court holds that a "good faith" or "fairness" limitation on TD Bank's power to choose a debit-account transaction posting order and elect to honor transactions into overdraft, whether applied through the implied covenant of good faith and fair dealing (count II), the doctrine of unconscionability (count III), a common law conversion claim (count IV), the doctrine of unjust enrichment (count V), or state consumer protection statutes (count VI) is preempted where such limitation significantly interferes with the Bank's federally authorized incidental powers.[3] The Court further holds that the state law claims itemized above, specifically *as pled* in counts II-VI of the CAC, constitute precisely such a limitation on transaction posting order and discretionary authorization of debit transactions, significantly interfere with TD Bank's exercise of its incidental powers, and are therefore preempted.

The Court emphasizes that this preemption analysis is necessarily an "as applied" inquiry into the soundness of the state law claims asserted. In other words, it is of course true that claims by a consumer against a national bank sounding in state contract and tort law in the abstract are not preempted, so long as their impact on the

---

[3] The plaintiffs' claims in counts II-VI, reduced to their essence, are that TD Bank acted unfairly and in bad faith in choosing a high-to-low posting order and routinely honoring transactions into overdraft for the sole purpose of increasing overdraft fees.

21

bank's exercise of its powers is only *incidental*. *See* 12 C.F.R. § 7.4007(c); *see also Watters* (550 U.S. at 11) (holding that national banks are subject to such laws "*to the extent* [they] do not conflict with the letter or general purpose of the NBA" (emphasis added)). For example, breach of contract claims *not* premised on unfairness or bad faith theories but on genuine disputes about the terms of the contract and the parties' compliance therewith, fall squarely within that category of state laws that are not inconsistent with the deposit-taking powers of national banks because they only *incidentally affect* the exercise of those deposit-taking powers. *See id.* For this reason, count I of the CAC, alleging breach of contractual terms is not subject to preemption.[4] For the same reason, counts II-VI as they relate to claims that TD Bank assessed overdraft fees when there were sufficient funds in the account are *not* preempted, even though premised on unfairness and bad faith theories, because, as will be explained more fully below, the impact of those claims on federally authorized powers is *incidental* only. However, the *degree* of impact on TD Bank's deposit-taking powers imposed by the claims in counts II-VI regarding posting order and honoring transactions into overdraft cannot be described as *incidental*. Indeed, the plaintiffs' effort to differentiate their claims in counts II-VI based on the nature of the relief sought from the challenge to high-to-low posting practices at issue in *Gutierrez* is wholly unpersuasive.

The plaintiffs argue that the Ninth Circuit was influenced by the distinctive nature of the relief sought, namely a permanent injunction, and quote *Gutierrez* when it notes that "as a practical matter, the remedy ordered by the district court boils down to a *complete prohibition* on the high-to-low sequencing method." *Gutierrez*, 704 F.3d at 723

---

[4] Nor has TD Bank argued that preemption applies to count I.

(emphasis added).[5] This argument conveniently avoids the fact that *Gutierrez* vacated both the injunctive relief and the monetary relief awarded by the district court. *Id.* at 730 ("The restitution order, which is predicated on liability for Wells Fargo's choice of posting method and thus also preempted, is vacated as well."). Realistically, a finding, for example, that TD Bank's high-to-low posting method violated the implied covenant of good faith and fair dealing would result in a de facto *complete prohibition* on that practice, regardless of the specific remedy requested in the CAC. Furthermore, the remedies requested by the plaintiffs – including *inter alia* a declaratory judgment that TD Bank's overdraft fee policies and practices are unlawful, restitution of all overdraft fees at issue, disgorgement of ill-gotten gains, actual, punitive and exemplary damages (ECF No. 37 at 71) – amount to the symbolic and functional equivalent of an injunction on the challenged practices, as they would literally reverse the assessment of the overdrafts in their entirety and put TD Bank on notice that continuation of the practices was illegal.[6] More to the point, *Gutierrez* stands for the proposition that where the plaintiffs' claims touch upon functions central to the business of banking (e.g. honoring debit-account transactions, determining account balance, and pricing decisions) and seek to substitute state law as a measure of the propriety of the bank's actions within those central

---

[5] The Court is not persuaded that "significant interference" is synonymous with complete prohibition of a national bank's enumerated or incidental power. The Sixth Circuit Court of Appeals has noted that the "significant interference" standard should not be conflated with prohibition of a practice. "We have found that the level of 'interference' that gives rise to preemption under the NBA is not very high." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009) (citing *Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 409 (6th Cir. 2001) (rejecting a party's attempt to redefine "significantly interfere" as "effectively thwart" because it would render redundant the two prongs of the *Barnett Bank* standard, namely that states may regulate national banks only where doing so does not "prevent or significantly interfere with" banks' exercise of their powers)).

[6] It is also not lost on the Court that the plaintiffs state that injunctive relief is appropriate in both the "Class Allegations" section and count VI of the CAC, though not in the "Prayer for Relief" section. (ECF No. 37 at 58, 67, 71.)

23

functions, the interference posed by the state law is deemed *significant* and therefore preempted. *See id.* at 723-75. Per the OCC:

> The process by which a bank honors overdraft items is typically part of the Bank's administration of a depositor's account. Creating and recovering overdrafts have long been recognized as elements of the *discretionary deposit account services that banks provide.* Where a customer creates debits on his or her account for amounts in excess of the funds available in that account, a bank *may elect to honor the overdraft and then recover the overdraft amount as part of its posting of items and clearing of the depositor's account.* These activities are part of or incidental to the business of receiving deposits.

OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (May 17, 2007) (internal citations omitted) (emphasis added).

In the same way that the challenge to the posting practices at issue in *Gutierrez* was an improper encroachment of state law on federal banking regulations because it sought to dictate a national bank's choice of posting *method*, counts II-VI seek to dictate TD Bank's *method* of deciding when to honor debits that will drive deposit accounts into overdraft and *method* of posting transactions for purposes of balance calculation. This is why counts II-VI are preempted in these categories, because they amount to de facto state regulation of discretionary functions specifically reserved to the sound judgment of a national bank. *See Gutierrez*, 704 F.3d at 723-25. Though they are couched in slightly different terms, and request slightly different remedies, these categories of the plaintiffs' claims offend federal preemption principles for the same essential reasons that the "unfairness" prong of California's UCL did. *Gutierrez* stands for the proposition that it is not the purview of private litigants to "dictate [a national bank's] choice of posting method" or invalidate a national bank's exercise of its discretionary powers with respect to the non-interest charges and fees it has established. *See id.* at 723-25. Moreover, the

question of whether TD Bank complied with safe and sound banking principles when establishing its policies regarding honoring overdrafts and posting order is an inquiry "within the exclusive purview of the OCC." *Id.* at 725.

*Gutierrez* is squarely on point regarding the high-to-low posting challenge raised by the plaintiffs in this proceeding and it counsels inexorably toward preemption of that challenge. "Designation of a posting method falls within the type of overarching federal banking regulatory power that is 'not normally limited by, but rather ordinarily pre-empts[s], contrary state law." *Id.* at 723 (citing *Watters*, 550 U.S. at 12). Though the question of intentionally honoring transactions into overdraft was not specifically raised in *Gutierrez*, the reasoning of the Ninth Circuit is clear: where state law claims operate to limit a national bank's exercise of its properly appointed discretion, the state law poses significant interference with the bank's powers and is preempted. *Id.* at 724-725 (citing *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197-98 (11th Cir. 2011 (holding that a state statute which disallowed banks from charging non-customers for cashing checks, and an unjust enrichment claim relying on the same facts, were both preempted because they significantly reduced the bank's discretion in deciding how to charge fees)); *see also Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283-284 (holding that garnishors' conversion claim pursuant to state law was preempted because it significantly interfered with the bank's discretion to exact its own processing fee prior to relinquishing the garnishee's funds). As such, this Court could not mandate, on fairness and good faith grounds, the manner in which TD Bank exercises its discretion to honor overdrafts any more than it could "mandate the order in which [TD Bank] posts its transactions." *Id.* Yet, this is exactly what the plaintiffs ask the Court to

do in counts II-VI with respect to their theory regarding the wrongfulness of intentionally authorizing transactions into overdraft.

To the extent that the plaintiffs challenge TD Bank's election to honor overdrafts specifically because they believe TD Bank should provide point-of-sale *notice* and the contemporaneous option to cancel the transaction, this portion of the challenge is also preempted. (*See* CAC, ECF No. 37 at ¶¶ 1, 5, 134, 143-44, 197.) An imposition of the plaintiffs' preferred method of notice via state law claims unquestionably poses a significant interference with TD Bank's discretionary exercise of its incidental powers because it amounts to an unqualified mandate on the way TD Bank can elect to honor overdrafts, namely only after receiving affirmative consumer opt-in for every debit card transaction that will potentially drive an account into the negative. In this way, the question of point-of-sale notice collapses back into the Bank's discretionary methodology for honoring overdrafts itself. OCC regulations provide that a "national bank may exercise its deposit-taking powers without regard to state law limitations concerning . . . *disclosure requirements*." 12 C.F.R. § 7.4007(b)(3) (emphasis added). Thus, on this notice slice of the plaintiffs' intentional honoring of overdrafts theory, it appears that their claim is even expressly preempted by section 7.4007(b)(3). *See Montgomery v. Bank of America Corp.*, 515 F. Supp. 2d 1106, 1114 (C.D. Cal. 2007) (holding plaintiffs' claim that bank's contracts were "unconscionable because they do not accurately disclose when the [overdraft] fees are assessed" were expressly preempted); *see also Gutierrez*, 704 F.3d at 726 (reversing the lower court's imposition of disclosure requirements regarding high-to-low posting, and imposition of liability for the same, because "[t]he requirement to make particular disclosures falls squarely

26

within the purview of federal banking regulation and is expressly preempted"); *Robinson v. Bank of Am., NA*, 525 F. App'x 580, 582 (9th Cir. 2013) (finding preemption under 12 C.F.R. § 7.4007 because the plaintiff was "attempting to use [state] law to impose a specific disclosure obligation on [the bank] whenever it discloses any fee"). Moreover, OCC regulations provide national banks, not consumers, the authority to electively honor overdrafts. *See* OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (May 17, 2007); 12 U.S.C. § 24(Seventh); 12 C.F. R. §§ 7.4002, 7.4007(a). This is to say nothing of the havoc that such a notice and right-to-cancel requirement could wreak upon the universe of debit card transactions, precisely because deposit account transactions are often processed in batches after some delay while they are pending presentation for payment, not instantaneously as the plaintiffs' arguments seem to presuppose. (*See* CAC, ECF No. 37 at ¶¶ 126-28; Ex. A, ECF No. 37-1 at 8-9.) The Bank cannot be expected to exercise foresight about potential deposits and credits occurring later the same day, which could render moot the scenario of any particular debit card transaction driving the account into overdraft. One can certainly raise questions, as the plaintiffs have, about the objective equities of an information imbalance between the Bank and its customers at the moment the debit card is being swiped at a coffee shop and the account already reflects a negative available balance, but to limit on fairness and good faith grounds what the Bank has otherwise been specifically empowered to do is, in the Court's opinion, a significant interference with its federally conferred power. If point-of-sale notice and right-to-cancel requirements are to be imposed on national banks, they must come by way of Congressional or OCC action limiting or qualifying previously

conferred power, not by way of private litigants claiming that the current, otherwise lawful practices are unfair.

Plaintiffs' argue that overdraft fee-related litigation has generated numerous decisions at the motion to dismiss stage confirming that state law claims of the type they have raised here are not preempted. (Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 24.) But the decisions they cite in support of this assertion either do not address *Gutierrez* at all, or do not adequately explain their rejection of its reasoning. *See King*, 26 F. Supp. 3d at 517 (stating only that MDL 2036 is persuasive and failing to explain why *Gutierrez* does not apply); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1020-26 (E.D. Ark. 2015) (assuming without deciding that federal preemption principles applied to a state-chartered bank via the Federal Deposit Insurance Act ("FDIA"), and finding persuasive the reliance by other district courts on MDL 2036); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 47-48 (E.D.N.Y. 2014) (stating merely that the plaintiffs "do not seek a blanket prohibition on high-to-low posting" and reverting to reliance on MDL 2036); *Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 680 (D.N.J. 2012) (predating *Gutierrez* and relying solely on MDL 2036); *In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d 1312, 1316-21 (S.D. Fla. 2011) (predating *Gutierrez* and denying a motion to reconsider the prior ruling on preemption in MDL 2036); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313-14 (S.D. Fla. 2010) (predating *Gutierrez* and relying on portions of the district court opinion that *Gutierrez* later reversed); *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1367 (N.D. Ga. 2008) (predating *Gutierrez* and making the conclusory statement without further explanation that the plaintiffs' "exercise of their rights" under state contract and

tort law only incidentally affected the national bank's deposit-taking powers); *Old National Bank v. Kelly*, 31 N.E.3d 522, 528-31 (In. Ct. App. 2015) (relying on MDL 2036 in making a distinction between an attack upon the right to charge overdraft fees writ large and an allegation of unlawful manipulation of an overdraft program to find only incidental impact); *Higgins v. Pinnacle Fin. Partners, Inc.*, Case No. 11-C4858, slip op. at 1-2 (Tenn. 5th Cir. Ct. May 16, 2012) (predating *Gutierrez*, conflating the motion to dismiss standard with the applicability of preemption, and holding that preemption did not apply because "[p]laintiff's state law claims . . . do not involve state statutes and, therefore, do not impose any 'state law limitation'").[7]

In truth, the plaintiff's arguments center around the explication of preemption doctrine as it applies to overdraft fee policies offered by MDL 2036. In the *In re Checking Account Overdraft* MDL, the "common nucleus of specific facts pled assert[ed] a common practice by [defendant banks], to enter charges debiting Plaintiffs' accounts from the 'largest to the smallest' thus maximizing the overdraft fee revenue for themselves." *In re Checking Account Overdraft Litig.*, 7694 F. Supp. 2d at 1307. The

---

[7] In full candor, and with the utmost respect to the courts that have considered this preemption question post-*Gutierrez*, the Court perceives something of an echo-chamber effect in the manner with which MDL 2036 has continued to be quoted and relied upon, even where directly inconsistent with *Gutierrez* on the ability of state law to prevent national banks from employing high-to-low posting methods. *See Hanjy*, 94 F. Supp. 3d at 1023 ("Other courts have followed the Florida MDL court in declining, at the motion to dismiss stage, to find preemption of state law claims regarding banks' debit posting practices." (citing *In re HSBC Bank*, *King*, and *Hughes*)); *In re HSBC Bank*, 1 F. Supp. 3d at 48 (quoting MDL 2036 in finding that "'[a]t this stage, these allegations do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted'"); *King*, 26 F.Supp.3d at 517 ("Construing the Amended Complaint in the light most favorable to Plaintiffs, the court finds the court's decision in MDL 2036 to be persuasive."); *Hughes*, 856 F. Supp. 2d at 680 ("This Court agrees with the MDL Court's opinion and adopts its reasoning in full."). This Court believes that *Gutierrez* explicated a more nuanced understanding of how state law is preempted in the context of overdraft policy and the NBA, and therefore adopts the more recent reasoning in *Gutierrez* as persuasive. Additionally, the Court's understanding of federal preemption is that it either applies or does not apply, because the state law claims either impermissibly conflict with federal law or they do not. Therefore, the Court finds the often repeated language that various courts decline to find federal preemption "at this stage of the proceedings" confusing and unhelpful to the analysis. *See, e.g.*, *King*, 26 F.Supp.3d at 517; *In re HSBC Bank*, 1 F. Supp. 3d at 48.

plaintiffs also asserted claims based on a number of other alleged agreements, policies, and practices "rely[ing] upon the legal theories of breach of contract and breach of a covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and violation of the consumer protection statues of various states." *Id.* When analyzing the preemption question specifically in the context of overdraft fees, the MDL court relied on the district court's holding in *Gutierrez*, to distinguish between situations when a "'bank's fundamental right to employ an overdraft fee at all'" was challenged, in which case preemption would apply, and when a bank "'has been manipulating – indeed downright altering – a customers' transaction records so as to maximize overdraft penalties imposed on customers,'" in which case preemption would not apply. *See id.* at 1312 (quoting *Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL 4279550, at *7 (N.D. Cal. Sep. 11, 2008)). The MDL court also relied on *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008) for the proposition that a lawsuit primarily alleging a national bank broke the law by routinely imposing overdraft fees for transactions not resulting in an actual overdraft was not of a "regulatory nature" that would subject it to federal preemption. *Id.* (quoting *White*, 563 F. Supp. at 1367).

The MDL court then analyzed the overdraft issue in the context of OCC Interp. Ltr. No. 997, 2002 WL 32872368, at *2 (Apr. 15, 2002), and opined that the letter "does not authorize debit card postings in a high to low order to increase fees, it merely states that doing so does not *violate* the OCC's requirement that banks set fees using sound banking judgment." *In re Checking Account Overdraft Litig.*, 7694 F. Supp. 2d at 1313. The MDL court reasoned, "A bank could follow both the requirements of sound banking judgment outlined in [12 C.F.R. § 7.4007] and good faith; these principles are not in

irreconcilable conflict." *Id.* The court further stated that the contract and tort claims at issue "[were] state laws of general application that [did] not vitiate the purpose of the NBA, and banks could comply with both the NBA, OCC regulations and state laws if they refrained from engaging in the criticized posting procedures." *Id.* Finally, the MDL court found that:

> The Plaintiffs alleged claims are *not* that banks lack the right to charge overdraft fees as part of their deposit-taking powers. Instead, Plaintiffs attack the allegedly unlawful manner in which the banks operate their overdraft programs to maximize fees at the expense of consumers. At this stage, these allegations do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted.

*Id.* (emphasis in original).

With due respect to the MDL court, this Court does not construe conflict preemption in the context of overdraft fee policy quite as narrowly, and finds the reasoning in *Gutierrez* more persuasive. First, the MDL court seems to conflate the "significant interference" standard, *see Barnett Bank*, 517 U.S. at 33, with an "irreconcilable conflict" between state and federal law such that compliance with both regimes amounts to a "physical impossibility," *see Rice v. Norman Williams Co.*, 458 U.S. 654, 659; *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963). Undoubtedly, there are scenarios in which particular state laws do not "irreconcilably conflict" with a national bank's federally authorized powers, yet significantly interfere with the exercise thereof. Where that is true, federal preemption applies. In other words, conflict preemption in the NBA context is not limited to those scenarios where state law requires a bank to act in a way prohibited by federal law, or vice versa. The mere fact that a national bank *can* act consistently with both state and federal law in a particular area, does not preclude the possibility that the state law may

31

"stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). This is why the standard set forth in *Barnett Bank* describes the category of state law that permissibly regulates national banks by way of two prongs, namely, when such state law does not "[1] prevent or [2] significantly interfere with the national bank's exercise of its powers." *See* 517 U.S. at 33.

Second, the MDL court's observation that the plaintiffs in MDL 2036 were not claiming the national bank defendants lacked the right to charge them overdraft fees *in general*, appears to be a red herring. After implying that such a claim is the scenario where preemption *would* apply, the MDL court distinguished the claims actually raised by saying they challenged only the "unlawful manner" in which the banks operated their overdraft programs. However, this Court does not find that distinction to be of much help in deciding whether the state law claims raised here run afoul of the standard articulated in *Barnett Bank*. Of course, the preemption issue would be much easier to decide if the plaintiffs in the instant case simply averred "state law prevents TD Bank from charging us overdraft fees at all." But the fact that they did not do so does not make the "significant interference" standard any less applicable or any less protective of a national bank's exercise of its lawfully conferred discretion.

The plaintiffs further argue that "'sound banking judgment' incorporates the concept of good faith, and an application of the contractual principle of good faith would not impinge the freedom of national banks to charge fees." (Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 29.) In so doing, the plaintiffs implicitly challenge TD Bank's overdraft fee policies on grounds that they exhibit a failure to exercise "sound banking

judgment." It may very well be true that concepts of good faith can become relevant to the question of whether a bank has exercised sound banking judgment. Ultimately though, the inclusion of good faith considerations does not change the fact that the sound banking judgment inquiry "is within the exclusive purview of the OCC." *Gutierrez*, 704 F.3d at 724-25; *see Martinez v. Wells Fargo Home Mortg. Svcs., Inc.*, 598 F.3d 549, 556 n.8 (9th Cir. 2010). In the Court's view, to superimpose good faith and fairness tests upon otherwise permissible actions by TD Bank is to subject the Bank to a *degree* of state law regulation that neither the NBA nor the OCC regulations envision.

Though the plaintiffs reference it only cursorily in their response in opposition to the motion to dismiss, the *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litigation*, 1 F. Supp. 3d, 34 (E.D.N.Y. 2014) case is probably the strongest persuasive authority that they cite in favor of no preemption. This is because *In re HSBC Bank* analyzed underlying facts and state law claims substantially similar to those raised in the instant case. It is also the only federal decision cited by the plaintiffs to support a finding of no preemption that both post-dates *Gutierrez* and is not readily distinguishable on other grounds (excluding the *King* case which is part of the instant proceeding).[8] The *In re HSBC Bank* court chose to follow MDL 2036 on many of its commonly cited points, including: (1) the claims in question invoked laws of general applicability and "'banks could comply with both the NBA, OCC regulations[,] and state laws if they refrained from engaging in the criticized posting procedures,'" and (2) "'[a] desire to limit a bank's authority to charge a fee is not synonymous with a desire to hold a bank liable for the

---

[8] In *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012 (E.D. Ark. 2015), the defendant bank asserted federal preemption of state law claims even though it was a state-chartered bank. *Id.* at 1021. The *Hanjy* court assumed, without deciding, that the state bank enjoyed the same preemption rights by way of the FDIA, 12 U.S.C. § 1831a(j)(1), that national banks enjoy under the NBA and attendant regulations. *Id.* at 1022. The *Hanjy* case is readily distinguishable on this point alone.

bad-faith manner in which an account is reorganized to justify a larger number of overdraft charges.'" *Id.* at 46, 47 (quoting *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1313, 797 F. Supp. 2d at 1322). This Court was able to glean only minimal guidance from *In re HSBC Bank* on why that court chose to largely reject the reasoning in *Gutierrez* and rely on MDL 2036. Indeed, the *In re HSBC Bank* court partially adopts the preemption holding in *Gutierrez* when it states, "[T]he [c]ourt finds that inasmuch as the Plaintiffs seek to impose liability on HSBC for the bank's failure to sufficiently disclose its posting method, that argument is preempted." *Id.* at 48 (citing *Gutierrez*, 704 F.3d at 726). However, with regard to the high-to-low posting theory, the court merely stated, "unlike in *Gutierrez*, the Plaintiffs do not seek a blanket prohibition on high-to-low posting. Instead the Plaintiffs seek recovery based on HSBC's alleged manipulation of their debit and checking charges." *Id.* at 47. With risk of being repetitive, the Court does not believe this is an adequate way to distinguish *Gutierrez*. The plaintiffs in *Gutierrez* similarly sought recovery based on Wells Fargo's "alleged manipulation of their debit and checking charges," and the Ninth Circuit said that their challenge on unfairness/bad faith grounds was preempted. Respectfully, this Court does not find *In re HSBC Bank* sufficiently persuasive to counteract the sound reasoning of *Gutierrez*.

At bottom, by way of their high-to-low posting theory and intentional honoring of transactions into overdraft theory the plaintiffs have challenged the *method* by which TD Bank calculates and imposes overdraft fees. These challenges limit the Bank's exercise of discretionary functions granted to it by the NBA and OCC regulations in a significant way. As such, the Court holds that counts II-VI are preempted to the extent they incorporate these two theories of liability.

**C. The Claims in Counts II-VI Only Incidentally Interfere With TD Bank's Incidental Powers as They Relate to Assessing Overdrafts When There Are Sufficient Funds in the Account**

Bearing all of the foregoing discussion in mind, the Court is equally persuaded that the plaintiffs' claims in counts II-VI are *not* preempted to the extent they incorporate the "sufficient funds" theory of liability. This theory claims that TD Bank "systematically assesses and collects overdraft fees for transactions that do not actually overdraw the account, as there is actually enough money in the account to cover the transaction." (CAC, ECF No. 37 at 28.) The plaintiffs highlight the distinction between "actual balance," which they define as "the actual amount of funds held in a demand account" (including checking accounts), and "available balance," which they define as "the actual balance minus 'pending' credits and debit transactions, which may not settle or be paid for several days (and may not settle for the authorized amount or at all)." (*Id.* at 29.) Specifically, the plaintiffs claim that TD Bank has breached the express terms of the PDAA (count I) by "assess[ing] overdraft fees even when [the Bank] does not 'advance funds' and the account has a positive balance even though the 'available balance' is negative." (*Id.* at 32.) The plaintiffs base additional claims on this theory in counts II-VI. They argue that even if the PDAA permits TD Bank to engage in this practice, it is otherwise unlawful as a breach of the implied covenant of good faith and fair dealing (count II), a business practice that renders the contract unconscionable (count III), a wrongful taking of the plaintiffs' money amounting to conversion (count IV), an unjust enrichment of the Bank (count V), and a violation of various state statutes prohibiting unfair and deceptive business practices (count VI).

The question before the Court is, again, whether these state law claims prevent or significantly interfere with TD Bank's exercise of its federally conferred banking powers. The answer, the Court finds, is that the claims in counts II-VI, as they relate to the sufficient funds theory, constitute an incidental impairment of the Bank's powers only. The preemption analysis on this theory of liability is relatively straightforward. The plaintiffs have essentially claimed that the Bank assesses overdraft fees when no overdraft actually occurs, at least not as conceived by the reasonable consumer. To the extent this is true, it would not "prevent" TD Bank from exercising its deposit-taking powers, or any of the attendant discretion that comes along with those powers, to require that the Bank refrain[9] from assessing overdraft fees when the relevant account contains enough money to cover the transaction in question. *See Barnett Bank*, 517 U.S. at 33. Neither would it "significantly interfere" with the Bank's exercise of those powers and that discretion, because there is no indication that requiring it to refrain from such a practice would stand as an obstacle to the accomplishment of the full purposes and objectives of Congress or the OCC. *See id.*; *Hines*, 312 U.S. at 67. The context raised by the sufficient funds theory of liability implicates a limited subset of the overdraft fees that TD Bank is assessing, and a subset that potentially raises the kind of fairness and good faith concerns pled in counts II-VI.

The *Gutierrez* case, upon which the Court has relied for other portions of the preemption analysis, is silent as to the sufficient funds theory. District courts that have considered this question appear to be unanimous in finding that state law claims based

---

[9] The Court is cognizant of the fact that the plaintiffs insist they are not trying to tell the Bank how it can and cannot act, but only asking that past and present harms against them be remedied. As previously noted, the Court considers the state law claims to be the functional equivalent of an injunction for purposes of a "significant interference" analysis pursuant to *Barnett Bank*.

on the sufficient funds theory are not preempted. *See, e.g., In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d at 1312-14; *White*, 563 F. Supp. 2d at 1367-68. The OCC has not answered the specific question whether the use of available balance, vice actual balance, in assessing overdraft fees is permissible. The closest OCC commentary on this point is language from OCC Interp. Ltr. No. 1082, 2007 WL 5393636 (May 17, 2007) already quoted above: "Where a customer creates debits on his or her account for amounts *in excess of the funds available in that account*, a bank may elect to honor the overdraft and then recover the overdraft amount as part of its posting of items and clearing of the depositor's account." *Id.* at *2 (emphasis added). However, OCC Interp. Ltr. No. 1082 was about national banks' authority to honor transactions into overdraft and recover overdraft fees generally, not directly on point to the sufficient funds theory. As such, the use of the phrase "in excess of the funds available" should not be read as specifically condoning the use of "available balance," as that term of art has been defined in this case, to invoke overdraft fees.

The Court wants to be careful, however, not to overstate the strength of the plaintiffs' position on this aspect of the preemption analysis. As pled in the CAC, the Court believes two potential scenarios are implicated by the sufficient funds theory. One scenario is where an overdraft fee is assessed because: (1) the customer has pending debits that create a negative *available* balance, (2) TD Bank pays on a transaction against that negative available balance, and (3) the pending debits later settle for the amount held at the time the transaction triggering the overdraft fee was paid. The second scenario is where an overdraft fee is assessed because: (1) pending debits create a negative *available* balance, (2) TD Bank pays on a transaction against that

negative available balance, and (3) the debits that were pending at the time the transaction triggered the overdraft fee either *do not settle* for the amount held or *do not settle* at all. (*See* CAC, ECF No. 37 at 29.) The Court understands the plaintiffs to assert that both of these scenarios amount to unfair, unlawful, and wrongful assessment of overdraft fees because at the precise moment the triggering transaction is paid by the Bank the money implicated in the pending debits has not yet physically[10] left the account. (*See id.* at 28 ("there is actually enough money in the account to cover the transaction"), 30 ("By using the 'available balance' instead of the amount of actual money in the account . . ., approximately 10-20% of the time that TD Bank is assessing overdraft fees, it is doing so on transactions when there are actual funds in the account sufficient to cover the transaction.").) Meanwhile, TD Bank argues that the plaintiffs' sufficient funds theory is premised on the lag time between the authorization of a transaction (e.g. swiping the debit card at a merchant's register) and the final settlement and payment of that transaction (i.e. when the funds are distributed to the merchant and the transaction "posts" to the account). (*See* Mot. to Dismiss, ECF No. 53-1 at 22.) The Bank explains its use of debit "holds" on pending transactions as designed to "ensure that sufficient funds are in the account when the merchant presents the transaction for payment." (*Id.* at 20.) When money is subject to such a hold, according to TD Bank, it "renders the authorized amount unavailable for the customer's use for other transactions because the customer has already committed those funds." (*Id.*) Obviously, by finding that federal preemption does not apply to the sufficient funds theory, as incorporated in counts II-VI, the Court is allowing the plaintiffs to proceed with this

---

[10] The Court uses this term for the sake of clarification, despite the vagaries of referring to the "physical" presence of money in the age of ubiquitous electronic transactions where no dollar bills or coins are ever exchanged.

theory as embodied in both of the scenarios described above. Permission to proceed with regard to both scenarios is no indication of the Court's view on the relative strength of the sufficient funds theory as it is embodied in one scenario or the other.

### D. Claims Challenging the Pre-Merger Practices of State Banks Are Not Preempted

Part and parcel to the complexity of this proceeding is the fact that some of the challenged conduct implicates actions by Carolina First Bank and Mercantile Bank, both state bank subsidiaries of the holding company South Financial Group, Inc. prior to its merger with TD Bank on September 30, 2010. TD Bank argues that the plaintiffs' state law claims are preempted to the extent they challenge the conduct of the state banks before their merger with TD Bank. The Bank cites the Sixth Circuit Court of Appeals' holding in *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009) for the proposition that federal preemption extends to the pre-merger conduct of state-chartered banks. TD Bank further argues that although a national bank assumes the liabilities of a state bank upon merger, *see* 12 U.S.C. § 215a, it may also assert all defenses premised on its status as a national bank because the merger occurs "under the charter of" the national bank, *see id.* § 215a(a). This "under the charter of" concept, the Bank asserts, means that upon merger, "the state bank [is] necessarily swallowed up, and thereafter in no real sense can it be said to have had a separable identity." *Fidelity-Baltimore Nat'l Bank v. United States*, 328 F.2d 953, 959 (4th Cir. 1964). TD Bank relies on the Fourth Circuit's decision in *Fidelity-Baltimore* for the conclusion that, in the event of a merger, the consolidated national bank cannot remain subject to state regulation that is incompatible with federal regulation. (*See* Mot. to Dismiss, ECF No. 53-1 at 39 (citing *Fidelity-Baltimore*, 328 F.2d at 957).) Finally, TD Bank argues that for

this Court to render any judgment regarding the pre-merger practices of Carolina First Bank and Mercantile Bank would be to subject TD Bank, a national bank, to state law constraints on the business of banking, violating the principle set forth in *Fidelity-Baltimore*.[11]

The Court holds that the plaintiffs' state law claims against Carolina First Bank, Mercantile Bank, and South Financial Group, Inc. are not preempted to the extent they challenge conduct by the state banks prior to their merger with TD Bank. TD Bank's assertion that because the merger occurred "under the charter" of a national bank federal preemption of state law can somehow reach back in time to cover pre-merger conduct is a non sequitur. The authorities cited by the Bank do not adequately support the propositions claimed.

In *Monroe Retail*, a group of garnishor-creditors who sought to collect judgments by garnishing debtors' funds on deposit with various defendant banks brought suit against the banks for imposing their own additional garnishment fees to customer accounts prior to relinquishing funds to the garnishors. *Id.* at 277. The district court held, *inter alia*, that the NBA preempted the garnishors' claims as to the national bank defendants, but not as to the state bank defendants. *Id.* at 278. The Sixth Circuit affirmed, in pertinent part, on the point that the garnishors' conversion claim pursuant to a state garnishment statute was preempted by the NBA's grant of authority to the defendant banks to charge and collect fees. *Id.* at 281. The Sixth Circuit dealt with the issue of potentially disparate preemption results for state and federal banks in a footnote, stating, "The Garnishors brought claims against both national and state banks before the district court. . . . As noted at oral argument, however, [one of the federal

---

[11] Notably, the *Fidelity-Baltimore* case did not deal with preemption doctrine.

bank defendants] has since acquired [the state bank defendant]. Therefore, all of the defendants are now national banks, and we need not bifurcate the analysis." *Id.* at 280 n.5. This cursory treatment of the disparate preemption landscape for federal and state banks may have satisfied the factual scenario in *Monroe Retail*, but it does not answer the operative questions in this proceeding. The Court does not pretend to know the precise chronological boundaries of the state law claims raised in *Monroe Retail* as they relate to the date of the merger in that case, but it makes no conceptual sense to say that a state bank's liability for pre-merger conduct is erased merely by virtue of being "swallowed up" into a national bank. Specifically, the plaintiffs have defined their "South Financial Class" with inclusive dates "within the applicable statute of limitations preceding the merger of accounts onto the TD system in June 2011 to the date of class certification." (CAC, ECF No. 37 at 53.) So long as those dates precede September 30, 2010, and the state law claims at issue raise questions regarding conduct by the state-chartered banks prior to that date, the claims are not preempted.

*Fidelity-Baltimore* does not offer TD Bank any more assistance than *Monroe Retail.* Indeed, the reasoning of *Fidelity-Baltimore* actually supports the notion that a state bank's pre-merger conduct is not preempted because it interprets the NBA concept of merger "under the charter of" the national bank as "'indicative of the intent that upon its consolidation with or merger into a national bank the state bank shall go out of existence and the latter continue its existence and identity under its original charter.'" *Fidelity-Baltimore*, 328 F.2d at 959 (quoting 15 Fletcher, Private Corporations 371, § 7199 (1961 ed.)). If a state bank goes out of existence upon merger, then the logical consequence of TD Bank's argument is that valid state claims against that bank,

41

which would have been viable prior to the merger, would be completely foreclosed on preemption grounds merely because they were not raised until after the merger had taken place. This cannot be the correct result. The real question at issue in *Fidelity-Baltimore* was whether, upon consolidation of a state and national bank, each of the constituent corporations retained its identity and character in a legal sense for purposes of determining stamp tax obligations on the transfer of stock and issuance of new stock of the consolidated bank. *Id.* at 954-959. The answer was that the state bank "was necessarily swallowed up" within the national bank, and although a predecessor statute to 12 U.S.C. § 215a (12 U.S.C. § 34a) provided that the consolidated bank was to be regarded as a continuation of each of its constituents, that provision did not carve out an arbitrary exception to the stamp tax obligations under existing tax statutes. *Id.* at 958-59. In other words, the state bank did not retain its independent identity and character *going forward*. *See id.* The import of all this to the instant case is simple: once the merger between the state banks and TD Bank took place, the federal preemption enjoyed by TD Bank applied to state law claims regarding the conduct of the state banks from that time forward. Prior to that merger, preemption did not apply.

All of that said, it seems abundantly clear that the cutoff date for the preemption analysis as it applies to the conduct of the state banks is the date they became inseparable parts of TD Bank, September 30, 2010. (*See* CAC, ECF No. 37 at 21.) This is true irrespective of the June 2011 date the plaintiffs list for the "merger of accounts onto the TD System" in their class definition. (*See id.* at 53.) The Court finds that the state law claims against the state banks *are* preempted to the same degree as against TD Bank itself from September 30, 2010 forward.

**II. Failure to State a Claim**

The next question to be answered by the Court is whether counts I-VI and VIII of the CAC fail to state a claim upon which relief can be granted. In order to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the plaintiffs must have alleged sufficient facts to "raise a right to relief above the speculative level, and have enough facts to state a claim to relief that is plausible on its face." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (internal citations and quotation marks omitted). The Court will address each of the challenged counts in turn.

**A. Count I – Breach of Contract**

TD Bank argues that the plaintiffs have failed to state a claim for breach of contract in count I of the CAC because their claim depends on a distorted reading of the PDAA. Such a distorted reading, the Bank argues, requires the reader to disregard some of the contract's language and take other language out of context. TD Bank asserts that if the contract is read reasonably and as a whole, the contract expressly discloses the challenged overdraft practices and there is no breach.

The first point raised by TD Bank is that the PDAA openly states that the Bank relies on available balance in assessing overdraft fees. TD Bank quotes the following language, *inter alia*, from the "OVERDRAFTS" section of the PDAA: "If your negative *available balance* exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account." (Ex. A, ECF No. 37-1 at 10 (emphasis added).) The second point made by the Bank is that the PDAA clearly indicates that debits are posted in order from highest to lowest by dollar amount. In support, TD Bank quotes the "PROCESSING ORDER FOR PAYMENT OF CHECKS AND OTHER

ITEMS" ("PROCESSING") section of the PDAA, which reads: "Within categories [itemized above, including ATM and debit card transactions], we post items in order from largest to smallest." (*Id.* at 9.) Further, they cite language warning customers about a potential increase in overdraft fees as a result of their posting policy: "We do not process transactions in the order in which they occur. The order in which items are processed may affect the total amount of overdraft fees incurred." (*Id.*) Finally, TD Bank argues that the PDAA openly discloses that the Bank can and does assess overdraft fees for debit card transactions. In support, the Bank quotes the PROCESSING section again, which states, "[o]verdraft fees may be assessed on items presented for payment that bring your Account into a negative balance," and defines "item" to include an "electronic transaction, . . . ATM withdrawal or transfer, debit card point-of-sale transaction, pre-authorized debit card payment, . . . and any other instruction or order for the payment, transfer or withdrawal of funds. (*Id.* at 8-9.)

Meanwhile, the plaintiffs adamantly contend that the very provisions cited by TD Bank in its defense *do not* authorize the Bank to assess overdraft fees under the circumstances alleged in the CAC. First, the plaintiffs quote language from the OVERDRAFTS section that defines an overdraft as "an *advance of funds* greater than the amount that has become available in accordance with the Bank's Fund Availability Policy . . . ." (*Id.* at 10 (emphasis added).) They argue that the Bank improperly calculates overdrafts by subtracting the customer's pending debits (available balance) to determine when an "advance of funds" occurs, rather than simply using the actual balance of funds in the account.[12] On this point, the plaintiffs quote the same language from the PROCESSING section that TD Bank quotes in its defense: "Overdraft fees

_____

[12] See definitions of available balance and actual balance *supra* at section I., C.

44

may be assessed on items presented for payment that bring your Account into a *negative balance*, as well as any subsequent transactions presented for payment while the Account has a *negative balance*." (*Id.* at 9 (emphasis added).) The use of the term "negative balance," the plaintiffs argue, comports with a customer's common sense understanding that an overdraft fee will not be assessed until the Bank is actually "out of pocket" money, *i.e.* paying more money than is in the account. Moreover, the plaintiffs assert that throughout the PDAA, when TD Bank uses the term "balance" without the accompanying modifier, "available," it is referring to the amount of money presently in the account or "actual balance." (*See* Pls.' Resp. in Opp. to Mot. Dismiss, ECF No. 59 at 34.) Therefore, the absence of the modifier "available" in the PROCESSING section's description of overdraft fees indicates contractual intent to utilize actual balance, *not* available balance, when assessing those fees. In sum, the plaintiffs contend that, "Basing overdraft fees on 'available balance' violates the plain language of the PDAA, because the Agreement does not use the term 'available balance' when determining whether an overdraft fee can be assessed." (*Id.* at 15-16.)

Next, the plaintiffs argue that the PDAA fails to state that debits are posted from highest to lowest dollar amount. They aver that TD Bank has manipulated and reordered debits from highest to lowest for no other reason than to increase the number of overdraft fees. The plaintiffs further allege that the Bank posts batches of debit card transactions that have accumulated over multiple days by amassing them on a single date and applying the high-to-low posting method, which results in the imposition of overdraft fees that would not otherwise be triggered. They argue that the PROCESSING section, which the Bank cites as express notice of high-to-low posting, "is both taken out

45

of context and given a liberal construction because it states that the items are posted by category, and then '[w]ithin categories i, ii, and iii, we post items in order from largest to smallest.'" (*Id.* at 16.) They claim that the fact that high-to-low posting specifically applies to debit card transactions is "hidden within prior layers regarding posting categories," and that "nowhere in the PDAA is the customer ever expressly informed that 'debit card charges' are ordered from high to low." (*Id.* at 17.)

Finally, the plaintiffs argue that the PDAA fails to disclose that TD Bank will assess overdraft fees on debit card transactions that overdraw the account. Their basis for this assertion is that the PDAA "repeatedly suggests" that debit card transactions that would push the account below zero will not be approved. For example, because the PDAA states that the Bank uses "available balance," which is always equal to or lower than actual balance, to "determine the amount available to pay other items presented against your account," the plaintiffs infer that the contract gives customers the reasonable impression that transactions will be rejected once the available balance falls below zero. (*See* Ex. A, ECF No. 37-1 at 9.) The plaintiffs contend that customers' common sense expectations lead them to believe that their debit card is not a credit card, but that TD Bank has nevertheless "developed a system whereby it secretly adopts a hidden credit line for each customer, and then treats their debit card as a credit card, but a credit card where exorbitant fees are charged for each use." (Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 17.) Moreover, the plaintiffs point to the "WE MAY REFUSE TO PAY A CHECK OR OTHER ITEM" section of the PDAA, which states that the Bank can refuse to pay an item which "is drawn in an amount greater than the amount of funds then available for withdrawal in [the] Account . . . or which

would, if paid, create an overdraft." (Ex. A, ECF No. 37-1 at 9.) The plaintiffs acknowledge that the OVERDRAFTS section states some transactions may *not* be rejected, and the Bank may decide to "advance funds" and charge an overdraft fee, but they aver that this provision is ambiguous because it allows "advances" only in the event of "check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account" and does not specifically list "debit card transactions." (*See id.* at 10.) In sum, the plaintiffs argue that the collective language in the relevant sections of the PDAA, when read together, does not communicate that the Bank will intentionally honor debit card transactions into overdraft and then assess overdraft fees on those transactions.

The Court sees the logic in TD Bank's argument that some of the theories of liability in count I belie a selective reading of the contract by the plaintiffs. For example, the plaintiffs make the bold assertion that "the Agreement **does not use the term** 'available balance' when determining whether an overdraft fee can be assessed," because the PROCESSING section of the PDAA states that overdraft fees may be assessed on items that bring the account into a "negative balance." (Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 15-16 (emphasis added).) Yet, the very next sentence of the PDAA directs the reader to "[s]ee 'Overdrafts' and 'Sustained Fee for Overdrawn Accounts' below . . . for more information." (Ex. A, ECF No. 37-1 at 9.) When one turns to the OVERDRAFTS section, which is on the next page of the PDAA, it reads, "If your **negative available balance** exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account." (*Id.* at 10 (emphasis added).) Thus, it is abundantly clear that the Bank *does* use the term "available balance" at least once to

describe when overdraft fees will be assessed. This is only one example of the plaintiffs'

selective reading of the contract. Nevertheless, at the motion to dismiss stage, the Court

is not in a position to evaluate the strength of the plaintiffs' claims. Rather, the Court is

simply tasked with determining whether they have stated a plausible claim for relief. The

Court finds that the plaintiffs have survived this minimal pleading bar with respect to

certain portions of count I, but has failed to state a claim with respect to other portions.

Count I is alleged on behalf of the plaintiffs and the putative "TD High-to-Low,"

"TD Sufficient Funds," and "South Financial" classes. The plaintiffs claim TD Bank

violated the PDAA by engaging in certain overdraft practices that were not disclosed,

not requested by customers, and unreasonable. (*See* Ex. A, ECF No. 37-1 at 4.) They

provide the following non-exhaustive list of practices that are allegedly violative of the

PDAA:

> a. the authorization of debit card transactions that Defendant knew would result in an overdraft fee;
> b. the adoption of a line of credit or spending limit up to which Defendant would authorize debit card transactions;
> c. the manipulation of debit card transactions by Defendant's posting software to increase overdraft fees; and
> d. the decision to assess overdraft fees even when there were funds in customer accounts sufficient to cover the transaction.

(CAC, ECF No. 37 at 59.) To the extent count I incorporates the sufficient funds theory

of liability (i.e. the use of available balance to assess overdraft fees), the plaintiffs state

a plausible claim for relief and count I survives the motion to dismiss. At the very least,

there are outstanding factual questions on when TD Bank actually "advanced funds,"

whether imprecise use of the terms "negative balance" and "negative available balance"

created a duty on the Bank's part to only assess overdraft fees when the "actual

48

balance" was negative, and the like.[13] However, to the extent count I incorporates the high-to-low posting theory of liability, that portion of count I fails to state a claim and is dismissed. The Court finds that the PROCESSING section of the PDAA lays out the Bank's posting practices in great detail, with explicit reference to "debit card transactions" as among the types of items that are posted to accounts via the high-to-low method. There is no plausible interpretation of the relevant contractual language that a reasonable reader could interpret otherwise.

TD Bank is not moving at this time to dismiss the portion of count I based on the Carolina First Bank contract, and the Court will not engage in an analysis of whether that portion fails to state a claim *sua sponte*. (*See* Mot. to Dismiss, ECF No. 53-1 at 19 n.1.) Thus, count I survives in its entirety with respect to alleged actions taken by Carolina First Bank and Mercantile Bank.

### B. Count II – Implied Covenant of Good Faith and Fair Dealing

TD Bank argues that the plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing for the same essential reasons the Bank believes that count I fails. At bottom, the Bank contends that a reasonable reading of the PDAA according to sound principles of contract construction expressly discloses and permits all of the challenged conduct, and although the laws governing the implied covenant vary from state to state, the implied covenant cannot be used to alter the express terms of the contract. *See, e.g., Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599 (4th Cir. 2004) ("[T]here can be no breach of an implied covenant of good faith and fair dealing where 'a party to a contract [does] what provisions of the contract expressly [give] him the right to do.'" (quoting *Adams v. G.J.*

---

[13] See related discussion of viable claims in the preemption analysis *supra* at section I., C.

*Creel & Sons, Inc.*, 465 S.E.2d 84, 85 (1995)). TD Bank cites *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509 (D.N.J. 2009), for the proposition that where a contract "permit[s] precisely [the] . . . fee incurral" alleged to be wrongful, a claim for breach of the implied covenant fails. *Id.* at 519. Finally, the Bank argues that under the laws of New York, Vermont, and Pennsylvania, the claim for breach of the implied covenant of good faith and fair dealing should be dismissed simply because it is based on the same facts as, and is therefore duplicative of, the breach of contract claim. (*See* Mot. to Dismiss, ECF No. 53-1 at 44 n.15 (citing *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013); *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000); *Citibank N.A. v. City of Burlington*, 971 F. Supp. 2d 414, 431 (D. Vt. 2013)).

The plaintiffs deny that they are attempting to vary the express terms of the contract by way of the implied covenant of good faith and fair dealing, and quip that TD Bank is actually the party attempting to vary the express terms of the PDAA by treating "balance" and "available balance" as synonymous terms when they are not. The plaintiffs assert that "'[i]n the absence of an express provision therefore, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do.'" *Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 484 (S.C. 1966) (citation omitted). They argue that their claim for breach of the implied covenant is merely an attempt to enforce TD Bank's obligation to carry out its contractual duties in good faith, pursuant to the purpose of the contract between the parties. The plaintiffs contend that the Bank's reliance upon *Hassler* is misplaced because the more recent New Jersey decision in *Hughes v. TD Bank*, 856 F. Supp. 2d 673, 681 (D.N.J. 2012) held that a claim for breach of the implied

covenant based on facts nearly identical to this case survived a motion to dismiss for failure to state a claim. Finally, the plaintiffs argue that it is permissible under the laws of New York, Vermont, and Pennsylvania, to bring a breach of contract claim and a separate implied covenant claim if the latter is supported by distinct factual allegations. (*See* Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 39 n.10 (citing *Dorset Indus., Inc. v. Unified Grocers*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012); *Harsch Props., Inc. v. Nicholas*, 932 A.2d 1045, 1050 (Vt. 2007); *Ross v. Canada Life Assurance Co.*, 1996 WL 182561, at *7-8 (E.D. Pa. Apr. 16, 1996)).) The plaintiffs do not specify what distinct factual allegations support count II, as opposed to count I, but simply aver that their "claims arise from at least five different aspects of TD's overdraft practices which involve different contracts and different contract provisions, as well as different acts by TD." *Id.*

There exists within every contract an implied covenant of good faith and fair dealing. *See, e.g., Parker v. Byrd*, 420 S.E.2d 850, 853 (S.C. 1992). The United States Supreme Court offered helpful insight into the vagaries of this doctrine in the case of *Northwest, Inc. v. Ginsberg*, 134 S.Ct. 1422 (2014):

> While most States recognize some form of the good faith and fair dealing doctrine, it does not appear that there is any uniform understanding of the doctrine's precise meaning. "[T]he concept of good faith in the performance of contracts 'is a phrase without general meaning (or meanings) of its own.'" *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (C.A.D.C. 1984)(Scalia, J.) (quoting Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L.Rev. 195, 201 (1968)); *see also* Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L.Rev. 369, 371 (1980). Of particular importance here, while some States are said to use the doctrine "to effectuate the intentions of parties or to protect their reasonable expectations," *ibid.*, other States clearly employ the doctrine to ensure that a party does not "'violate community standards of decency, fairness, or reasonableness.'"

*Id.* at 1432 (citing *Universal Drilling Co., LLC v. R & R Rig Service*, LLC, 271 P.3d 987, 999 (Wisc. 2012); *DDP Roofing Services, Inc. v. Indian River School Dist.*, 2010 WL 4657161, at *3 (Del. Super. Ct., Nov. 16, 2010); *Allworth v. Howard Univ.*, 890 A.2d 194, 201-202 (D.C. 2006); *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assocs.*, 864 A.2d 387, 395-396 (N.J. 2005); *Harper v. Healthsource New Hampshire*, 674 A.2d 962, 965-966 (N.H. 1996); *Borys v. Josada Builders, Inc.*, 441 N.E.2d 1263, 1265-1266 (Ill. 1982); Restatement (Second) of Contracts § 205, Comment a (1979);  Summers, The General Duty of Good Faith—Its Recognition and Conceptualization, 67 Cornell L.Rev. 810, 812 (1982)). Some states maintain that the implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim for breach of contract. *See, e.g., RoTec Servs., Inc. v. Encompass Servs., Inc.*, 597 S.E.2d 881, 884 (S.C. 2004). Where these states recognize the implied covenant, they maintain that it should be viewed "as merely another term of the contract at issue." *Id.* at 884 (internal citation omitted).

The Court finds that the plaintiffs have pled sufficient facts to state a plausible claim for relief under the implied covenant of good faith and fair dealing, and declines to dismiss count II on those grounds. It is worth reminding the parties, however, that count II is preempted to the extent it incorporates the high-to-low posting and intentional honoring of overdraft theories. On its face, count II incorporates only some of the putative classes: "TD High-to-Low," "TD Sufficient Funds," and "South Financial." However, it also purports to repeat and reallege every factual allegation in the complaint. (CAC, ECF No. 37 at 59.) Thus, count II can be read to apply the good faith and fair dealing test to every theory of liability contained within the complaint.

The result in *Hassler*, on which TD Bank relies, appears to be quite specific both to New Jersey law and to the facts of that case. *See Hassler*, 644 F. Supp. 2d at 519 (dismissing the implied covenant claim because even the most favorable reading of the plaintiff's allegations failed to satisfy the "improper motive element of a good faith performance claim"). The Court deems that case to be of minimal persuasive value in the instant proceeding. If read in the light most favorable to the plaintiffs, the allegations in count II raise legitimate questions regarding whether TD Bank exercised its contractual discretion reasonably. (*See* CAC, ECF No. 37 at 61.) In other words, even if TD Bank complied with the literal terms of the contract (an assumption that the plaintiffs dispute), the plaintiffs still state a plausible claim that the *manner* in which the overdraft policy was imposed was abusive, or that the Bank's actions violated the implied covenant where they were in excess of the express terms to the plaintiffs detriment. *See In re HSBC Bank*, 1 F. Supp. 3d at 51 ("'Ordinarily, the covenant of good faith and fair dealing is breached where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain.'" (quoting *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co of New York*, 10 N.Y.3d 187, 198 (2008)). In this way, count II can be read in a fashion that does not reduce it to a backdoor attempt to modify the express terms of the PDAA. *See Hughes*, 856 F. Supp. 2d at 681-82 ("Plaintiffs do not want to vary express terms of the contract, but want TD Bank to exercise its contractual discretion reasonably.").

The Court also declines to dismiss count II with respect to New York, Vermont, and Pennsylvania law on grounds that the plaintiffs have failed to raise "distinct factual

allegations" from count I. To the extent that these jurisdictions do not recognize simultaneous claims for breach of contract and breach of the implied covenant grounded in the same predicate facts, it is generally because they conceive of the implied duty of good faith as part of the contract itself. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) ("[P]arties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."); *Harsch Props., Inc.*, 932 A.2d at 1051 ("[A]lthough breach of the implied covenant may create an action in tort, the covenant arises from the contract and exists because of the contract . . . . The covenant of good faith and fair dealing was an implied term, which required the parties 'not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement.'" (quoting *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 635 A.2d 1211, 1216 (Vt. 1993)); *Ross*, 1996 WL 182561 at *7-8 (acknowledging two lines of state and federal court decisions diverging on the question of whether some or all contracts contain an implied duty of good faith and fair dealing under Pennsylvania law, and concluding that such an implied duty existed in a contract between a lender and borrower even under the more limited view)). Thus, it is of no import for the Court to decide at this stage of the proceedings whether count II raises "distinct factual allegations" under New York, Vermont, and Pennsylvania law, because the implied covenant theory would survive as embedded within count I in any event. Accordingly, the motion to dismiss count II is denied insofar as count II is not preempted.

### C. Count III – Unconscionability

TD Bank argues that the plaintiffs' claim for unconscionability fails first, because there is no affirmative cause of action for unconscionability, and second, because the plaintiffs have not alleged sufficient facts to plead unconscionability even if such cause of action exists. The Bank cites multiple sources of authority for the rule that unconscionability is a defense to a claim for enforcement of a contract not an affirmative cause of action. (*See* Mot. to Dismiss, ECF No. 53-1 at 45 (citing *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) (applying Pennsylvania law and describing unconscionability as a "defensive contractual remedy"); *Cowin Equip. Co., Inc. v. Gen. Motors Corp.*, 734 F.2d 1581, 1582 (11th Cir. 1984) (observing that "neither the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse *enforcement* of the unconscionable section or sections of the contract so as to avoid an unconscionable result") (quotation marks omitted) (emphasis in original); *Wells Fargo Bank, NA v. Smith*, 2012 WL 10987189, at *4 (S.C. Ct. App. June 13, 2012) ("The doctrine of unconscionability is used as a shield, not a sword, and may not be used as a basis for affirmative recovery.") (quotation marks and citation omitted); *Okafor v. Yale Univ.*, 2004 WL 1615941, at *11 (Conn. Super. Ct. June 25, 2004); *Sitogum Holding, Inc. v. Ropes*, 800 A.2d 915, 922 n.14 (N.J. Super. Ct. 2002); *Rite Color Chem. Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 649 (N.C. Ct. App. 1992); *Super Glue Corp. v. Avis Rent a Car Sys., Inc.*, 517 N.Y.S.2d 764, 766 (N.Y. App. Div. 1987); *Witmer v. Exxon Corp.*, 394 A.2d 1276, 1286 (Pa. Super. 1978)).) Even assuming an affirmative cause of action for unconscionability exists, TD Bank argues that most of the states relevant to this

proceeding require a showing of both procedural and substantive unconscionability in order to substantiate such a claim, and that the plaintiffs have not alleged facts sufficient to plead these elements. (Mot. to Dismiss, ECF No. 53-1 at 45-48); *see, e.g., Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 472 S.E.2d 242, 245 (S.C. 1996) ("Unconscionability has been recognized as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms which are so oppressive that no reasonable person would make them and no fair and honest person would accept them.").

The plaintiffs assert that while they believe they have stated a valid claim for unconscionability they nevertheless concede to dismissal of count III based on the prior ruling in *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 518 (D.S.C. 2014). They cursorily argue that there is "ample authority to support allowing [their] claim for unconscionability to go forward" (citing *Hanjy*, 2015 WL 1456186 at *15-18; *Hughes*, 856 F. Supp. 2d at 681; *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1318-19), but because of the *King* decision dismissing this claim they are "willing to accept that ruling for the purposes of TD's latest motion to dismiss." (Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 43.)

The Court need not address the question of whether the plaintiffs have pled sufficient facts to make a plausible claim for both procedural and substantive unconscionability because the Court agrees with TD Bank in the first instance: unconscionability is not an affirmative cause of action. The plaintiffs have clearly plead count III as an affirmative cause of action, in that they are seeking damages based on that claim. (*See* CAC, ECF No. 37 at 62.) More importantly, the plaintiffs have conceded

to dismissal of count III in their response brief. Accordingly, the motion to dismiss count III is granted.

### D. Count IV – Conversion

TD Bank argues that the plaintiffs' conversion claim fails for three reasons: (1) the plaintiffs cannot show "wrongful" interference with the plaintiffs' ownership rights in contravention of federal or state law, (2) deposited funds cannot support a claim for conversion, and (3) the economic loss rule and/or gist-of-the-action doctrine preclude recovery. The Bank's first assertion is essentially that a conversion claim cannot be premised upon a party's exercise of its contractual rights because the underlying taking is by definition not "wrongful" in that scenario. *See, e.g., Castell v. Stephenson Fin. Co.*, 135 S.E.2d 311, 313 (S.C. 1964) ("Since conversion is a wrongful act, it cannot arise from the exercise of a legal right."). In the Bank's view, because all of the challenged practices were authorized by the applicable contracts and associated law a conversion claim will not lie. *See, e.g., Kirby v. Horne Motor Co.*, 366 S.E.2d 259, 261-62 (S.C. Ct. App. 1988) (no claim for conversion because defendant acted properly under contract and state law).

TD Bank's second argument is that money held in a general deposit account in a bank may not be the subject of a claim for conversion. Conversion can be defined as the "unauthorized assumption and exercise of the right of ownership over goods or personal chattel belonging to another." *Owens v. Andrews Bank & Trust Co.*, 220 S.E.2d 116, 119 (S.C. 1975). The Bank cites South Carolina law for the commonly held view that the "relationship between a general depositor and his bank is that of creditor and debtor." *Id.*; *see Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) (a bank

57

account "consists of nothing more or less than a promise to pay, from the bank to the depositor"). TD Bank further contends that "money may be the subject of conversion, when it is capable of being identified," but "there can be no conversion where there is a mere obligation to pay a debt." *Owens*, 220 S.E.2d at 119. Given these principles, "the overwhelming authority is that money on deposit in a bank cannot be the subject of conversion unless it was intended to be kept separate or constituted a specific intact fund," and "[t]he proper action where payment of a general deposit is refused, is an action on the contract and not one in tort." *Id.* (citing 9 C.J.S. Banks and Banking s 320, p. 646 (1938)). TD Bank argues that the plaintiffs have not alleged any right to a specific intact fund, are in a debtor/creditor relationship with the Bank as depositors, and therefore cannot bring a conversion claim.

TD Bank's third argument is that in seven of the twelve jurisdictions at issue in this proceeding, the economic loss or "gist of the action" doctrine mandates that a breach of duty arising under the provision of a contract between the parties must be redressed via a contract claim, and not a tort action. *See, e.g., Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995). Under this doctrine, where a plaintiff brings an action for purely economic loss, the source of the duty that the plaintiff claims the defendant owed determines the appropriate form of the claim. *Id.* TD Bank contends that the plaintiffs have identified the account agreements as the source of the duty owed to them by the Bank, and as a result their claim must be contract-based, rather than tort-based.

The plaintiffs respond that in order to state a claim for conversion, they need only show: (1) their ownership of or right to possess the property, and (2) a wrongful

interference with that right. *See, e.g., Moore v. Weinberg*, 644 S.E.2d 740, 749 (S.C. Ct. App. 2007). The plaintiffs argue that the plain language of the account agreements indicate that they hold the requisite possessory or ownership rights to the funds in their accounts. The plaintiffs further contend that by taking monies from customer-owned accounts to cover fees not allowed by contract, the Bank has engaged in a wrongful interference with their possessory or ownership rights. Finally, they assert that the cases cited by TD Bank in support of dismissal dealt with scenarios that are distinguishable from the allegedly improper overdraft fees at issue here.

The Court generally agrees with the plaintiffs and finds that they have stated a claim for conversion. The majority of federal courts that have addressed this question in the context of overdraft fees have found that plaintiffs may bring a conversion claim for fees that are alleged to have been wrongfully assessed, and permitted such claims to proceed past the motion to dismiss stage. *See King*, 26 F. Supp. 3d at 518-19; *Hughes*, 856 F. Supp. 2d at 682; *In re Checking Account Overdraft Litig.*, 694 F. Supp. at 1323 (surveying numerous state jurisdictions on the question of customers' right to possess funds that they have deposited with banks and concluding "a conversion action is available for a bank's wrongful debiting of funds from a customer's account"); *White*, 563 F. Supp. 2d at 1371 ("[A]s explained in declining to dismiss the breach of contract claim, Plaintiffs have alleged that Wachovia imposed Overdraft Fees when there was in fact no overdraft. The trover and conversion claim may proceed for now."); *but see In re HSBC Bank*, 1 F. Supp. 3d at 52-53 (dismissing the plaintiffs' claims for conversion under New York and California law because of: 1. the debtor to creditor relationship between bank and customer, and 2. the lack of specific and identifiable funds).

With respect to TD Bank's first argument, the Court has discussed the plaintiffs' allegations of the Bank's breach of contract extensively and sees no need to regurgitate the same points. The Court will not dismiss the conversion claim on these grounds.

The Bank's second argument, that the parties' debtor/creditor relationship precludes the plaintiffs' ownership of the property and thus any conversion claim, fails because the plaintiffs retain a right to immediate possession of the property at any time. *See Hughes*, 856 F. Supp. 2d at 682; *see also In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1323 ("Plaintiffs unquestionably had the right to possess the funds in their bank accounts upon demand to the bank, and they have alleged that Defendants wrongfully took funds from their accounts so that Plaintiffs were unable to possess and use those funds. This interference with Plaintiffs' property interest in the funds in their accounts constitutes a cause of action for conversion."). Additionally, the Court is not sure the traditional view of the debtor/creditor relationship between bank and customer properly applies to the overdraft fee scenario because that relationship appears to be inverted when the account is in a negative balance. The plaintiffs claim is not that TD Bank has wrongfully refused to pay funds owed to the customer, *see Owens*, 220 S.E.2d at 119-120, but rather that the Bank has improperly relieved itself of its debtor obligations and imposed a debtor status on the customer by debiting funds from the account that it had no business debiting, *see Moore*, 644 S.E.2d at 749 ("Conversion is a wrongful act that emanates by either a wrongful *taking* or wrongful detention.") (emphasis added).

Finally, TD Bank's third argument, that the economic loss doctrine prevents an action in tort, is unpersuasive because the losses claimed are associated with actions

on the part of the Bank that the plaintiffs contend exceeded the bounds of the contract. In other words, the plaintiffs allege that TD Bank wrongfully deducted funds from their accounts in ways and in situations not contemplated by the contract. *See Hughes*, 856 F. Supp. 2d at 682. Accordingly, the motion to dismiss count IV is denied to the extent count IV is not preempted.

### E. Count V – Unjust Enrichment

TD Bank argues that the plaintiffs' claim for unjust enrichment fails for two reasons: (1) no quasi-contractual recovery is available when the parties have an express contract that governs, and (2) the plaintiffs have alleged no enrichment that was unjust. TD Bank asserts that, "Relief under a theory of *quantum meruit* is not available if a party bases its action on the existence of a contract." *Limehouse v. Resolution Trust Corp.*, 862 F. Supp. 97, 103 (D.S.C. 1994). Rather, "*Quantum meruit* is only available in circumstances where no contract exists, but the obligation to pay is implied by law." *Id.* The Bank further argues that the plaintiffs' claims are directly governed by the express terms of a written contract, and therefore no claim for unjust enrichment can proceed. (*See* Mot. to Dismiss, ECF No. 53-1 at 51 (citing *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (holding that  a two million dollar jury award on an unjust enrichment claim could not stand because a written supply contract between two fund-raising distributors clearly governed the expenses and services at issue)).)

TD Bank's second argument is that in order for enrichment to be unjust, the allegedly enriched person must have retained money that belonged to another. *See, e.g., Inglese v. Beal,* 742 S.E.2d 687, 690 (S.C. 2013). Therefore, "a plaintiff cannot

seek restitution for benefits that the defendant had a legal right to receive." *Bright*, 20 F.3d at 1306. The Bank reasserts points made previously: that it was authorized by contract and OCC regulations to assess and collect overdraft fees under the methods that it chose. As a result, the Bank argues, any enrichment that occurred as a result of retaining the fees cannot be unjust.

The plaintiffs respond that their unjust enrichment claim should be allowed to proceed at this early stage of the litigation. (*See* Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 41 (citing *King*, 26 F. Supp. 3d at 519; *Hughes*, 856 F. Supp. 2d at 682; *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1321).) The plaintiffs further argue that their unjust enrichment claims should be permitted as an alternative theory to their breach of contract claim.

The federal courts that have addressed this question in overdraft fee litigation have arrived at disparate results. One line of cases holds that an unjust enrichment claim may be pled along with a breach of contract claim as an alternative theory of relief, and survives a motion to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6). *See King*, 26 F. Supp. 3d at 519 ("[W]hile they cannot recover for both breach of contract and unjust enrichment, [Plaintiffs] can allege alternative theories of relief."); *Hughes*, 856 F. Supp. 2d at 680 n.4, 682 (relying on result in MDL 2036); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1323 ("[Fed.R.Civ.P. 8(d) allows pleading in the alternative, even if the theories are inconsistent. Defendants have not conceded that Plaintiffs are entitled to recovery under the contract, and it is possible that if their contractual claim fails, Plaintiffs may still be entitled to recovery under an unjust enrichment theory."). The other line of cases dismissed the unjust enrichment claims

because they found that an express contract existed and adequately covered the dispute at issue. *See In re HSBC Bank*, 1 F. Supp. 3d at 52-53 (applying New York and California law and dismissing the unjust enrichment claim because "a plaintiff would not be required to elect his or her remedies only where, unlike here, there is a bona fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue") (quotation marks omitted); *Hassler*, 644 F. Supp. 2d at 519-20 (applying New Jersey law and dismissing the unjust enrichment claim because the high-to-low posting in question was "permissible under the terms of an express contract, meaning that Plaintiff has failed to allege that Defendant was enriched beyond its contractual rights") (internal citations and modifications omitted); *White*, 563 F. Supp. 2d at 1371 (applying Georgia law and dismissing the unjust enrichment claim because "Plaintiffs allege that the same behavior underlying their unjust enrichment claim underlies their breach of contract claim. Effectively, Plaintiffs claim that there was a contract and that Wachovia was unjustly enriched within a single count").

After careful review and consideration, the Court finds the first line of cases persuasive and declines to dismiss count V on grounds of failure to state a claim at this early stage of the litigation. While it is true that there appears to be much crossover between the practices challenged in the breach of contract and implied covenant claims (counts I and II) and the practices challenged in the unjust enrichment claim (count V), part of the plaintiffs' theory of the case is that TD Bank's overdraft fee policy *in practice* exceeded the bounds of what the express terms of the contract allowed. In this way, the unjust enrichment claim is potentially an alternative theory of relief, should the plaintiffs' contractual claims fail. Additionally, unlike the breach of contract and implied covenant

claims, the unjust enrichment claim is asserted on behalf of all putative classes. (CAC, ECF No. 37 at 64.) Therefore, it incorporates more alleged misconduct than the contractual claims in counts I and II. Accordingly, the motion to dismiss count V is denied to the extent count V is not preempted.

### F. Count VI – Violation of State Statutes Prohibiting Unfair and Deceptive Acts and Practices

The plaintiffs have advanced claims for unfair and deceptive trade practices under statutes from each of the twelve jurisdictions included in this proceeding. Namely, Connecticut: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a *et seq.*); Delaware: the Delaware Uniform Deceptive Trade Practices Act, (6 Del. C. § 2531 *et seq.*); Maryland: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§ 13-101 *et seq.*, 14-101 *et seq.*); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A); New Hampshire: the Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*); New Jersey: the New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1 *et seq.* (West)); New York: New York Consumer Protection Act (N.Y. Gen. Bus. Law §§ 349, 350 (Consol.)); North Carolina: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1 *et seq.*); Pennsylvania: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 § 201-1 *et seq.* (Purdon)); South Carolina: South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*); Vermont: Vermont Consumer Fraud Statute (Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*); and Washington, D.C. the Consumer Protection Procedures Act (D.C. Code Ann. § 28-3901 *et seq.*). Count VI is purportedly asserted on behalf of the plaintiffs and the "EFTA Classes," and does not, on its face, incorporate the TD High-to-Low, TD Sufficient

64

Funds, South Financial, and Usury classes. (*See* CAC, ECF No. 37 at 65.) However, count VI still purports to repeat and reallege each and every allegation contained in the remainder of the complaint as if fully set forth in count VI itself. (*Id.* at ¶ 231.) The plaintiffs seek damages in an amount equal to threefold actual damages, disgorgement in an amount sufficient to restore the monies taken, and injunctive relief. (*Id.* at ¶ 235.)

In their response to the motion to dismiss, the plaintiffs have agreed to the dismissal of their claims brought under the consumer protection statues of Massachusetts, Pennsylvania, and Vermont. (*See* Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 43 n.12.) Thus, to the extent those claims are incorporated in count VI, that portion of count VI is dismissed and the Court will not address any arguments related to those statutes.

### 1. Delaware Uniform Deceptive Trade Practices Act ("DTPA")

TD Bank argues that the plaintiffs cannot maintain a claim under the DTPA because "the DTPA is not intended to redress wrongs between a business and its customers." *Grand Ventures v. Whaley*, 632 A.2d 63, 65 (Del. 1993). Instead, the DTPA "is intended to address unfair or deceptive trade practices that interfere with the promotion and conduct of another person's business." *Id.* Consequently, the Bank argues, a consumer has no standing to assert a cause of action under the DTPA. *Worldspan, L.P. v. Ultimate Living Group, LLC*, 390 F. Supp. 2d 412, 414-15 (D. Del. 2005) (dismissing DTPA claim).

The plaintiffs contend that Delaware case law allows standing under the DTPA for consumers with relationships to businesses similar to their own relationships with TD Bank. They cite three Delaware Superior Court cases that predate *Grand Ventures* and

construed the DTPA liberally to allow consumer lawsuits. However, the plaintiffs have not explained why these Superior Court decisions should trump a Delaware Supreme Court decision that is both more recent and has precedential force.

The Court agrees with TD Bank and hereby dismisses the portion of count VI that incorporates the DTPA claim. The Supreme Court of Delaware has outlined the parameters of the DTPA and held that they do not include suits brought by customers against a business. *See Grand Ventures*, 632 A.2d at 66-70. Specifically, the *Grand Ventures* court delineated a sharp difference between the Delaware Consumer Fraud Act, which "protects consumers and legitimate business enterprises from unfair or deceptive merchandising practices," 6 Del. C. § 2512, and the DTPA, which "prohibits unreasonable interference with the promotion and conduct of another person's business." *Grand Ventures*, 632 A.2d at 66-67. The court explained that the most logical interpretation of the two state statutes in conjunction "is that the Consumer Fraud Act provides remedies for violations of the 'vertical' relationship between a buyer (the consumer) and a producer or seller. . . . Conversely, the DTPA addresses unreasonable or unfair interference with the 'horizontal' relationships between various business interests." *Id.* at 70. Thus, there is no doubt that "a litigant has standing under the DTPA only when such person has a business or trade interest at stake which is the subject of interference by the unfair or deceptive trade practices of another." *Id.* The plaintiffs have alleged no such business or trade interest and lack standing to bring a claim under the DTPA.

## 2. New Hampshire Consumer Protection Act ("NHCPA")

TD Bank argues that the NHCPA exempts from its reach "[t]rade or commerce that is subject to the jurisdiction of the bank commissioner . . . or federal banking or securities regulators who possess the authority to regulate unfair or deceptive trade practices." N.H. Rev. Stat. Ann. § 358-A:3(I). TD Bank "is a national bank chartered and supervised by the federal Office of the Comptroller of Currency." (CAC, ECF No. 37 at 21.) Moreover, "The OCC's power to regulate national banks is comprehensive, and the OCC plainly has the authority to protect consumers from the same kinds of fraudulent, deceptive, and unfair trade practices that are targeted by the [NHCPA]." *Atkins v. U.S. Bank N.A.*, 2014 WL 24259, at *3 (D.N.H. Jan. 2, 2014) (quotation marks omitted); *see also* OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, AL 2002–3, 2002 WL 521380, at * 2–3 (March 22, 2002). Therefore, argues TD Bank, the NHCPA does not apply to the Bank. *See id.* (dismissing NHCPA claim); *Campbell v. Specialized Loan Servicing, LLC*, 2014 WL 280492, at *3 (D.N.H. Jan. 23, 2014) (same).

The plaintiffs failed to respond to the Bank's arguments for dismissal of the NHCPA claim. The Court agrees with TD Bank and hereby dismisses the portion of count VI that incorporates the NHCPA claim. The NHCPA expressly exempts consumer protection claims regarding the behavior of national banks from its purview because of the OCC's comprehensive power to regulate those banks.

## 3. South Carolina Unfair Trade Practices Act ("SCUTPA")

TD Bank argues that the plaintiffs SCUTPA claim cannot stand because "SCUTPA . . . prohibits a plaintiff from bringing a suit in a representative capacity."

*Dema v. Tenet Physician Svcs.–Hilton Head, Inc.*, 678 S.E.2d 430, 434 (S.C. 2009). "[B]ecause SCUTPA claims may not be maintained in a class action law suit," the Bank argues, this portion of count VI should be dismissed. *Id.* (affirming trial court's dismissal of SCUTPA claim); *see In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 727 (D. Md. 2001) (dismissing SCUTPA claim); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423, 446 (4th Cir. 2003) (affirming by implication the district court's refusal to certify a SCUTPA suit as a class action pursuant to S.C. Code Ann. § 39–5–140).

The plaintiffs respond that the U.S. Supreme Court's decision in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), dictates that Fed.R.Civ.P. 23, and not state law, governs whether a class action may be maintained. *Id.* at 399 ("Rule 23 provides a one-size-fits-all formula for deciding the class-action question."). The Supreme Court stated, "Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met. We cannot contort its text, even to avert a collision with state law that might render it invalid." *Id.* at 406 (emphasis in original). Moreover, "Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court." *Id.* at 416. The plaintiffs cite two federal court decisions that have relied on *Shady Grove* to permit class actions under SCUTPA in multidistrict litigations such as this one. *See In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (denying motion to dismiss class actions claims under South Carolina law "notwithstanding a limitation on class actions in the state statute" based on *Shady Grove*); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *106 (E.D. Mich. June 6,

2013) (relying on *Shady Grove* in denying dismissal of claim based on South Carolina's class prohibition under § 39-5-140).

The Court agrees with TD Bank and hereby dismisses the portion of count VI that incorporates class claims under SCUTPA. The individual plaintiffs' claims based on SCUTPA remain intact and may proceed. First, SCUTPA unambiguously states that the statute may not form the basis of a class action lawsuit: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39–5–20 may bring an action individually, *but not in a representative capacity*, to recover actual damages." S.C. Code Ann. § 39-5-140(a) (emphasis added). As already noted, the South Carolina Supreme Court has held that class actions are not permissible under SCUTPA. *Dema*, 678 S.E.2d at 434; *see also Harris v. Sand Canyon Corp.*, 274 F.R.D. 556, 565 (D.S.C. 2010). Accordingly, the plaintiffs' class action claims based on the SCUTPA are improper and subject to dismissal.

The Court further agrees with TD Bank's reply brief, (ECF No. 60 at 17-18), and the recent decision in *Stalvey v. American Bank Holdings, Inc.*, 2013 WL 6019320, at *4 (D.S.C. Nov. 13, 2013), on the point that SCUTPA's class action bar survives *Shady Grove* for the following reasons. "In *Shady Grove*, a fragmented Court held that a New York procedural law prohibiting class actions in suits seeking penalties or statutory damages did not preclude a federal district court sitting in diversity from entertaining a class action under Rule 23 of the Federal Rules of Civil Procedure because Rule 23 preempted the New York state law." *Id.* Under standard rules of interpretation applied to

plurality opinions like *Shady Grove*, a majority of courts have concluded that Justice Stevens' opinion is controlling in view of the "narrowest grounds" principle. *Id.*; *see, e.g., In re Packaged Ice Antitrust Litig.*, 779 F.Supp.2d 642, 660 (E.D. Mich. 2011) (referencing multiple cases); *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) (noting that the Tenth Circuit has understood Justice Stevens' opinion to be controlling). Justice Stevens concluded, "A federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove*, 559 U.S. at 423. The *Stalvey* court noted that SCUTPA is importantly different from the state procedural law at issue in *Shady Grove*, because the New York law had no substantive component. *Stalvey*, 2013 WL 6019320 at *4; *see* N.Y. Civ. Prac. Law Ann. § 901(b). "Here, the prohibitions against class actions ingrained in the very text of the SCUTPA . . . are substantive portions of South Carolina law and are not trumped by Federal Rule of Civil Procedure 23, even in light of the *Shady Grove* decision." *Stalvey*, 2013 WL 6019320 at *4. The Court agrees with the *Stalvey* court's analysis and accordingly dismisses the plaintiffs' representative SCUTPA claims. However, as in *Stalvey*, the plaintiffs may maintain their SCUTPA causes of action in their individual capacity. *See id.*

### 4. Remaining State Statutes

Given the Court's rulings above, the consumer protection statutory claims that remain viable are those brought pursuant to the law of Connecticut, Maryland, New

Jersey, New York,[14] North Carolina, South Carolina (plaintiffs' individual capacity only) and Washington, D.C. TD Bank argues that these claims collectively fail because the Bank's practices of assessing overdraft fees based on available balance, posting transactions high to low, and assessing overdraft fees on debit card transactions are accurately disclosed in the PDAA and comply with federal banking law. The Bank argues that these practices are not unfair for the same reasons they are not unconscionable or unjust – because they are permitted by the applicable banking law – and consumer protection statutes cannot be applied to bar practices specifically authorized by other laws. *See United Corp. v. Fed. Trade Comm'n*, 110 F.2d 473, 476 (4th Cir. 1940) ("If it was lawful, as there can be no doubt it was, for [defendants] to sell under these labels, it is rather difficult to see how the sale . . . could be held an unfair trade practice.")

TD Bank further argues that none of the three practices listed are deceptive in fact, so the plaintiffs cannot state a claim under the relevant statutes that they are misleading or deceptive. The Bank refers back to language from the PDAA in the attempt to show that all of the challenged practices are expressly disclosed in the agreement, and cannot support a claim for deception. TD Bank cites *Hassler*, 644 F. Supp. 2d at 517 (New Jersey law), and *Gay v. Peoples Bank*, 2015 WL 3650090, at *10-11 (N.C. Super. Ct. June 10, 2015), for the proposition that an unfair trade practice claim based on high to low posting cannot be maintained where a bank's practices are disclosed in the relevant agreement. The *Hassler* court stated, where a statutory unfair trade practices claim "is based upon an allegedly incomplete or misleading disclosure,

---

[14] The New York Statute prohibits only deceptive, not unfair, acts. N.Y. Gen. Bus. Law § 349(a); *see Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 413 (S.D.N.Y. 2004).

and where the parties' agreement contains the very information that Plaintiffs allege was misrepresented, suppressed, or concealed, dismissal for failure to state a claim is appropriate." 644 F. Supp. 2d at 515 (internal quotation marks and alterations omitted). The Bank contends that all of the plaintiffs' claims regarding misrepresentation and deception are "unequivocally belied by the plain terms of the parties' Agreement." *Id.*

Lastly, TD Bank argues that to the extent the plaintiffs assert claims for alleged misrepresentations, those claims fail because the plaintiffs have not alleged reliance and/or causation. The Bank cites to a smattering of state and federal case law from a select few of the relevant jurisdictions (Pennsylvania, North Carolina, Maryland, and New Jersey) for the assertion that plaintiffs are "generally required to allege either reliance or causation" to properly plead claims under unfair trade practices statutes. (*See* Mot. to Dismiss, ECF No. 53-1 at 56-57.) TD Bank contends that the plaintiffs never allege that they relied on any misrepresentations, or that but for the alleged misrepresentations they would not have incurred the overdraft fees in question. The Bank argues that the plaintiffs have not even really alleged that they were exposed to any misrepresentation, and that the claims under the state unfair trade practices statutes should therefore be dismissed.

The plaintiffs respond that TD Bank has treated their state consumer protection statutory claims *en masse* with generalized arguments that are not universally applicable. They contend that the CAC recites detailed allegations of the ways in which TD Bank's overdraft practices are unfair, unconscionable, misleading, and deceptive. First, the plaintiffs point to their sufficient funds theory as an example of conduct by TD Bank that was both (1) inconsistent with the Bank's contractual obligations and (2)

unfair, misleading, and deceptive. They cite language from the CAC which states, *inter alia*, that the Bank "fail[ed] to accurately and truthfully describe this overdraft practice in the terms of the customer agreements" and "misrepresent[ed] in th[e] agreements what it actually does by stating that the bank will only charge overdraft fees when there is not 'enough money' in the account and the bank is required to 'advance funds' to cover the transactions." (CAC, ECF No. 37 at ¶¶ 118.)

Second, the plaintiffs argue that the consumer fraud and unfair business practices statutes upon which they rely are general in their application, and that no federal or state law or regulation can immunize TD Bank from general prohibitions against unfair, deceptive, or unconscionable practices such as those alleged in the CAC. On this point, the plaintiffs cite the result in *Gutierrez*, 704 F.3d 712, 726-27 (9th Cir. 2012), which upheld the district court's judgment against Wells Fargo Bank for making misleading statements about its high-to-low posting method, and the OCC itself, which has specifically put national banks on notice that they need be mindful of the constraints imposed by state statutes of the type invoked by the plaintiffs, *see* OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *2 (Mar. 22, 2002); *see also Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010).

Third, the plaintiffs argue that TD Bank has conflated the concepts of reliance and causation, which are not the same and apply in distinct fashion in each of the relevant jurisdictions. It is enough, they contend, that the CAC alleges the plaintiffs suffered harm as a direct result of the Bank's actions and representations, which were both unfair and misleading. Finally, the plaintiffs go through, in painstaking detail, why

they feel that they have satisfied the Rule 12(b)(6) pleading standard under the applicable state law of various jurisdictions (Connecticut, Maryland, North Carolina, New Jersey, New York, and others now moot), and why they have met the reliance and/or causation requirements where applicable. (*See* Pls.' Resp. to Mot. to Dismiss, ECF No. 59 at 48-55.)

The Court finds that the plaintiffs have stated plausible claims for relief under the remaining state consumer protection statutes, and declines to dismiss these claims. With respect to TD Bank's first argument, that the conduct in question is accurately disclosed in the PDAA and fully complies with federal banking law, the Court has already extensively analyzed these issues in the context of counts I-V, and will not restate all of the same points here. Suffice to say, there are outstanding questions about whether the PDAA adequately disclosed the assessment of overdraft fees when sufficient funds remained in the account, and the Court has determined that federal banking law does not expressly permit this practice. Thus, the Court cannot dismiss the statutory claims on this basis. However, it goes without saying that the statutory claims *are* dismissed pursuant to the preemption analysis *supra* to the extent they incorporate the high-to-low posting theory and the intentional honoring of transactions into overdraft theory.

With respect to TD Bank's second argument, that the express language of the PDAA categorically demonstrates that none of the practices were deceptive in fact, the Court again disagrees. There is at least a plausible reading of certain portions of the PDAA that could cause the reader to be misled about the mechanics of the overdraft policy, *e.g.* with regard to the assessment of overdraft fees when sufficient funds remain

in the account to cover the transaction in question. Neither *Hassler* nor *Gay* counsel for a different result. The *Hassler* court considered only the high-to-low posting theory and found that the plaintiffs had not stated a valid claim under the New Jersey Consumer Fraud Act because the applicable agreement adequately disclosed the posting practice. *See* 644 F. Supp. 2d at 215. This Court has ruled *both* that preemption doctrine precludes the high-to-low posting theory claims *and* that the plaintiffs fail to state a plausible claim for breach of contract on those grounds. In other words, the Court's rulings are aligned with the result in *Hassler* on this issue. But the allegations in the instant case raise additional theories of liability that are not so easily disposed of, *e.g.* the sufficient funds theory, and on which the result in *Hassler* does not directly bear. The *Gay* court did consider a version of the sufficient funds theory and dismissed the plaintiffs' statutory claim under the North Carolina Unfair and Deceptive Trade Practices Act, but it did so by evaluating the evidence presented, or lack thereof, in the context of a motion for summary judgment. *See* 2015 WL 3650090 at *7-8, 10-11. It is not the prerogative of this Court to evaluate the strength of the plaintiffs' claims at the motion to dismiss stage. Rather, the Court must accept all of the plaintiffs' allegations as true. The Court is not persuaded by the ruling in *Gay*. Accordingly, the Court will not dismiss the statutory claims on this basis.

With respect to TD Bank's third argument, that the state unfair trade practices claims should be dismissed for a failure to allege reliance and causation, the Court is not convinced. The cases cited by the Bank in support of this proposition are inapposite here, because the misrepresentations alleged by the plaintiffs in this case are contained within the contract at issue and directly relate to the assessment of overdraft fees, which

is itself the alleged harm. In other words, there is no lack of proximate cause between the alleged misrepresentation and the alleged harm. The cases cited by TD Bank for the proposition that reliance and causation are prerequisites to an unfair trade practices claim deal with situations where the alleged misrepresentation was either wholly unconnected to any attendant harm, *see Stewart v. Bierman*, 859 F. Supp. 2d 754, 769 (D. Md. 2012) ("Plaintiffs fail to indicate how the alleged forgeries of the foreclosure documents materially impacted the debtors' conduct or how the signatures caused Plaintiffs a specific harm separate from the debt owed."), or where legitimate questions regarding the proximate relationship between the alleged misrepresentation and the alleged harm remained, *see Bumpers v. Community Bank of Northern Virginia*, 747 S.E.2d 220, 226-228 (reversing trial court's grant of summary judgment for plaintiffs because there was a genuine question whether the plaintiffs actually and reasonably relied upon alleged misrepresentations about loan discount fees when choosing to take out the loans); *Donachy v. Intrawest U.S. Holdings, Inc.*, 2012 WL 869007, at *1 (D.N.J. March 14, 2012) (granting defendants' motion for judgment on the pleadings because plaintiffs claimed reliance on misrepresentations in a marketing brochure, but the agreement between the parties contained an express acknowledgment that no pre-contractual representation had induced the plaintiffs to enter the purchase agreements at issue).[15] Additionally, where reliance requirements are imposed, they appear to apply narrowly to statutory consumer protection claims that are based on misrepresentation theories only. *See, e.g., Bumpers*, 747 S.E.2d at 226. In the instant case, the plaintiffs

---

[15] The plaintiffs also cite *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004). However, TD Bank's arguments based on this case are rendered moot by the plaintiffs' concession that their claim pursuant to the Pennsylvania Unfair Trade Practices Act and Consumer Protection Law, Pa. Stat. Ann. Tit. 73 § 201-1 et seq. (Purdon), should be dismissed.

have asserted all of their statutory consumer protection claims on unfairness grounds as well,[16] rendering TD Bank's reliance/causation argument largely moot. In any event, the Court will not dismiss the plaintiffs unfair and deceptive trade practices claims for lack of reliance and/or causation at this stage of the proceedings, without giving the plaintiffs an opportunity to demonstrate such reliance and causation where it is required. The Court is satisfied that the claims in count VI allege sufficient proximate cause between the purported misrepresentations and the purported harms to survive a motion to dismiss for failure to state a claim.

### G. Count VIII – Violation of National Bank Act, 12 U.S.C. §§ 85-86 and Usury

The plaintiffs have alleged a violation of the National Bank Act's prohibition on the taking of usurious interest. Their claim is premised on the assertion that an extended overdraft balance charge, or what is referred to in the PDAA as a "SUSTAINED FEE FOR OVERDRAWN ACCOUNTS" (*see* ECF No. 37-1 at 10) ("sustained overdraft fee"), amounts to an interest charge by TD Bank on the funds it advances when an account is overdrawn. The sustained overdraft fee is a one-time $20.00 charge levied on a customer whose checking account remains in an overdrawn status for ten consecutive business days. (*See id.*) The plaintiffs allege that "[u]nlike an initial overdraft fee, the [sustained overdraft fee] is an *additional* charge to a customer based solely on the alleged indebtedness to the bank remaining unpaid by the customer for a period of time." (CAC, ECF No. 37 at 47 (emphasis in original).) Moreover, the plaintiffs aver that "TD Bank renders no service to its customers in exchange for

---

[16] This does not apply to the claim brought pursuant to section 349 of the New York General Business Law. However, in New York, "reliance is not an element of a Section 349 claim." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29. Moreover, "[r]eliance and causation are twin concepts, but they are not identical." *Id.* at 30. Nevertheless, where a plaintiff alleges that they suffered harm because of a defendant's deceptive act, they have satisfied the causation requirement, and "[p]laintiffs need not additionally allege that they would not otherwise have entered into the transaction. Nothing more is required." *Id.*

charging this extra fee other than advancing money to a customer's account in an amount to cover the overdraft," and "TD Bank uses the fact that it has loaned funds to its customer as a pretext to justify charging that customer a secondary service charge that exceeds lawful limits." (*Id.* at 48.) The plaintiffs further state, "There is nothing in TD Bank's written materials disclosing that this additional 'fee' is in reality a charge of interest on extended credit." (*Id.* at 49.) Finally, the plaintiffs extrapolate an effective annualized interest rate far in excess of the permissible limit by relating the $20.00 charge, which corresponds to a 10-day period, to the actual negative balance on the account (e.g. Plaintiff Robinson's negative balance fluctuated from $147.10 to $439.42, leading to an effective annualized interest rate between 166 and 496 percent). (*See id.* at 68-70.) The question of whether count VIII states a plausible claim for relief turns entirely upon whether or not the $20.00 sustained overdraft fee is properly characterized as interest.

TD Bank argues that the sustained overdraft fee is simply not "interest" within the meaning of 12 U.S.C. § 85. The Bank points to OCC regulations, which differentiate between bank charges of interest, governed by 12 C.F.R. § 7.4001, and non-interest charges and fees, governed by 12 C.F.R. § 7.4002. Section 7.4001(a) dictates that "creditor-imposed not sufficient funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds" constitute interest. However, the OCC has specifically excluded deposit account charges, including overdraft fees from this definition. 66 Fed. Reg. 34784-01, 34786-87; *see Cargile v. JP Morgan Chase & Co.*, 2010 WL 5491200, at *3 (E.D. Mich. Nov. 23, 2010) (noting that OCC regulations "make[] it clear that an NSF fee constitutes 'interest' only when a

borrower tenders an insufficient funds check to a creditor *in payment of a previous debt*" and "use of the term 'NSF fees' does not apply to overdraft charges to a deposit account") (emphasis in original). TD Bank contends that if a fee is charged on a deposit account under the terms of the deposit agreement that fee is a "non-interest" charge levied pursuant to 12 C.F.R. § 7.4002(a). *See Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1049-1051 (S.D. Fla. 1998) (holding that overdraft fees "aris[ing] from the terms of the deposit agreements" were non-interest charges under 12 C.F.R. § 7.4002 rather than interest under 12 C.F.R. § 7.4001), *aff'd per curiam* 205 F.3d 1358 (11th Cir. 2000), *cert. denied*, 531 U.S. 822 (2000); OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (stating that overdraft fees are authorized under 12 C.F.R. § 7.4002). The Bank asserts that the critical inquiry is the nature of the account; if the fees are charged on a deposit account, then they are not "interest" under the NBA. *Soto v. Bank of Lancaster Cty.*, 2011 WL 1050213, at *9 (E.D. Pa. Mar. 23, 2011). "[T]he distinction between a credit account and a deposit account is dispositive." *Id.* at *8.

The plaintiffs respond that the sustained overdraft fee is indeed an interest charge because it is distinct from the initial overdraft charge in both its purpose and application. Whereas the initial overdraft fee is properly categorized as administrative in nature, the sustained overdraft fee, argue the plaintiffs, is an amount paid by the customer for the use of money over time. The plaintiffs assert that such an amount charged meets the definition of "interest" regardless of what label the Bank uses, making the sustained overdraft fee subject to usury laws. They characterize the initial overdraft fees as *de facto* loans made without a specific loan agreement, and the

sustained overdraft fee as interest charged on those loans far in excess of the permissible rate. (CAC, ECF No. 37 at ¶ 247-48.)

In support of these concepts the plaintiffs advance the following progression of arguments. First, the sustained overdraft fee falls within the definition of "interest" as explicitly laid out in 12 C.F.R. § 7.4001(a) because it is a "late fee" connected to the extension of credit, and therefore is subject to the prohibition on usurious interest in the NBA, 12 U.S.C. § 86. (*See* Pls.' Resp. to Mot. to Dismiss, ECF No. 59 at 58.) Second, 12 C.F.R. § 7.4002 explicitly states that charges and fees which constitute "interest" within the meaning of the NBA are governed by § 7.4001 and not § 7.4002. Because § 7.4001 does not define "extension of credit," one should look to the definition in Regulation O, 12 C.F.R. § 215.3, which includes "an advance by means of an overdraft, cash item or otherwise." Third, one should look to certain federal banking administrative provisions promulgated by the FDIC and the Federal Financial Institutions Examination Council for the proposition that overdrafts are actually loans, and that charges levied against overdrawn accounts based on the length of time the account has been overdrawn are interest income. (*See* Pls.' Resp. to Mot. to Dismiss, ECF No. 59 at 59.) Finally, the plaintiffs attempt to distinguish the litany of federal decisions that have held that overdraft fees do not constitute interest, by pointing out that nearly all of those decisions dealt with *initial* overdraft fees, not *sustained* overdraft fees.

The Court agrees with TD Bank, and finds that the sustained overdraft fee is not interest within the meaning of 12 U.S.C. § 85 and 12 C.F.R. § 7.4001. As such, count VIII fails to state a plausible claim for relief and is hereby dismissed. The OCC has clarified any ambiguity on the point of whether overdraft fees constitute interest in the

following section of a final rule regarding banking activities and operations entitled,

"Definition of 'Interest' for Purposes of 12 U.S.C. 85 (Revised § 7.4001(a))" dated July 2,

2001:

> The OCC proposed revising § 7.4001 to clarify the scope of the term "NSF fees" for purposes of 12 U.S.C. 85. Section 85 governs the interest rates that national banks may charge, but it does not define the term "interest." Section 7.4001 generally defines the charges that are considered "interest" for purposes of section 85, and then sets out a nonexclusive list of charges covered by that definition. The list includes "NSF fees."

> The inclusion of "NSF fees" in the definition of "interest" was intended to codify a position the OCC took in Interpretive Letter 452, issued in 1988. IL 452 concluded that charges imposed by a credit card bank on its customers who paid their accounts with checks drawn on insufficient funds were "interest" within the meaning of section 85. The charges were referred to as "NSF charges" in the letter. The term, however, is also is [sic] commonly used to refer to fees imposed by a bank on its checking account customers whenever a customer writes a check against insufficient funds, regardless of whether the check was intended to pay an obligation due to the bank. These different uses of the term "NSF fees" have created ambiguity about the scope of the term as used in § 7.4001(a).

> The proposal invited comments on a change to § 7.4001(a) that would clarify that the term "NSF fees" includes only those fees imposed by a creditor bank when a borrower attempts to pay an obligation to that bank with a check drawn on insufficient funds. *Fees that a bank charges for its deposit account services—including overdraft and returned check charges—are not covered by the term "NSF fees" as that term is used in § 7.4001(a).* The OCC received no objections on that proposed change, and, therefore, we adopt it in the final rule as proposed. change. [sic] Thus, we are clarifying the definition of "interest" by stating in the final rule that interest includes creditor-imposed NSF fees that are charged when a borrower tenders payment on a debt with a check drawn on insufficient funds.

66 Fed. Reg. 34784-01, 34786-87 (emphasis added). It is of course true that this

section does not discuss "sustained" overdraft fees specifically. However, the Court is

unconvinced that a one-time sustained overdraft fee constitutes the accrual of interest

on an extension of credit merely because it occurs ten days after the initial overdraft fee

is imposed. In general, the nature of interest is the application, over time, of an established rate to an identified principal. In contrast, the sustained overdraft fee is a flat $20.00 fee, applied universally after ten consecutive days of negative balance and without regard to the total amount of the negative balance or fluctuations within that negative balance during the ten-day period. (*See* CAC, ECF No. 37 at 47-49, 68-70.)

Federal courts that have considered the question of whether NSF fees (including overdraft fees) arising from a deposit agreement can be "interest" for purposes of the NBA have uniformly held that they cannot constitute "interest," and have dismissed claims under 12 U.S.C. § 85 that relate to overdraft fees. *See Armstrong v. Colonial Bank, N.A.*, 196 F. App'x 872 (11th Cir. 2006) (affirming district court's order concluding that overdraft charges are not interest and dismissing related action for failure to state a claim); *Soto*, 2011 WL 1050213, at *8; *Cargile*, 2010 WL 5491200, at *3-4; *In re Wash. Mut. Overdraft Prot. Litig.*, 2004 WL 5046210, at *5 (C.D. Cal. Apr. 26, 2004) (applying the NBA's definition of "interest" to the Home Owner's Loan Act and concluding that overdraft fees are not interest because they are "a deposit account service charge arising from the terms of the depository agreement" and thus controlled by 12 C.F.R. § 7.4002), *aff'd in part, rev'd in part on other grounds*, 201 Fed. App'x 409 (9th Cir. 2006); *Video Trax, Inc.*, 33 F. Supp. 2d at 1049-51; *Terrell v. Hancock Bank*, 7 F. Supp. 2d 812, 816 (S.D. Miss. 1998) (assuming for purposes of argument that the NBA applied to defendant state bank and concluding that overdraft fees are not interest because they "arise[] from the terms of the Depository Agreement" and are addressed in 12 C.F.R. § 7.4002); *Nicolas v. Deposit Guar. Nat'l Bank*, 182 F.R.D. 226, 231 (S.D. Miss. 1998) (same).

Two federal courts have recently considered the specific question at issue in the case *sub judice*, whether *sustained* overdraft fees constitute "interest" for purposes of 12 U.S.C. § 85, and have both held that such fees are not interest. In *McGee v. Bank of Am., N.A.*, 2015 WL 4594582, at *4 (S.D. Fla. July 30, 2015), the court held that an "extended overdrawn balance charge" was not interest within the meaning of 12 U.S.C. §§ 85 and 86, and dismissed the plaintiffs' complaint for failure to state a plausible claim for relief. The *McGee* court specifically considered and rejected the same arguments raised by the plaintiffs in this case, namely: 1) that the sustained overdraft fees cannot be non-interest charges because no additional service is provided, 2) that the sustained fees are "interest" because they qualify as "late fees" within the text of 12 C.F.R. § 7.4001(a), (3) that the initial overdraft fees are extensions of credit, and (4) that the plaintiffs' arguments raise questions of fact inappropriate for resolution at the pleading stage. *Id.* at *3-4. The *McGee* court stated, "The [extended overdrawn balance charges] at issue are flat fees contingent upon a customer's failure to remedy an overdrawn account, rather than payment for the use of money, and are not 'interest' within the ordinary meaning of the word." *Id.* at *3 (citing *Video Trax*, 33 F. Supp. 2d at 1050). Furthermore, "the extended overdrawn balance charges—like initial overdraft charges— *do not arise from a credit transaction*, and are not interest under 12 U.S.C. § 85." *Id.* (emphasis added). In so holding, the *McGee* court relied upon the reasoning in *Video Trax*, "that flat fees for overdrafts serve purposes other than compensation for the use of money, such as covering the costs of banking services, discouraging harmful customer behavior, and fostering the safety and stability of the banking system." *Id.* at

*2 (citing *Video Trax*, 33 F. Supp. 2d at 1050-53). This Court finds the reasoning and analysis of *McGee* persuasive and dismisses count VIII accordingly.

Likewise, in *Shaw v. BOKF, N.A.*, 2015 WL 6142903, at *4 (N.D. Okla. Oct. 19, 2015), the court held that the "extended overdraft fees" being challenged by the plaintiffs were not "interest" as that term is defined in the NBA. The *Shaw* court relied upon the reasoning and results in *McGee* and *Video Trax* for the proposition that "the extended overdraft charges were incurred as part of maintaining a deposit account, not a credit transaction, and the extended overdraft charges could not be considered interest." *Id.* at *3 (citing *McGee*, 2015 WL 4594582 at *3). In addition, the *Shaw* court directly confronted the plaintiffs' argument that 12 C.F.R. § 215, also known as Regulation O, defines overdrafts as "extensions of credit." In their response brief, the plaintiffs seek to disclaim the rather obvious inapplicability of Regulation O to their relationship with the Bank. (*See* Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 59 at 59 ("Although this definition appears in the section addressing extensions of credit to insiders of a bank, it is an integral part of the entire framework of the regulations, and understanding all of them is vital to grasping regulatory intent.").) As the *Shaw* court explains, "Regulation O is entirely inapplicable to the ordinary bank customer with a deposit account, because Regulation O was intended to prevent 'banking abuses by bank insiders.' This understanding of Regulation O is confirmed by 12 C.F.R. § 215.1, which states that the 'purpose and scope' of Regulation O is to govern 'any extension of credit made by a member bank to a company controlled by such a person . . . .'" *Shaw*, 2015 WL 6142903 at *4. This Court finds the reasoning in *Shaw* persuasive. Similar to the plaintiffs in *Shaw*, the plaintiffs in this case did not borrow money or obtain a line of

84

credit from TD Bank. Rather, they maintained deposit accounts with the Bank and overdrew those accounts, at which point the Bank provided the service of covering their overdrafts. *See id.* Furthermore, the plaintiffs were not charged interest for the use of money, but were charged fees for overdrawing their accounts and for failing to remedy the status of those overdrafts within the contractually allotted time period. *See id.*

The plaintiffs point the Court to a document issued on February 15, 2015 by the OCC, the Board of Governors of the Federal Reserve System, the FDIC, and the National Credit Union Administration, entitled "Joint Guidance on Overdraft Protection Programs," as a source of authority for the concepts that overdraft fees are extensions of credit and that banks must be wary of the usury implications raised by such extensions of credit. (*See* Resp. to Def. Not. of Supp. Authority, ECF No. 64 at 1.) The plaintiffs urge the Court to ignore the results in *Shaw*, *Mcgee*, and *Video Trax* as having no application to the sustained overdraft fees at issue in this proceeding. (*See id.*) The Court disagrees and believes the plaintiffs have overstated any purported support that the Joint Guidance offers their position on the usury issue.

Finally, the plaintiffs submitted a notice of supplemental authority regarding the usury issue with citations to various sources. Among those sources are: 1. two OCC enforcement actions, cited for the premise that honoring a check on an account with insufficient funds is an extension of credit; 2. one federal and three state court decisions, cited for the premise that a bank makes a loan when it honors an overdraft check; and, 3. two banking treatises, cited for the premise that overdraft coverage constitutes short-term unsecured loans to customers so banks ought to be concerned about compliance with usury laws. (*See* Pls.' Not. of Supp. Authority, ECF No. 66 at 1-

2.) The Court has reviewed all of the sources cited and finds them unpersuasive as they relate to the central question at issue in count VIII: whether the sustained overdraft fees constitute "interest" within the meaning of 12 U.S.C. §§ 85 and 86. The relevance of the sources to that question is tangential. As explained above, count VIII fails to state a plausible claim for relief and is dismissed.

## **CONCLUSION**

For the reasons set forth above, defendants' motion to dismiss is GRANTED in part and DENIED in part. In general, for those portions of the complaint for which dismissal is GRANTED, such dismissal is with prejudice. However, where the plaintiffs conceded dismissal of their claims brought under the consumer protection statues of Massachusetts, Pennsylvania, and Vermont, such dismissal is without prejudice.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

December 10, 2015
Greenville, South Carolina