UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: TD BANK, N.A. DEBIT CARD OVERDRAFT FEE LITIGATION | ) ) ) | Civil Action No.: 6:15-MN-2613-BHH ALL CASES |
| MDL No. 2613 | ) ) | **Opinion and Order** |
| _____ | ) | |

This matter is before the Court on Plaintiffs' motion for class certification (ECF No. 140). Defendant TD Bank, N.A. (hereinafter "Defendant," "TD," or "the Bank") filed a response in opposition (ECF No. 142), and Plaintiffs filed a reply in support (ECF No. 143). On May 24, 2017, the Court conducted a hearing on this issue and took the class certification motion under advisement. (*See* ECF No. 156.) The matter is ripe for consideration.

## OVERVIEW

Plaintiffs maintain two overarching theories of liability. First, they allege the Bank has engaged in a regular practice of extracting overdraft fees from customers even when their accounts were not actually overdrawn (the "available balance theory"), to the tune of millions of dollars in improper fees. The gravamen of this claim pertains to TD's computerized processing system, which was programmed to deem accounts overdrawn if a transaction was greater than the balance of money in the account minus the amounts of approved debit card transactions, even before such transactions had been presented for payment and *while the relevant funds were still in the account*. This practice, Plaintiffs note, disproportionately impacts the Bank's most vulnerable customers—those whose available balance tends to approach zero or negative

numbers on a recurring basis and who have the least ability to afford sometimes numerous $35 overdraft fees. According to Plaintiffs, this practice breached the Bank's own form contract (Count I), breached the implied covenant of good faith and fair dealing (Count II), amounted to conversion (Count IV), constituted unjust enrichment (Count V), and violated the unfair and deceptive trade practice statutes of several states (Count VI). (*See* Pls.' Mot. for Class Certification, ECF No. 140-1 at 13, 18-26.)

Second, Plaintiffs allege that TD has systematically violated federal law by failing to comply with mandatory opt-in requirements imposed by Regulation E (the "Reg E theory") prior to assessing overdraft fees on one-time debit card and automated teller machine ("ATM") transactions. The fallout of these regulatory infractions, Plaintiffs contend, has been widespread "opt-in" to the Bank's debit card overdraft program ("Debit Card Advance" or "DCA") without lawful notice, authorization, and confirmation of enrollment. Plaintiffs further assert that these opt-in practices have been standardized across large swaths of TD's customer base, making class treatment of this claim the only practicable option for the Court, the parties, and the putative class members. Although the same alleged deficiencies did not apply to every customer, Plaintiffs aver that each "channel" for customer opt-in—for example, in-branch or online opt-in—was flawed in the same manner. (*See id.* at 13-14, 26-39.)

Plaintiffs' central argument for class certification is that the Bank's uniform contracts and standardized, automated practices—including computer systems that assessed and collected overdraft fees from the proposed classes with uniform logic— were applied to the putative class members in the same manner as they were to the named Plaintiffs, making the case ideally suited for class treatment. Defendant's main

counter-argument is that individual questions will predominate over common questions with regard to all theories, all claims, and all defenses, and that the only way to properly treat the relevant issues would be through thousands, perhaps millions, of mini-trials, thus precluding class treatment across the board.

## FACTUAL BACKGROUND

Defendant TD Bank, N.A. is a combination of several U.S. banks acquired by its Canada-based parent, Toronto-Dominion Bank, since 2004. The Bank maintains more than 1200 branches across the United States and has more than 8.5 million customers. (*See* Company Fact Sheet, ECF No. 140-27 at 2.)

**Applicability of the Available Balance Theory**

During all times relevant to this case, the Bank's relationship with its checking account customers has been governed by a form contract called the Personal Deposit Account Agreement ("PDAA"). (*See* ECF Nos. 140-29 (June 2010 PDAA), 140-30 (Sept. 2011 PDAA), 140-31 (Feb. 2012 PDAA), 140-32 (June 2013 PDAA).) The relevant contractual terms are the same for all checking account customers, and all customer transactions have been and are processed in a uniform, automated manner by the Fidelity IMPACS processing system and TD's debit card management system, the FIS-EFT System (or "Metavante"). (*See* Tomlinson Dep. 10:16-12:9, ECF No. 140-10 at 5-7.) The Bank maintains archival reports dating back to the early 2000s detailing all customer account transactions that have been processed through its systems. (*Id.* at 12:20-24, 14:4-21.)

Beginning in February 2008, as part of a series of progressive changes to its overdraft fee practices called Project MORE ("<u>M</u>aking <u>O</u>verdraft <u>R</u>evenue <u>E</u>asier"), the

Bank began to take into account all pending transactions, including pending credits, pending debits, and outstanding debit card authorizations, in determining the customer's available account balance to pay items presented for final settlement and payment. (*See* TD Resp. to Interrog. 4, ECF No. 140-34 at 18; Project MORE Update, ECF No. 140-35 at 2.) This change in available balance calculation practice was part of a phase of Project MORE called "Wave 6." (*See id.*) Prior to the implementation of Wave 6, pending transactions were not calculated in the customer's available account balance to pay items presented for final settlement and payment. (*See* TD Resp. to Interrog. 4, ECF No. 140-34 at 18; Sacknoff I Dep. 34:5-37:8, ECF No. 140-11 at 11.) After this change, if an item posted to an account with a negative available balance resulting from a pending transaction(s), an overdraft fee would be assessed. (ECF No. 140-34 at 18.) However, the Bank would not deduct pending transactions from a customer's available account balance for certain categories of merchants that routinely request authorization for amounts in excess of the likely settlement amount, including hotels and resorts, airlines and cruise lines, car rental companies, and automated gas pumps. (*Id.*)

The modifications made to the determination of customers' available balance pursuant to Wave 6 produced a significant increase in annual overdraft fee revenue for the Bank. (*See* Project MORE Update, ECF No. 140-35 at 2 (projecting a $10 million increase in annual overdraft fee revenue from Wave 6 implementation)); Chevalier III Dep. 82:17-83:18, ECF No. 140-8 at 22 (acknowledging that Wave 6 met TD management's expectations of a 9 to 17 percent increase in revenue from overdraft fees, but stating that the witness did not recall the precise percentage).) The Bank made no change to the PDAA when implementing Wave 6; however, the Bank communicated

the relevant changes to its customers through various channels, to include paper mailings, an online landing page, an email to customers who utilize online banking, and a message alerting customers banking by phone. (Sacknoff I Dep. 41:20-42:23, ECF No. 140-11 at 12-13; Chevalier III Dep. 67:1-25, ECF No. 140-8 at 18.)

TD's overdraft policies, practices, and procedures were implemented uniformly across all branches and in each state where TD has a presence. (*See* TD Resp. to Interrog. 5, ECF No. 140-34 at 21.) The process of assessing an overdraft fee based on a customer's available balance generally includes the following steps in any particular instance:[1] 1. the customer initiates a debit card transaction at a merchant; 2. the merchant sends TD an electronic authorization request, typically through a third-party processor, which is received by the FIS-EFT System; 3. the FIS-EFT System automatically determines whether the transaction should be authorized based on the transaction information and the customer's account information; 4. the FIS-EFT System makes this determination based on account information provided by Fidelity IMPACS, TD's customer deposit account system of record, which updates customer account balances throughout the day and processes and posts day-to-day transaction activity during nightly batch; 5. in communicating the relevant account information, Fidelity IMPACS assesses the available balance at the time of the merchant's query, potentially available funds in any linked overdraft protection source (e.g., a savings account or line of credit), and the amount to which the particular account is permitted to go into overdraft (permission is based upon an algorithmic scoring matrix specific to the

---

[1] For purposes of explanation, the Court uses the example of a debit card transaction, though ATM withdrawals are also at issue in this case.

individual account called "OD Points"[2]); 6. if sufficient funds are available based on the foregoing factors as determined by Fidelity IMPACS, the FIS-EFT System sends authorization back to the merchant (if sufficient funds are not available the transaction is declined and no overdraft fee results from the attempt); 7. once the transaction is authorized, the Bank places a "memo hold" on the customer's account in the amount of the authorization request and deducts the amount of the pending transaction from the customer's available balance; 8. the memo hold remains in place until the earlier of (a) receipt of final settlement information for the transaction or (b) three business days; 9. the Bank posts transactions to customers' accounts during the late night or early morning hours of each business day pursuant to the analysis and processing of batch files received from multiple sources (e.g., third-party processors, point of sale and ATM networks, other banks processing checks, entities submitting automated clearing house payments and requests, etc.) in the following order—(a) deposits and other credits that become available to the customer that business day are added to the customer's available balance, (b) subject to certain exceptions, pending electronic debit transactions that have been authorized but not yet presented for final settlement and payment are deducted from the customer's available balance, (c) debit items presented against the customer's account for final settlement and payment are posted to the account in the order of highest dollar amount to lowest dollar amount, within categories;[3] 10. when a debit transaction exceeds the available balance and any linked overdraft protection source it is "flagged" as exceeding available funds; 11. such a

---

[2] TD's introduction of the OD Points system in May 2001 and the mechanics of its operation are more fully described in the Bank's response to interrogatory number 4. (*See* ECF No. 140-34 at 15.)

[3] This "posting" step of the process contains certain intricacies, which are explained in minute detail in subsection B. of the Bank's response to interrogatory number 10. (*See* ECF No. 140-34 at 29-31.)

flagged transaction is either (a) paid and becomes an overdraft item, or (b) if applicable, returned for insufficient funds (authorized and completed debit card transactions and ATM withdrawals cannot be returned for insufficient funds and so will always be posted and paid once submitted for settlement, even if they exceed the overdraft permission limits on the account);[4] and 12. subject to certain exceptions, debit items paid into overdraft result in the assessment of an overdraft fee, with a limit of five items per account per business day, while items returned for insufficient funds result in a per-item overdraft-return fee. (TD Resp. to Interrog. 10, ECF No. 140-34 at 26-33.)

Plaintiffs uniformly allege that they were charged overdraft fees as a result of TD's practice of assessing overdraft fees on transactions that did not exceed the actual amount of money remaining in their accounts, but rather exceeded the available balance as systematically calculated by the Bank's computer systems. In her deposition, TD's corporate representative confirmed that Plaintiffs would have been assessed fewer overdraft fees if TD had used the money in the account (i.e., the "current balance" or "ledger balance") as the measure of whether the account was overdrawn, rather than the available balance. (See, e.g., Sacknoff II Dep. 51:18-52:8 (confirming for Plaintiff Robinson), 99:12-24 (same for Plaintiff Ucciferri), 102:24-103:7 (same for Plaintiff Padilla), ECF No. 140-15 at 15, 27, 28.) Plaintiffs assert that their expert, Mr. Arthur Olsen, has already calculated Plaintiffs' damages under the available balance theory by using the account data that TD has produced to date, and that Mr. Olsen's report shows he will be able to perform a comprehensive damages analysis for the entire "Sufficient Funds Class." (See Olsen Decl., App. 1, ECF No. 140-21 at 4-5

---

[4] The amount by which the Bank will authorize an account to go into overdraft, or post items into overdraft, is determined electronically for each individual account using OD Points. (See ECF No. 140-34 at 32.)

(showing putative damages specific to instances where Plaintiffs were assessed overdraft fees on a positive ledger balance); Olsen Report ¶¶ 72-74, ECF No. 140-33 at 22-23 (stating the information needed to perform a class-wide damages analysis and the system for applying a computer algorithm to perform the calculations in an automated way on the entire customer data set).)

**Carolina First Practices Prior to Merger**

Carolina First Bank ("Carolina First") was a South Carolina chartered banking corporation headquartered in Greenville, South Carolina. Prior to July 1, 2007, Mercantile Bank ("Mercantile") was a Florida chartered banking corporation headquartered in Jacksonville, Florida. Effective July 1, 2007, Mercantile merged into Carolina First, and Mercantile operations were run as a division of Carolina First under the brand name "Mercantile Bank." Carolina First (including Mercantile) merged into TD Bank, N.A. on September 30, 2010. However, customers remained subject to Carolina First systems and account agreements until June 2011. Effective June 20, 2011, the legacy Carolina First and Mercantile[5] branches were rebranded as TD Bank, and all customers were converted to TD systems and account agreements. The South Financial Group, Inc. ("TSFG") was the parent holding company of Carolina First. (*See* TD Resp. to Request for Admissions, ECF No. 140-42 at 4; Summary of Carolina First Overdraft Policies, ECF No. 140-70 at 2.)

During all times relevant to this case, Carolina First's relationship with its checking account customers was governed by a form, boilerplate Account Agreement. (*See* ECF Nos. 140-71 (S.C. Account Agreement), 140-72 (Fla. Account Agreement),

---

[5] Hereinafter, the Court will use the term "Carolina First" inclusively to describe the practices of both Carolina First and Mercantile.

140-73 (N.C. Account Agreement).) The relevant contractual terms were the same for all checking account customers, and Carolina First utilized uniform fee schedules. (*See* Aug. 1, 2007 Fee Schedule, ECF No. 140-74.) All checking account transactions were processed in a uniform, automated manner by the On Base processing system. (*See* Catoe Dep. 13:7-16:20, ECF No. 140-18 at 5-8.) Carolina First maintained, in its On Base storage system, reports detailing all customer account transactions that were processed through its systems, which reports are available for the entire relevant period but for a few random days where data is missing. (*Id.*)

In 2005, Carolina First began working with a banking consultant group to implement various overdraft practice changes designed to increase fee revenue. (*See* TSFG Revenue Enhancement Project, ECF No. 140-75.) First, through a program called "Pay Matrix," Carolina First began use of a computer algorithm that automated its decision to pay or return debit items by establishing a dollar amount up to which an account was permitted to go into overdraft. (*See id.*; Pay Matrix Overview, ECF No. 140-76; Recommendation MX02, ECF No. 140-78.) Carolina First's Pay Matrix program is similar to TD Bank's OD Points program in this respect.

Second, Carolina First began approving debit card transactions (ATM and point of sale) into overdraft. Prior to this change, debit card transactions were not authorized beyond a customer's account balance. After the change, debit card transactions were authorized up to the account balance plus the overdraft limit imposed by Pay Matrix. (*See id.*) Carolina First's consultant estimated that implementation of Pay Matrix and extending overdrafts to debit cards would together create between $.8 and $1.5 million in enhanced annual fee revenue. (*See* Income Initiatives Presentation, ECF No. 140-77;

ECF No. 140-78.)

Third, Carolina First introduced a new batch posting priority sequence in which it posted debits received for final settlement and payment, within categories, in the order of highest-to-lowest dollar amount of the transactions. (TD Resp. to Request for Admission Nos. 1 & 2, ECF No. 140-42 at 9-10.) Specifically, Carolina First began posting all customer-initiated debits in a single group from highest-to-lowest dollar amount. (ECF No. 140-70 at 4.) Previously, the highest volume debits (e.g., checks, ACH, and debit card transactions) were not treated equally for posting purposes. For example, debit card transactions typically posted before checks, which, in turn, typically posted before ACH transactions. Following the change, the highest volume debits had the same posting priority. (*Id.*) The modifications to posting sequence depleted customer's account balances more quickly, thereby increasing the number of overdraft and returned item fees assessed. (*See* Recommendation OP01, ECF No. 140-79.) Carolina First's consultant estimated that the posting sequence changes would create between $1 and $1.5 million in additional annual fee revenue. (*See id.*; ECF No. 140-77.)

Fourth, Carolina First began to include authorized debit card transactions in its nightly batch processing. These "Point of Sale (POS) holds" reduced the customer's available account balance, and if an item posted to an account with a negative available balance as a result of a POS hold, an overdraft fee would be assessed. (*See* ECF No. 140-70 at 4.) Carolina First estimated that this change would generate an additional $.8 to $1.2 million in annual fee revenue. (*See* Revenue Projection Spreadsheet, ECF No. 140-80 at 2.) Ultimately, the income initiatives implemented by Carolina First resulted in

significant profits from overdraft fees. Subsequent data analysis showed that annualized "non-sufficient funds" fee income (including overdraft fees) totaled nearly $27 million by 2010. (*See* JMFA Overdraft Privilege Study, ECF No. 140-85 at 8.)

Carolina First represents that, before it merged with TD Bank, it engaged in various efforts to disclose its overdraft practices to customers. Beginning in 2005, Carolina First provided its Fee Schedule to customers at account opening, made it available online and at branches, and periodically mailed it to customers when there was a change in fees. (Sacknoff Decl. ¶ 57, ECF No. 142-3 at 24.) In a section entitled "Payment Order of Items," the Fee Schedule stated: "Our policy is to pay items received on any one day in the order of the highest dollar amount to the lowest dollar amount." (*Id.* ¶ 58 & Ex. 57, ECF No. 142-9 at 59.) The same section warned that the posting order "may increase the overdraft . . . fees you have to pay if funds are not available to pay all of the items." (*Id.*) In a section entitled "Non-Sufficient Funds,"[6] the Fee Schedule stated: "At our discretion, we may . . . authorize an ATM withdrawal and/or debit card purchase that may result in an overdraft to the account." The same section further stated that if Carolina First decides to pay such a debit item, the customer "shall reimburse us immediately for the amount of the overdraft, plus the Non-Sufficient Funds Item fee in the amount stated on our Fee Schedule." (*Id.*) Carolina First mailed customers an overdraft notice each time they overdrew their accounts; displayed customers' available balances online and at the ATM; showed online customers both their posted and pending transactions; offered automatic balance notifications by email or text message; and maintained a written policy to educate customers about Carolina

---

[6] Subsequent versions of the Fee Schedule changed the section title to "Insufficient Funds," but retained essentially the same content. (*See* ECF No. 140-74 at 3.)

First's overdraft practices when a customer sought a refund of an overdraft fee. (*Id.* ¶¶ 62-64 & Exs. 49-50, ECF No. 142-9 at 64-68.)

The Carolina First Plaintiffs (hereinafter "CF Plaintiffs") allege that Carolina First obscured its overdraft practices by providing inaccurate, incomplete, or misleading information to class members. For example, they assert that the documents relied upon by Carolina First as "disclosures" never advised that Carolina First used available balance to determine overdraft fees. CF Plaintiffs further claim that the terms and conditions document given to customers when they opened an account was never updated to address the changes to overdraft procedure that were implemented. (*See* Sacknoff II Dep. 160:4-11, ECF No. 140-19 at 42.) Additionally, CF Plaintiffs note, the language on the Fee Schedule regarding insufficient funds states only that an overdraft fee will be assessed when there "are not sufficient funds available in your account." (*See* ECF No. 140-74 at 3.)

Moreover, CF Plaintiffs aver that the Carolina First Account Agreement did not disclose or authorize the practice of high-to-low reordering of debit transactions. They note that the only mention of this practice came in Carolina First's Fee Schedule. (*See* Sacknoff II Dep. 157:7-158:2, ECF No. 140-19 at 41.)

CF Plaintiffs' state law claims against Carolina First premised on the available balance theory parallel the claims raised against TD. They allege that Carolina First systematically assessed overdraft fees on transactions that did not exceed the money in their accounts. It is undisputed that CF Plaintiffs would have been assessed fewer overdraft fees if Carolina First had used the ledger balance as the measure of whether the account was overdrawn, rather than the available balance. (*See* TD Resp. to

Request for Admission No. 13, ECF No. 140-42 at 20.) Moreover, CF Plaintiffs' state law claims premised on the high-to-low posting theory allege that they improperly incurred additional overdraft fees as a result of Carolina First's reordering of transactions. Putting aside the question of propriety, the fact that this posting practice resulted in additional fees is unsurprising given that the Fee Schedule itself declares the likelihood of this eventuality. (*See* ECF No. 140-74 at 3.)

CF Plaintiffs assert that Mr. Olsen has already calculated their damages under the available balance theory and high-to-low posting theory by using the account data Carolina First has produced in this case. (*See* Olsen Decl., App. 1, ECF No. 140-21 at 5 (showing putative damages specific to instances where CF Plaintiffs were (a) assessed overdraft fees on a positive ledger balance, and (b) assessed overdraft fees due to resequencing using the positive ledger balance metric).) CF Plaintiffs also claim that Mr. Olsen's report shows he will be able to perform a comprehensive damages analysis for the entire "South Financial Class." (Olsen Report ¶¶ 72-74, 80-82, ECF No. 140-33 at 22-25 (stating the information needed to perform a class-wide damages analysis and the system for applying computer algorithms to perform the calculations in an automated way on the entire customer data set).)

**Applicability of the Reg E Theory**

In November 2009, the Board of Governors of the Federal Reserve System ("the Board") amended Regulation E ("Reg E"), which implements the Electronic Fund Transfer Act ("EFTA"), in order to limit the ability of a financial institution to assess an overdraft fee for paying ATM and one-time debit card transactions that overdraw a consumer's account, unless the consumer affirmatively consents, or opts in, to the

institution's payment of overdrafts for these transactions. *See* 74 Fed. Reg. 59033 (Nov. 17, 2009). A few months later, the agency amended Reg E and the official staff commentary again in order to clarify certain aspects of the Reg E final rule. *See* 75 Fed. Reg. 31665 (June 4, 2010). The background for this rule change was that regulators found that consumers had often been enrolled in overdraft services without their consent. 74 Fed. Reg. 59038 (Nov. 17, 2009). The Board's research further indicated that the large majority of overdraft fees were paid by a small portion of consumers who frequently overdrew their accounts and who may have had difficulty both repaying overdraft fees and bringing their accounts current, which would in turn cause additional overdraft fees. *Id.* The Board believed that, on balance, an opt-in rule would create the optimal result for consumers with respect to ATM and one-time debit card transactions specifically. *See id.*

Like all banks subject to the Board's regulatory action, TD responded to the new regulations with new procedures to educate customers concerning their options regarding overdraft services and implemented new protocols to enroll customers from whom affirmative consent (opt-in) had been obtained. The Reg E amendments, 12 C.F.R. § 1005.17(b), imposed the following requirements on the opt-in process:

> (1) General. Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:
>
> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
>
> (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card

14

transactions;

(iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and

(iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

12 C.F.R. § 1005.17(b)(1)(i)-(iv). Prior to these amendments, the Bank's practice was to automatically enroll customers into overdraft services for all transaction types. (Sacknoff Decl. ¶ 7, ECF No. 142-3 at 2-3.) After the amendments, beginning in May 2010, the Bank began to offer customers three options: (1) "standard" overdraft services, which cover check, automated clearing house ("ACH"), and other transactions not subject to Reg E; (2) TD Debit Card Advance ("TDDCA"), which extends overdraft services to ATM and one-time debit card transactions; and (3) a "decline all option," which opts the customer out of overdraft service for all transaction types (though this option is not itemized on the Bank's informational or enrollment forms). (*Id.* ¶ 10, ECF No. 142-3 at 3-4.) If a customer does not enroll in TDDCA, the Bank excludes overdraft coverage for ATM and one-time debit card transactions from the customer's account, and declines any such transactions that exceed the customer's available balance. (*Id.*)

The principal document that the Bank has used to inform customers about their overdraft options is TD's version of the Board's Model A-9 form, which was set forth in Appendix A of 12 C.F.R. § 1005.17 when the amendments were made to Reg E. According to the Bank, it made only one relevant alteration to the model form, namely, the addition of the word "available" to the Board's proposed language, so that the Bank's form reads: "An overdraft occurs when you do not have enough money *available*

in your account, but we pay it anyway." (*See id.* ¶ 11, ECF No. 142-3 at 4; TD Reg E Form, ECF No. 142-4 at 36-37 (emphasis added).) This form constituted the Bank's effort to comply with the notice requirement cited *supra*, 12 C.F.R. § 1005.17(b)(1)(i). Reg E permits banks to use overdraft disclosures "substantially similar to Model Form A-9." 12 C.F.R. § 1005.17(d).

TD mailed its Reg E Form to all existing personal checking account customers with their June 2010 statements and re-sends the form annually with the Bank's privacy notice. (Sacknoff Decl. ¶ 13, ECF No. 142-3 at 5.) The June 2010 statement mailing included additional educational materials indicating that the new regulation was set to take effect in August 2010, providing a link to the relevant Federal Reserve consumer information webpage, explaining customers' options, and listing various ways to avoid overdraft fees (e.g., linked savings account or credit line). (*See id.* ¶ 14 & Ex. 6, Changes to Your Debit Card Mailer, ECF No. 142-5 at 3-4.) The Bank supplemented the statement mailings with additional mailings to customers who had used overdraft services in the past in an effort to, according to TD, ensure that such customers would not be surprised if the Bank declined their ATM and one-time debit card transactions because they had neglected to opt-in prior to the August 2010 regulatory implementation date. (*See id.* ¶ 15 & Ex. 7, Supplemental Reg E Mailers, ECF No. 142-5 at 8-13.) In the spring and summer of 2010, TD employees also called some customers who had incurred one or more overdraft fees in 2009 and responded to calls from customers who had questions about the DCA program. (*Id.* ¶ 17.) The Bank provided training to its customer service representatives, branch employees, and branch managers on how to speak directly with customers about the regulatory change,

answer customer questions, and assist customers with making informed decisions based their individual needs and circumstances. (*See id.* ¶ 18 & Exs. 8-9, Reg E Staff Training Materials, ECF No. 142-5 at 15-43.) For example, one section of training materials applicable to all store and call center staff stated:

> Customers who prefer to be declined when they use their debit card and have insufficient funds, should not be enrolled in TD Debit Card Advance, and will have their debit card overdraft coverage turned off as of 8/14. Each choice presents its own advantages and disadvantages, making it important [sic] us to present Customers with all options and help them determine which is best for their unique situation.

(ECF No. 142-5 at 21.)

More generally, Lindsay A. Sacknoff, Senior Vice President and Head of Consumer Banking Business Management and Governance at TD Bank, has explained the overall context of customer enrollment in the Bank's DCA program during the relevant time period in the following manner:

> Both during and after 2010, customers have learned about the Bank's overdraft practices when presented with the option to enroll in TDDCA. Bank customers may enroll in or unenroll from TDDCA at the branch, by telephone, online and through the Bank's mobile app. The enrollment processes are customized for each of these channels, have evolved over time, and vary depending on whether the customer is new or existing.

(Sacknoff Decl. ¶¶ 2, 19, ECF No. 142-3 at 1, 7.) In her declaration, Ms. Sacknoff goes on to summarize the DCA enrollment procedures applicable to each delivery channel, including: branch enrollment for new customers, branch enrollment for existing customers, telephone enrollment, online enrollment for new customers, online enrollment for existing customers, and mobile enrollment. (*Id.* ¶¶ 20-26, ECF No. 142-3 at 7-11.)

Depending on the delivery channel relevant to any individual customer, the DCA

enrollment procedures may involve differing protocols including, but not limited to: unscripted conversations between a branch employee and the customer regarding overdraft services, verbal elections to enroll or not enroll in TDDCA made by the customer (whether in a branch or on the telephone), employee entry of the customer's election into the Bank's computer system, printed copies of the Bank's Reg E Form with a checked box (prior to January 2014) or customer signature (since January 2014) indicating the customer's DCA election, mailed written notice confirming the customer's verbal DCA election, oral disclosures read over the telephone by a customer service representative ("CSR") to the customer regarding the overdraft service options, scripted responses to Frequently Asked Questions provided to CSRs and branch employees, online checkboxes requiring the customer to acknowledge that he/she read the Reg E Form, online links to the Reg E Form either requiring the customer to click on the link prior to completing enrollment (since 2015) or not requiring the customer to do so (prior to 2015), and mobile application screens requiring the customer to acknowledge having read the form before enrolling and then check an electronic box. (*See id.*)

In the motion for class certification, Plaintiffs raise generalized theories of unfairness regarding the Bank's implementation of the amendments to Reg E. Specifically, Plaintiffs assert that the Bank, in an effort to stem projected losses to overdraft revenue, engaged in strategies to maximize customer opt-in to TDDCA, particularly targeting vulnerable customers who may be least able to afford fee-based overdraft products. (*See* ECF No. 140-1 at 28-32.) Citing a Financial Institution Letter issued by the Federal Deposit Insurance Corporation that counsels against steering such customers to opt-in (*see id.* at 28), Plaintiffs vaguely allude to TD "policies"

designed to "avoid compliance" with Reg E when describing the Bank's marketing plan to keep eighty-five percent (85%) of "heavy overdrafters" enrolled in the DCA program. (*See id.* at 29-31.) While these practices, as presented, sound nefarious, it is not immediately clear how this aspect of Plaintiffs' claim translates into a private right of action for violation of Reg E. The Bank's marketing goals and intent to preserve overdraft revenue, whether honorable or ignoble, are of questionable relevance to the merits of the Reg E theory and entirely immaterial to the class certification questions currently before the Court. The *content* of the Bank's written/electronic disclosure to customers and subsequent compliance with the strictures of customer enrollment enumerated in 12 C.F.R. § 1005.17(b), not the Bank's revenue aspirations or putative dearth of virtuous intent, will control the viability of Plaintiffs' Reg E claim.

Plaintiffs allege that TD's enterprise-wide opt-in process failed to comply with Reg E in five specific ways. First, they assert that the Bank's Reg E Form inaccurately described an overdraft as occurring "when you do not have enough money available in your account to cover a transaction." (*See, e.g.*, R. Ryan DCA Opt-In, ECF No. 140-64 at 2.) They contrast this description with their own formulation, which they aver to be more accurate, that an overdraft occurs "when there is a negative available balance in the account even if there is enough money to cover the transaction." (ECF No. 140-1 at 35.) Accordingly, Plaintiffs claim that this "misstatement" of the Bank's overdraft practice rendered the Reg E Form a non-conforming disclosure. (*Id.*)

Second, Plaintiffs allege that, for customers who opted into TDDCA by telephone or online, TD either failed to provide the Reg E Form, or failed to ensure that it was provided to customers segregated from all other information prior to obtaining their

affirmative opt-in. Plaintiffs' banking supervision and regulation expert, Bonita Jones, notes in her report that the Bank's website is, or has been, set up in such a manner that there is no default screen or link that ensures the customer sees and reviews the opt-in disclosure *before* selecting enrollment in the DCA program by checking an on-screen box. (Jones Report ¶ 37, ECF No. 140-60 at 19.) Rather, states Ms. Jones, later in the enrollment process, after the box is already checked, the customer *could* proactively select the disclosure notice but need not necessarily do so. (*Id.*) Moreover, she notes that the hyperlink file icon that leads to opening the disclosure is not properly segregated from a number of other notices in the form of icons. (*Id.*)

Third, Plaintiffs allege that TD failed to obtain affirmative consent during the opt-in process. Specifically, Plaintiffs aver that TD's practice (prior to December 2014 for branch enrollment) of branch employees checking a box on the employee's computer screen to enroll customers into DCA, rather than allowing customers to check the box themselves or sign the Reg E Form, violated the affirmative consent requirement of 12 C.F.R. § 1005.17(b)(1)(ii).

Fourth, Plaintiffs allege that customers enrolled online from December 2011 through July 2015 did not receive the requisite confirmation letter or copy of their signed Reg E Form, including a statement informing the customer of the right to revoke consent, following the opt-in procedures. While the Bank has admitted a failure to provide written confirmation of opt-in to certain customers during the itemized time period and refunded a portion of the overdraft fees assessed against those customers, Plaintiffs claim that the Bank's partial refund of fees did not remedy the violation of 12

C.F.R. § 1005.17(b)(1)(iv).[7] Moreover, Plaintiffs aver that TD failed to provide any confirmation of opt-in to customers who enrolled in branches prior to January 2014, but to date has not admitted this failure.[8] (*See* ECF No. 140-1 at 37.)

Fifth, Plaintiffs allege that TD's enrollment confirmation forms were universally deficient because they do not include notice that the customer has a "right to revoke" his/her consent to DCA enrollment. *See* 12 C.F.R. § 1005.17(b)(1)(iv). Here, Plaintiffs aver that the Bank's statement in confirmation letters and on the Reg E Form—"You may change your enrollment status any time" (*see, e.g.*, R. Ryan DCA Opt-In, ECF No. 140-64 at 2)—is insufficient to comply with the "strong language" of revocation itemized in the regulation. (ECF No. 140-1 at 37.)

Plaintiffs assert that their expert has already calculated Plaintiffs' damages under the Reg E theory by using the data that TD has produced in this case. (*See* Olsen Decl., App. 1, ECF No. 140-21 at 4-5 (showing putative damages on Reg E transactions specific to each Plaintiff).) Moreover, in his report Mr. Olsen claims that he will be able to perform a comprehensive damages analysis for the entirety of the Reg E Class,

---

[7] Ms. Sacknoff confirmed that, "Because of a system error, from December 2011 to July 2015, the Bank did not mail enrollment confirmations to new customers who enrolled in TDDCA during online account opening." (Sacknoff Decl. ¶ 25, ECF No. 142-3 at 10.) However, the Bank asserts that once the problem was discovered through standard compliance monitoring, it was corrected and refunds/credits were provided to customers in the amount of overdraft fees the online enrollees incurred on ATM and one-time debit card transactions through their first overdraft notices. (*Id.*) According to the Bank, the overdraft notices themselves provided customers with information about TDDCA and the Bank's overdraft practices sufficient to conform with Reg E's requirements. (*See id.*)

[8] Plaintiffs' motion states "prior to December 2014" (*see* ECF No. 140-1 at 37), but this appears to be a typographical error, given that it was January 2014, not December, when the Bank changed its policy with respect to new customers enrolled in TDDCA at a branch. Specifically, this was the time frame when the Bank began providing customers with a copy of the Reg E Form including the customers' signature rather than a checked box indicating enrollment. (*See* Sacknoff Decl. ¶ 20, ECF No. 142-3 at 7.) Moreover, the factual basis for Plaintiffs' assertion that newly enrolled customers were not provided *any* confirmation of enrollment is unclear. The Court can only conclude that Plaintiffs are alleging that provision of a copy of the Reg E Form with a checked box (*see, e.g.,* Bond Dep., Ex. 6-B, ECF No. 140-5 at 11), vice an executed signature (*see, e.g.,* Sacknoff Decl., Ex. 13, ECF No. 142-6 at 8), did not comply with the requirement in 12 C.F.R. § 1005.17(b)(1)(iv) of written confirmation of the consumer's consent.

incorporating variables for differing time periods depending on the channel used to purportedly opt-in any given customer and disputes between the parties over what portion of subsequent overdraft fees would be refundable if Plaintiffs' Reg E claims were successful. (Olsen Report ¶¶ 75-76, ECF No. 140-33 at 22-23) (stating the information needed to perform a class-wide damages analysis and the system for applying a computer algorithm to perform the calculations in an automated way on the entire customer data set).)

## DISCUSSION

### A. Legal Standard

Rule 23(a) of the Federal Rules of Civil Procedure identifies the prerequisites for a class action as follows:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); s*ee generally Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013); *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700 (4th Cir. 2011); *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 339 (4th Cir. 2006). These four prerequisites for class certification under Rule 23(a) are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *See id.*

In addition to the requirements of Rule 23(a), Plaintiffs must also meet the requirements for maintenance of a class action imposed by Rule 23(b)(3)—namely, that

"the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[9] Fed. R. Civ. P. 23(b)(3). Factors pertinent to a determination whether the "predominance" and "superiority" requirements have been satisfied include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). Certification is only proper if the Court, after conducting a "rigorous analysis," is satisfied that the prerequisites of Rule 23 have been satisfied.

---

[9] Plaintiffs make cursory argument that class certification is also appropriate under Rule 23(b)(2) (*see* ECF No. 140-1 at 79-80), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that the final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). However, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of money damages." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011). In this case, Plaintiffs seek tens, if not hundreds, of millions of dollars in overdraft fees based on the individualized damages claims of putative class members. Accordingly, Rule 23(b)(2) certification is inapposite. *See Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011) (denying certification under Rule 23(b)(2) where individualized damages were at issue because "[t]he monetary tail would be wagging the injunction dog," and an injunction would not provide "final" relief as required by the rule). Moreover, a court may certify a class seeking monetary relief under Rule 23(b)(2) only where the non-individualized monetary relief is *incidental* to the injunctive relief sought. *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) ("If a class action is more about individual monetary awards than it is about uniform injunctive or declaratory remedies, then the 'presumption of cohesiveness' breaks down and the procedural safeguard of opt-out rights becomes necessary."). That is hardly the case here, and no further consideration is necessary.

*See id.* at 350-51. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* at 351. However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage,'" and "the merits of a claim may be considered only when 'relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). "Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006) (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004)) (internal quotation marks and modifications omitted).

## B. Analysis

The Bank does not contest Rule 23(a)(1) numerosity or Rule 23(a)(4) adequacy,[10] so the remaining areas of dispute deal with Rule 23(a)(2) commonality, Rule 23(a)(3) typicality, and Plaintiffs' burden to demonstrate the predominance of common issues and the superiority of class treatment under Rule 23(b)(3).

### i. Class Certification is Appropriate for Claims Pertaining to the Available Balance Theory

The foundation of Plaintiffs' available balance theory is that the Bank breached its own form contract when it assessed overdraft fees against customers before their checking accounts were actually overdrawn. Correspondingly, the basis of Plaintiffs' request for certification of the "Sufficient Funds Class" (*see* Consolidated Am. Class Action Compl. ("CAC") ¶ 182, ECF No. 37 at 53), is that the Bank programmed its

---

[10] (*See* Def.'s Resp. in Opp'n to Mot. for Class Certification n.12, ECF No. 142-1 at 38.)

computer processing systems to deem accounts overdrawn if a transaction was greater than the balance of money in the account minus amounts of approved debit card transactions, even though such transactions had not yet been presented for payment and were thus still "pending." Plaintiffs aver that this accounting methodology was applied with uniformity to all consumer checking accounts, such that the putatively improper fees were charged in an automated fashion.

The Court would first note that both the TD PDAA and Carolina First Account Agreement are standardized form, non-negotiable contracts that are materially uniform across the states in which TD and Carolina First did retail banking business during the relevant time periods. (*See* Pls.' Proposed Trial Plan, ECF No. 140-2 at 5 (citing various iterations of the applicable agreements that are part of the record).) Plaintiffs' breach of contract theory boils down to the assertion that these account agreements misstated TD's and Carolina First's practice of assessing overdraft fees based on the available balance rather than the actual balance of funds. (*See id.* at 6 (citing, at note 8, specific portions of the agreements that Plaintiffs aver are misleading).) Stated another way, Plaintiffs maintain that the Bank's overdraft practices contravened at least one reasonable interpretation of the contractual language about when overdraft fees would be imposed and/or constituted a violation of the Bank's duties under the implied covenant of good faith and fair dealing.

Plaintiffs assert that the questions of law and fact common to the Sufficient Funds Class include: (1) whether the Bank assessed overdraft fees on transactions that did not overdraw the account; (2) whether the Bank failed to provide class members with accurate, non-misleading disclosures and balance information; and (3) whether the

Bank breached its form contract. They argue that Rule 23's commonality and typicality requirements are satisfied because Plaintiffs and members of the Sufficient Funds Class were exposed to the same misleading representations and omissions about when overdraft fees would be imposed, were subjected to the same practices of assessing overdraft fees on transactions that did not overdraw their accounts, incurred overdraft fees as a result by operation of an automated computer system, and all while their relationships to the Bank were governed by common and materially uniform account agreements. (*See* ECF No. 140-1 at 54-58.)

Defendant argues, first, that Plaintiffs cannot meet their burden to establish Rule 23(a)(2) commonality under the "heightened standard" of *Wal-Mart Stores, Inc. v. Dukes*. In *Wal-Mart*, the United States Supreme Court concluded that a class of female employees alleging Title VII discrimination in the form of pay and promotion disparities had been improperly certified because Rule 23(a)(2) commonality could not be satisfied. 564 U.S. 338, 352-60 (2011). The *Wal-Mart* court explained that the language respecting commonality in Rule 23(a)(2) "is easy to misread, since any competently crafted class complaint literally raises common questions." *Id.* at 349 (internal modifications, quotation marks, and citation removed). The court stated, "What matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (internal modifications and citation removed, emphasis in original). Defendant asserts that *Wal-Mart* both clarified the commonality standard and elevated, as a practical matter, the burden Plaintiffs must meet to justify a finding of commonality.

While it is true the *Wal-Mart* holding evidenced a clear move away from rubber-stamp findings of commonality based on the pleadings alone, the factual basis pertaining to commonality in that case is readily distinguishable from the instant facts. In *Wal-Mart*, the Supreme Court held that the plaintiffs provided no convincing proof of a companywide discriminatory pay and promotion policy, and therefore could not establish the existence of any "common question." *Id.* at 359. The court stated its agreement with a dissenting opinion from the Ninth Circuit Court of Appeals that the members of the class

> held a multitude of different jobs, at different levels of Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed . . . . Some thrived while others did poorly. They have little in common but their sex and this lawsuit.

*Id.* at 359-60 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010) (Kozinski, C.J., dissenting), *rev'd*, 564 U.S. 338 (2011).

In stark contrast to the nuanced, individualized, fact-intensive employment decisions challenged in *Wal-Mart*, Plaintiffs in this case complain about the universal application of computer accounting software to systematically and algorithmically assess overdraft fees before customer accounts were overdrawn. In light of these differences, the Rule 23(a)(2) commonality holding in *Wal-Mart* has little relevance to this case, other than as a helpful reminder to the Court to look beyond the pleadings in determining whether Plaintiffs have met their burden.

In order to reach a finding that commonality has been satisfied, the Court must be convinced that there is at least one common question that is "of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the

claims in one stroke.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (quoting *Wal-Mart*, 564 U.S. at 350). The Court agrees with Plaintiffs regarding the common nature of the questions of law and fact invoked by the available balance theory, and hereby finds that Rule 23(a)(2) commonality is satisfied. Specifically, the *answer* to the overarching question of whether it was permissible, under the contract and/or other legal duties, for the Bank to charge overdraft fees before it actually advanced any funds to the customer will resolve large swathes the class members' available-balance-based claims in one fell swoop. *See, e.g.*, *Reed v. Big Water Resort, LLC*, No. 2:14-CV-1583-DCN, 2015 WL 5554332, at *6 (D.S.C. Sept. 21, 2015) (finding that where interpretation of the same contractual provision is at issue for all class members, "this common question should generate a common answer"). What was lacking in *Wal-Mart*—a companywide pay and promotion policy—is present here—a uniform, both in definition and implementation, overdraft fee policy. *See, e.g.*, *Parker v. Asbestos Processing, LLC*, No. 0:11-CV-01800-JFA, 2015 WL 127930, at *7 (D.S.C. Jan. 8, 2015) ("Where the injuries complained of by named plaintiffs allegedly result from the same unlawful pattern, practice, or policy of the defendants, the commonality requirement is usually satisfied.").

Defendant next argues that Rule 23(a)(3) typicality has not been satisfied. "Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). "The premise of the typicality requirement is simply

stated: as goes the claim of the named plaintiff, so go the claims of the class."
*Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)
(quotation marks omitted). "Typicality does not require the plaintiff's claims to be
perfectly identical to the claims of class members; however, 'when the variation in
claims strikes at the heart of the respective causes of action,' the Fourth Circuit has
readily denied class certification." *Melton ex rel. Dutton v. Carolina Power & Light Co.*,
283 F.R.D. 280, 287 (D.S.C. 2012) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461,
466-67 (4th Cir. 2006)). "[T]he appropriate analysis of typicality must involve a
comparison of the plaintiffs' claims or defenses with those of the absent class
members." *Id.* (quotations marks omitted).

Defendant argues that because class members had such a wide variety of
interactions with the Bank, proof of one Plaintiff's claim will not prove all class members'
claims. In seeking to demonstrate this putative lack of typicality, Defendant describes
the varying nature of Plaintiff Bond, Plaintiff Drakeford, and Plaintiff King's verbal and
written communications with the Bank. (*See* Def.'s Resp. in Opp'n to Mot. for Class
Certification, ECF No. 142-1 at 41-44.) These communications include in-branch
conversations with TD employees regarding TDDCA enrollment, receipt of the Bank's
Reg E Form, telephone conversations in which Plaintiffs sought and obtained overdraft
fee refunds through TD CSRs, and CSR notes documenting such conversations as well
as the reasons for certain instances of Plaintiffs overdrawing their accounts. (*See id.*)
Defendant also asserts that Plaintiffs' divergent subjective understandings of the role
available balance played in triggering the imposition of overdraft fees, as demonstrated
through their deposition testimony, reflect the differing understandings undoubtedly held

by putative class members, thus precluding a finding of typicality. (*Id.*)

The Court would first note that most of the divergences in proof that Defendant has raised pertaining to the typicality prong of Rule 23—such that proving or disproving the Plaintiffs' claims would not sustain or defeat other class members' claims—apply to the Reg E theory exclusively (e.g., non-scripted conversations about DCA enrollment, potential flaws with the content of the Reg E Form and how/when/if it was received by customers, etc.). These divergences in proof are real and are discussed at length below (*see* section B.iii. *infra*); however, they have nothing to do with the available balance theory and do not impact the satisfaction *vel non* of the typicality requirement applied to Plaintiffs' available-balance-related claims. The only putative problem of proof suggested by Defendant that could, in theory, frustrate typicality as applied to available balance claims is the notion that the Bank's asserted defenses will require the admission of extrinsic evidence particular to each Plaintiff and each class member in order to defeat the claim that the contract is ambiguous with regard to the use of available balance in imposing overdraft fees. Defendant spends the vast majority of its opposition brief arguing that individual issues will predominate over common issues, thereby merging the analysis of Rule 23(a)(3) typicality with Rule 23(b)(3) predominance in this regard. (*See* Def.'s Resp., section III.D., ECF No. 142-1 at 44-91.)

Rule 23's predominance requirement is met by examining each cause of action independently of one another, not the entire lawsuit, and all causes of action against all parties do not have to satisfy the predominance requirement before the Court can certify a class. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441-45 (4th Cir. 2003). "The predominance requirement 'tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation.'" *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004)) (holding that predominance had not been satisfied where the resolution of defendant's statute of limitations defense turned on "the contents of the plaintiff's mind" and was not susceptible to class-wide determination because inquiry into each class member's knowledge and the timing of that knowledge would require individual testimony). Rule 23(b)(3) is normally satisfied where there is an essential common factual link, such as standardized documents and practices, even though the nature and amount of damages may differ among class members. *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 106 (W.D. Va. 2000) (citing *Halverson v. Convenient Food Mart, Inc.*, 69 F.R.D. 331, 335 (N.D. Ill. 1974) ("The pivotal question is whether defendants' liability depends on legal and factual issues which are the same for all [class members] wherever located."); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 675 (N.D. Ill. 1989) ("The necessity of answering individual questions after answering common questions will not prevent a class action.")); *see also Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 194 (D.D.C. 2011) (finding predominance factor "easily met" in a high-to-low debit reordering case because proof of defendant's liability "would be based on the bank's policies and practices that would have been applicable to all class members" and "the existence of minor differences in state law does not preclude the certification of a nationwide class"), *appeal dismissed*, No. 12-7001, 2012 WL 556319 (D.C. Cir. Feb. 13, 2012); *S.C. Nat. Bank v. Stone*, 139 F.R.D. 325, 333 (D.S.C. 1991) (certifying a Rule 23(b)(3) class where plaintiffs' claims were premised upon defendants' alleged omissions from standardized, uniform written documents);

*Reed v. Big Water Resort, LLC*, No. 2:14-CV-01583-DCN, 2016 WL 7438449, at *4 (D.S.C. May 26, 2016) ("The common questions previously discussed predominate over any differing circumstances of individual claims because the central issues involve the [d]efendants' materially uniform conduct, policies, procedures, and forms."); *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, 2008 WL 4279550, at *17 (N.D. Cal. Sept. 11, 2008) (certifying a high-to-low posting class on Rule 23(b)(3) grounds because "[t]he challenged practice is a standardized one applied on a routine basis to all customers" and possible individual issues "will not predominate over the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of thousands of depositors"), *aff'd*, 704 F.3d 712, 728-29 (9th Cir. 2012).

The relevant facts are these. A bank consulting firm hired by TD generated new operational proposals and offered the Bank a variety of ways to increase fee revenue through a program entitled "MORE" (Making Overdraft Revenue Easier). Among the changes implemented through the MORE program was "Wave Six," where the Bank adopted available balance as the measure for when an overdraft fee would be assessed. A similar effort, including the adoption of the available balance metric, was employed at Carolina First Bank after deliberation with consultants over how to increase fee revenue. This change occurred prior to TD's acquisition of Carolina First, and continued thereafter. Importantly, the changes made to the Bank's computer systems in order to implement the available balance rubric were made uniformly across all relevant transaction processing systems. The Bank acknowledges as much in its responses to interrogatories. TD did not alter its form contract in connection to the shift from actual/ledger balance to available balance accounting for the purpose of assessing

overdraft fees. Neither did Carolina First. To summarize, both the overdraft practices and the contracts were uniform across the Bank's checking account customer base at all times relevant to the available balance claims. As Plaintiffs' counsel stated in argument at the class certification hearing, when considering the available balance theory the Court is confronted with "uniform, standard, automated, programmatic, identical practices" on the part of the Bank. (*See* Class Certification Hr'g Tr., ECF No. 162 at 8.)

The Court finds that the Bank's liability under the available balance theory, in each cause of action through which it is alleged, depends on legal and factual issues that are the same for all Plaintiffs and class members, and that Rule 23(b)(3) predominance is therefore satisfied. This conclusion arises from the fact that TD's checking account policies and practices were governed by form contracts with terms applicable to Plaintiffs and class members alike, and from the context of computer controlled processing systems that treated all checking account customers and transactions in like fashion. Similar to the commonality analysis, the common issue that predominates over all individual issues pertaining to the available balance claims is whether it was permissible under the Bank's materially uniform contract with its customers, and associated common law and statutory duties, for the Bank to impose overdraft fees before the money associated with "pending" debits, which brought the available balance below zero, had actually left the accounts. This overarching question will, no doubt, be briefed in multitudinous ways and from myriad perspectives at the summary judgment phase. But just as assuredly, the resolution of this question, whether from the standpoint of state unfair trade practice statutes or from technical construction

of the relevant contract provisions, will permit resolution of Plaintiffs' and class members' available balance claims in the aggregate. For the same reasons, the Court also finds that Rule 23(a)(3) typicality has been satisfied for these claims.

### a. Predominance with Respect to the Breach of Contract (Count I) and Breach of the Implied Covenant of Good Faith (Count II) Claims

Defendant argues that Plaintiffs do not actually bring a straightforward breach of contract claim (Count I) under the available balance theory because the plain text of the PDAA entitled the Bank to use customers' available balances when assessing overdraft fees: "If your negative available balance exceeds $5 at the end of the day, we will charge you for each transaction that overdraws your account . . . ." (CAC, Ex. A, ECF No. 37-1 at 10.) According to Defendant, Plaintiffs can, at best, only claim that the relevant contractual language is ambiguous and therefore proper interpretation of the contract to resolve the implied covenant of good faith claim (Count II) will require consideration of extrinsic evidence. (*See* ECF No. 142-1 at 61-62.) This consideration of extrinsic evidence, Defendant avers, precludes class consideration because evidence concerning individualized issues such as the parties' course of dealings, course of performance, written disclosures, and individual conversations with Bank employees will be admissible to clarify the ambiguity. (*Id.* at 62-64.) Defendant argues that the extrinsic evidence will be relevant and necessary both to ascertain and give effect to the intention of the parties, and to determine the parties' reasonable expectations with regard to the implied covenant of good faith. (*Id.*) Moreover, Defendant asserts that individual issues predominate and class certification is inappropriate because the extrinsic evidence of class members' understandings and courses of performance regarding the Bank's

overdraft policies vary widely. (*Id.* at 64 to 69 (citing various discrepancies in Plaintiffs' understandings of the available balance practice, the effects of those understandings on Plaintiffs' banking conduct, and Plaintiffs' individual in-deposition reactions to the meaning of the PDAA's language regarding pending debits and the assessment of overdraft fees).)

Defendant's arguments glibly dismissing the breach of contract claim are too clever by half. It is true that the PDAA warns of the imposition of fees if a customer's "negative available balance" exceeds the $5 threshold. But it is also true that the PDAA's very first reference to the triggering conditions for assessment of overdraft fees seems to invoke actual balance accounting: "Overdraft fees may be assessed on items presented for payment **that bring your Account into a negative balance**, as well as any subsequent transactions presented for payment **while the Account has a negative balance**." (CAC, Ex. A, ECF No. 37-1 at 9 (emphasis added).) The PDAA then directs the reader to the "OVERDRAFTS" section and the "Fee Schedule" for more information. The first sentence of the OVERDRAFTS section defines an "overdraft" in the following manner: "An overdraft is an **advance of funds** greater than the amount that has become available in accordance with the Bank's Funds Availability Policy, made by us to you, at our sole discretion." (*Id.* at 10 (emphasis added).) Accordingly, Plaintiffs' breach of contract theory is relatively uncomplicated: 1) the Bank's form contract states that an overdraft occurs when TD "advances funds," 2) the contract also states that overdraft fees will be imposed when an account is brought into a "negative balance," 3) the Bank imposed a certain portion of overdraft fees before it "advanced funds" and before accounts reached a "negative balance," under an objectively

reasonable understanding of the meaning of those terms, 4) the imposition of that portion of the total overdraft fees incurred was a breach of the contract's terms. This theory rings with a certain note of logic and common sense, a note which is strengthened by the fact that before TD's implementation of Wave 6 the Bank *did not* use available balance for the assessment of overdraft fees even while the *exact same* contractual language was in effect. (*See* Chevalier III Dep. 67:1-25, ECF No. 140-8 at 18.) These observations should not be construed as any opinion by the Court regarding the merits of Plaintiffs' breach of contract claim. Neither should they be construed to minimize the complexity imbued by the Bank's favored portion of the PDAA language, which uses "negative *available* balance" and not "negative balance" as the measure of when fees will be imposed. Rather, these observations simply demonstrate that it is unduly dismissive for Defendant to assert that Plaintiffs do not bring a straightforward breach of contract claim.

Turning to Defendant's assertion that the necessity of extrinsic evidence to interpret an ambiguous term(s) and to resolve an implied covenant claim precludes satisfaction of Rule 23(b)(3)'s predominance requirement, the Court finds that the relevant extrinsic evidence will not thwart predominance of common issues in this litigation. First, the Court disagrees with Defendant's general assertion that resolution of the implied covenant claim will require examination of each class members' subjective expectations. "To the contrary, a breach of the duty [of] good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 680 (S.D. Fla. 2011) ("*Union Bank*") (certifying in a high-to-low debit reordering case a Rule

23(b)(3) class including a two-state good faith and fair dealing subclass). In similar consumer banking cases, courts have found that customer expectations pertaining to contract-based good faith and fair dealing claims were to be judged objectively, permitting proof on a class-wide basis. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 646 (S.D. Fla. 2015) ("*Wells Fargo*") ("The reasonable expectations of a party to a form contract are judged objectively, from the perspective of a reasonable person, making the subjective views of class members irrelevant."), *pet. for leave to appeal denied*, No. 15-90024 (11th Cir. Dec. 1, 2015);[11] *In re Chase Bank USA, N.A. CHECK LOAN Contract Litig.*, 274 F.R.D. 286, 290 (N.D. Cal. 2011) (certifying class alleging bank breached credit-card agreement's implied covenant of good faith and fair dealing by raising minimum monthly payment after cardholders accepted fixed-interest-rate loans).

Second, while it is true that the states at issue permit consideration of extrinsic evidence to resolve ambiguities in form contracts, the extrinsic evidence that will assist the fact finder in resolving the instant breach of contract claim consists of uniform documents, disclosures, and practices. The Court begins with the common sense principle, stated in the Restatement (Second) of Contracts, that standardized agreements should be "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." § 211(2). The contracts at issue are contracts of adhesion,

---

[11] *See also In re Checking Account Overdraft Litig.*, 307 F.R.D. 656 (S.D. Fla. 2015) ("*Wachovia Bank*"), *pet. for leave to appeal denied*, No. 15-90026 (11th Cir. Dec. 1, 2015); *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645 (S.D. Fla. 2012) ("*Comerica*"), *pet. for leave to appeal denied*, No. 12-90032 (11th Cir. Dec. 13, 2012); *In re Checking Account Overdraft Litig.*, C/A No. 1:09-md-2036-JLK, ECF No. 2847 (S.D. Fla. July 19, 2012) ("*Capital One*"), *pet. for leave to appeal denied*, No. 12-90041 (11th Cir. Feb. 13, 2013).

involving non-negotiable terms and a vast bargaining/information imbalance between the parties. *See, e.g.*, *Simpson v. MSA of Myrtle Beach, Inc.*, 644 S.E.2d 663, 669 (S.C. 2007) ("[U]nder general principles of state contract law, an adhesion contract is a standard form contract offered on a 'take-it-or-leave-it' basis with terms that are not negotiable."). If there is *any* type of standardized agreement that ought to be interpreted uniformly, without regard to the non-drafting party's idiosyncratic comprehension of its terms, it is a consumer checking account agreement. Here, the same overdraft accounting policy was applied to every TD Bank customer whether he or she understood the role of available balance entirely, partially, or not at all, and irrespective of whether the customer's understanding changed during the relevant time period. There was no option for a customer, whether new or existing prior to Wave 6, to elect the use of actual balance versus available balance, or to negotiate a change in the mechanics of the available balance accounting method in any fashion.[12] In this context, the focus is on the Bank's conduct in relation to the contractual language, and individual customers' "intent" and "course of performance" is largely irrelevant to resolving any ambiguity.

Additionally, it is undisputed that the extra-contractual disclosures TD provided in the course of its efforts to educate customers about its overdraft policies were materially identical across the Bank's customer base. Therefore, as Plaintiffs concede in their reply brief, "If the evidence—for example, a document provided in the TD Welcome Kit

---

[12] The lack of any customer discretion in this regard distinguishes the extrinsic evidence relevant to resolving ambiguity created by imprecise use of the terms "negative balance" and "negative available balance," from the extrinsic evidence relevant to resolving actual damages claims under the Reg E theory, 15 U.S.C. § 1693m(a)(1). As more fully discussed below, customers' unscripted conversations with in-branch and telephone TD representatives, along with exposure to and comprehension of certain Reg E disclosures, would have a very real effect on their individual, subjective decisions to opt into or out of the DCA program. Not so with the use of available balance accounting to assess overdraft fees.

for all new customers—shows 'available balance' should be construed in favor of TD, Plaintiffs' [and class members'] claims will be affected in the same way." (ECF No. 143-1 at 21-22.) Likewise, the most reasonable way to determine whether ambiguity in contractual terms was potentially cured by the Bank's oral communications to its customers would be to look to TD's standard CSR training materials directing, at account creation, predetermined explanations of available balance accounting and scripted responses to questions about the same. Accordingly, the Court finds that individualized proof will be of minimal relevance, if at all, to the core questions of contract interpretation presented by the breach of contract claim.

TD cites *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, for the principle that extrinsic evidence is relevant to resolution of a breach of good faith claim relating to a form contract. *Id.* 1261-62 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005). So much is true, but it does not follow that the introduction of extrinsic evidence frustrates predominance. In *Allapattah*, the district court determined that various forms of extrinsic evidence were relevant to the question of whether Exxon breached its contractual duty of good faith under its form agreements with dealers. *Id.* The plaintiffs and class relied on such extrinsic evidence to prove their contract-based claims. *Id.* The Eleventh Circuit affirmed the district court's certification of a Rule 23(b)(3) class under the applicable law of thirty-five states, stating, "Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole." *Id.* at 1261. Moreover, "Whether it breached that obligation was a question common to the class and the issue of liability was

39

appropriately determined on a class-wide basis." *Id.*

TD also relies on *EQT Prod. Co. v. Adair*, in which the Fourth Circuit vacated certification of five classes of natural gas estate owners alleging underpayment of royalties by natural gas producers that were leasing the estates. 764 F.3d at 358-71. However, in *EQT Prod. Co.* the class members had signed different lease agreements with variable terms regarding the calculation and payment of royalties, which struck at the heart of the plaintiffs' claims. *Id.* at 367-68. The court stated, "these variable terms will make it difficult if not impossible, for a court to assess the validity of the defendants' royalty payment practice on a classwide basis." *Id.* Accordingly, the court found that the plaintiffs failed to demonstrate that even the lesser requirements of typicality and commonality were not defeated by the variations in lease language. *Id.* at 369. The *EQT Prod. Co.* court also noted that course-of-performance evidence presented additional complications for one of the five classes because of the way the class had been defined and because the record "highlight[ed] the individualized nature of such evidence." *Id.* at 369-70. In vacating the certification ruling, the Fourth Circuit observed that the district court failed to even discuss the course-of-performance evidence. *Id.* Putting aside the multitudinous ways in which the evidentiary landscape of *EQT Prod. Co.* differs from the evidence at issue here, it is instructive to note that the Fourth Circuit viewed the case as one that could potentially be certified on remand if the plaintiffs were able to show that there were a limited number of lease forms, such that the validity of the defendant's conduct could be assessed on a subclass basis, and if the district court was able to craft more definite class definitions, mitigating the problems of ascertainability denoted in the appellate ruling. *Id.* at 369.

TD further relies on *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010), as "directly on point" for the proposition that the necessity of extrinsic evidence prevents a showing of predominance. However, *Avritt* is readily distinguishable. In *Avritt*, the Eighth Circuit affirmed the district court's denial of class certification. With respect to the plaintiffs' claim that the life insurance company breached the terms of its annuity contracts, the court held that liability could not be established with common evidence because extrinsic evidence would be admissible to resolve ambiguity in the contract, including individualized evidence regarding "how the contract was explained in various sales discussions and whether each purchaser's understanding of the contract was consistent with the theory the [plaintiffs] now advance." *Id.* at 1029-31. Regarding the plaintiffs' implied covenant claim, the court held that common issues did not predominate because the question of whether the insurance company "acted in bad faith by emphasizing its non-guaranteed interest rate for new deposits and encouraging purchasers to believe that the introductory rate was indicative of future rates is a question closely tied to the circumstances of each individual plaintiff." *Id.* at 1031-32. The plaintiffs offered case law to support the proposition that the measure of the duty of good faith and fair dealing is defined by objectively reasonable conduct, but the *Avritt* court was "unpersuaded." *Id.* at 1032. However, in rejecting the plaintiffs' arguments the Eighth Circuit noted the essential point "that what is objectively reasonable *depends on the nature and context of parties' bargain.*" *Id.* (emphasis added). The context of the parties' bargain in *Avritt* was a host of individualized sales pitches, in which the purchasers of fixed deferred retirement annuities alleged that insurance salesmen unfairly obscured, misrepresented, or failed to disclose the true nature of the way

interest rates on deposits would be set. In other words, the ambiguity at issue in *Avritt* was the *extrinsic evidence itself*—i.e., the content of the individualized sales pitches. Thus, the setting in *Avritt* bears no relation to the contractual context at issue here— customers subject to uniform disclosures when opening new checking accounts or when being notified of changes to accounting practices for existing accounts—where the breach of contract claim is grounded in the actual words of the contract ("negative balance" and "advance of funds"), and the ambiguity is created by conflicting intra-contractual terms ("negative balance" versus "negative available balance," etc.).

If the Court were to find that *this* case could not be certified as a class action based on breach of contract and implied covenant theories due to Defendant's assertions regarding the predominance of individual issues, the logical consequence would be that *no* contract-based claims could be certifiable, because any prospective defendant could defeat certification simply by raising the specter of putative class members' idiosyncratic understanding of the term(s) at issue, irrespective of the form nature of the contract and the absence of negotiation regarding terms. Such a result would be an entirely nonsensical interpretation of class actions as a vehicle for the resolution of mass disputes, particularly disputes where the harm suffered by any one class member may be too small to incentivize a lawsuit for vindication of that class member's rights. Given the Bank's repeated affirmation that uniform disclosures were provided to its entire customer base, individualized proof is peripheral, if necessary at all, and the predominance requirement of Rule 23(b)(3) is satisfied with respect to the breach of contract and implied covenant claims.

### b. Predominance with Respect to the Conversion (Count IV) Claim

"Conversion is defined as the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights." *Moore v. Weinberg*, 681 S.E.2d 875, 878 (S.C. 2009) (citing *SSI Med. Servs., Inc. v. Cox*, 392 S.E.2d 789, 792 (S.C. 1990)). It is "a wrongful act which emanates by either a wrongful taking or wrongful detention." *Regions Bank v. Schmauch*, 582 S.E.2d 432, 442 (S.C. Ct. App. 2003) (citations omitted). Defendant argues that because conversion requires "wrongful" interference with Plaintiffs' ownership rights, the conversion claim cannot be successful if the Bank acted in accordance with its own rights under the law or under the contract. (ECF No. 142-1 at 71.) Thus, the Bank asserts, the determination whether the available balance overdraft fee practices were "wrongful" will turn on the same individualized issues applicable to the breach of contract and implied covenant claims, rendering certification inappropriate based on a failure to demonstrate Rule 23(b)(3) predominance. (*See id.*)

The Court will not belabor points already explained about why the predominance requirement is satisfied with respect to the breach of contract and implied covenant claims. Contrary to Defendant's assertions, resolution of those claims *will not* turn on individualized issues and neither will resolution of the conversion claim. Rather, Plaintiffs intend to use common evidence to demonstrate that they and the members of the Sufficient Funds Class had an ownership interest in the funds located in their checking accounts, and that the Bank systematically and automatically withdrew funds from their accounts for the payment of fees prior to the accounts being actually overdrawn, in derogation of that ownership interest. (*See* Trial Plan, ECF No. 140-2 at

7-8.) Alternatively, Plaintiffs' may seek to express their conversion theory through proof that, by deeming accounts overdrawn before "pending" debits settled, the Bank preemptively and improperly exercised dominion and control over the currency related to those "pending" debits, thereby interfering with Plaintiffs' ongoing ownership interest. (*See id.* at 8.) In either case, given the uniform, automated processes at issue, it is clear that the questions relevant to whether the Bank's "taking" or "detention" of funds was "wrongful" can be answered on a class-wide basis. The resolution of these questions with respect to one account holder will resolve the conversion claims of all class members, irrespective of any individual knowledge, intent, or understanding on the part of those class members. Accordingly, the Court finds that common questions predominate with regard to the conversion claim.

### c. Predominance with Respect to the Unjust Enrichment (Count V) Claim

Defendant argues that common questions will not predominate in resolving Plaintiffs' unjust enrichment claim because class members' understandings of the Bank's overdraft practices vary, and thus the element of inequity will turn on determination of individualized issues. (*See* ECF No. 142-1 at 72.) Defendant cites generalized authority for the proposition that the predominance requirement often precludes certification of unjust enrichment claims: "[C]ommon questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009). "That is because a claim for unjust enrichment requires the court to assess whether the individual circumstances of each particular claim would result in inequity." *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 640 (S.D. Fla. 2010) (citing

*Vega*).

In *Vega* the Eleventh Circuit held that the district court abused its discretion by finding the predominance requirement satisfied and certifying a class of employees who claimed their employer had been unjustly enriched by recovering certain sales commissions when a customer deactivated a prepaid service plan within a specific time window. *Vega*, 564 F.3d at 1274-75. The *Vega* court reasoned that there was no evidence that the circumstances under which the employer accepted a benefit from each putative class member were common, and whether or not a given commission "charge back" was unjust would depend on what each sales employee was told and understood about the commission structure and when and how commissions were "earned." *Id.*

*Vega* is distinguishable. The potential inequity at issue in that case was a function of whether sales representatives were adequately informed that their commissions would be "charged back" if customers cancelled their service plans. The court found that evidence in the record established that, unlike the named plaintiff, "many class members were told about, and fully understood, how the charge back procedure worked and that it applied to prepaid accounts that were deemed deactivated." *Id.* at 1277. In other words, the "charge back" procedure could only be said to be inequitable if sales associates were not notified and did not understand that their commissions would be retrieved by the employer. If a particular sales associate understood the "charge back" process, his or her unjust enrichment claim would not succeed.

In this case, even assuming that Plaintiffs and class members were adequately

informed and understood that overdraft fees would be assessed based on available balance accounting, resolution of the unjust enrichment claim will turn on the substantive equity or inequity of the practice *a priori*. Specifically, a customer's mere awareness of and understanding of the *results* of the practice may not be enough to defeat his or her unjust enrichment claim where certain *mechanics* of the practice were either deliberately obscured or simply not disclosed—for example, the Bank's use of OD Points to unilaterally decide, without explanation or notice to the customer, the degree to which an account would be authorized into overdraft. (*See* Corporate Compliance Email, ECF No. 140-43 at 2 ("[TD Bank] does not notify its customers about OD points (nor do we want to).").) More generally, a finding of inequity could result from a legal determination that the Bank was not entitled to exercise an ownership interest over the funds pertinent to "pending" debits before they settled, a question closely related to the conversion theory as well. Because the questions relevant to resolution of the unjust enrichment claim relate to uniform corporate policies and practices, the Court joins other courts that have found the predominance requirement satisfied for unjust enrichment classes in similar context. *See, e.g.*, *Comerica*, 286 F.R.D. at 657 ("Unjust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not."); *Union Bank*, 275 F.R.D. at 680 (certifying unjust enrichment subclass in overdraft case because of the focus on defendant bank's uniform conduct and disclosures).

### d. Predominance with Respect to State Unfair Trade Practices (Count VI) Claims

After the Court's ruling granting in part and denying in part the Bank's motion to

dismiss for failure to state a claim (ECF No. 68), Plaintiffs maintain class claims premised on state unfair and deceptive trade practices statutes in the following six jurisdictions: Connecticut, Maryland, New Jersey, New York, North Carolina, and Washington, D.C. Defendant argues that these claims will turn on questions of reliance and causation, requiring the Court to conduct individualized inquiries into each class member's understanding of the Bank's policies and practices, and thereby precluding satisfaction of the predominance requirement.[13] (*See* ECF No. 142-1 at 73-75.)

With respect to the state statutes that require proof of causation only—Connecticut, New Jersey, New York—the Court finds that such a showing will not necessitate inquiry into each class member's individual circumstances. As has already been stated numerous times, there is substantial evidence that all class members were subjected to the same or similar putative misrepresentations or omissions, through the PDAA and other uniform disclosures, which allegedly prevented them from understanding how the Bank's available balance practices caused them harm. In similar circumstances, courts have certified Rule 23(b)(3) classes under these consumer protection statutes. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 681 (S.D. Fla. 2012) ("*TD Bank*") (certifying class claims under, *inter alia*, Connecticut, New Jersey, and New York statutes premised upon uniform overdraft practices).

---

[13] Defendant acknowledges that the Washington, D.C. statute does not require causation (*see* ECF No. 142-1 at 73 n.37), but argues no class should be certified because the sole class representative for the District of Columbia is not a "consumer." This argument stems from the fact that Plaintiff Amos Jones' deposit account was labeled a "business account," rather than "personal account." The account label does not change the legal ramifications presented by Plaintiff Jones being *personally* obligated on the account. (*See* New Account Form, ECF No. 143-3 at 2 (indicating sole proprietorship with Plaintiff Jones' signature and redacted social security number, and stating acceptance of the terms and conditions set forth in the PDAA).) Accordingly, the Court finds that Plaintiff Jones is a "consumer" for purposes of the District of Columbia's consumer protection statute and a proper class representative. *See* D.C. Code § 28-3901(a)(2)(A) (defining "consumer" as "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services, including as a co-obligor or surety").

Accordingly, the Court concludes that the predominance requirement is satisfied for the Connecticut, New Jersey, and New York consumer protection statute claims. The Court also finds that common questions predominate regarding the District of Columbia Consumer Protection Procedures Act claim, which contains no causation element.

The matter of class certification with respect to the state statutes that require proof of reliance—North Carolina and Maryland—presents a close question. While it is true that reliance as an element of proof typically forecloses class treatment because of the individualized questions it raises, courts have *presumed* class-wide reliance and certified Rule 23(b)(3) classes under the statutes at issue where the alleged misrepresentation or omission (1) is material or likely to deceive a reasonable consumer and (2) was uniformly made to the putative class. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015) (finding reliance requirement satisfied because the class-wide proof met these elements and affirming certification of North Carolina Unfair and Deceptive Trade Practices Act ("UTPA") claim); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 484 (C.D. Cal. 2012) (certifying class under Maryland Consumer Protection Act ("MCPA") because the statute "imposes an objective test whereby a plaintiff's reliance on a defendant's omission can be presumed by the materiality of the omitted fact"); *Demmick v. Cellco P'ship*, No. CIV.A. 06-2163 JLL, 2010 WL 3636216, at *23 (D.N.J. Sept. 8, 2010) (presuming satisfaction of reliance element under the specific circumstances of the claim, and certifying MCPA subclass based on uniform, material misrepresentation); *but see Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th Cir. 1998) (holding that plaintiffs' UTPA claims impermissibly overlapped their contract claims, and stating that, under North Carolina law, the reliance element of

plaintiffs' fraud and negligent misrepresentation claims were not readily susceptible to class-wide proof). The Court finds that sufficient evidence of the uniformity and materiality of the putative misrepresentations and omissions has been presented to presume class-wide reliance under the North Carolina and Maryland statutes and satisfy the predominance requirement in this case.

### e. Superiority With Respect to All Available Balance Claims

Rule 23(b)(3)'s superiority requirement is designed to ensure that class treatment of a claim is the fairest and most efficient method of adjudication. *See* Fed. R. Civ. P. 23(b)(3).

> Although a determination of superiority necessarily depends greatly on the circumstances surrounding each case, some generalizations can be made about the kinds of factors the courts will consider in evaluating this portion of Rule 23(b)(3).
>
> The rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case. In determining whether the answer to this inquiry is to be affirmative, the court initially must consider what other procedures, if any, exist for disposing of the dispute before it. The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.

7AA Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 1779 (3d ed.). Defendant argues that Plaintiffs cannot meet their burden of establishing superiority under Rule 23(b)(3) for all of the same reasons it argued the predominance requirement was not satisfied. (*See* ECF No. 142-1 at 91 n.45 (incorporating all arguments regarding predominance and raising no independent arguments against satisfaction of the superiority requirement).) The Court disagrees and finds that all pertinent factors favor class treatment of the available balance claims, and the superiority requirement is satisfied.

First, the vast majority of class members have a *de minimus* interest in individually controlling the prosecution of their available balance claims because the monetary value of their damages would be dramatically outweighed by the cost of litigating an individual case. *See* Fed. R. Civ. P. 23(b)(3)(A). Here, as in many consumer protection lawsuits, "the low amount of . . . damages available means no big . . . damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective." *See Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010). In other words, for most class members the only realistic alternative to a class action is no action at all. If any individual class member does wish to retain control of his claim, or seek actual damages where a different remedy might be imposed upon him, the opt-out mechanism will allay such a presumption upon his individual interests.

Second, numerous putative class action lawsuits based on the same facts and containing substantively identical claims have already been filed against the Bank. *See* Fed. R. Civ. P. 23(b)(3)(B). The Judicial Panel on Multidistrict Litigation has seen fit to consolidate the handling of those common claims in this Court, which favors a consolidated disposition generally.

Third, the difficulties that would necessarily be presented by thousands upon thousands of individual actions far outweigh any difficulties the Court may encounter in managing a class action in this case. *See* Fed. R. Civ. P. 23(b)(3)(D). Put simply, "A class action is the only realistic way Plaintiffs' claims can be adjudicated. 'Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts.'" *Comerica*, 286 F.R.D. at 659 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983)). Accordingly, the Court finds that a class

action is the superior means for litigating the available balance claims.

### f. Concluding Thoughts Regarding Available Balance Claims

At a fundamental level, the question asked by the available balance theory is this: in an era of computerized consumer banking, when debit (as distinct from credit) transactions routinely occur before any currency changes hands, which party should bear responsibility for overages in the interim between authorization of a charge and settlement of a charge? The Bank will, of course, argue that when a consumer accumulates debit charges that exceed the amount of money in the account, the debit authorizations mean that the consumer has *committed* more funds than are "available" to him or her, resulting in a "negative available balance" and permitting the imposition of fees. Plaintiffs will, no doubt, argue that even where the amount of money committed by way of debit charges exceeds the present balance, the Bank should not be permitted to impose fees until the authorized debits *settle* and the currency in the account actually dips below zero. Then and only then, from Plaintiffs' perspective, should the money be deemed no longer "available." The answer to this question must be determined at a later stage of this case; however, it is helpful to view Plaintiffs' various sub-theories of liability under the available balance rubric as each approaching the same issue from a different angle—i.e., does the practice breach the terms of the contract? (Count I); if the contract permits discretion in the accounting method applicable to overdrafts, did the Bank exercise its discretion unfairly or in bad faith? (Count II); even if the challenged practices do not technically amount to a breach of contractual duties, were they substantively unfair in a way that violates state trade practice statutes? (Count VI); and so on. The Court will consider these issues pursuant to the parties' briefing at the

summary judgment stage.

### ii. Class Certification is Appropriate for Claims Pertaining to Carolina First Bank and Mercantile Bank's Pre-Merger Conduct

With the exception of CF Plaintiffs' breach of contract claim, the remainder of their state law causes of action against Carolina First premised on the available balance theory are essentially indistinguishable from the available balance claims advanced against TD Bank. For all material purposes, the core conduct alleged is the same. The CF Plaintiffs' breach of contract claim only differs because the underlying language in the Carolina First Account Agreement and Fee Schedule does not match the pertinent language in the TD PDAA. Nonetheless, the uniformity of relevant conduct and documents is no less present for the Carolina First available balance claims than for the TD Bank available balance claims. The Court is again confronted with standardized, automated, programmatic practices applied in identical fashion across Carolina First's customer base.[14] Accordingly, the Court has no hesitation in certifying the portion of the South Financial Class premised on the available balance theory[15] for all of the reasons elucidated above.

CF Plaintiffs also seek to certify state law causes of action based on Carolina First's practice of reordering debit transactions from highest-to-lowest dollar amount during the posting process ("posting order claims"). Defendant argues that these claims fail to satisfy the predominance requirement "for all the same reasons as Plaintiffs'

---

[14] The Court is aware of the distinction between Mercantile Bank's "pay all" policy and Carolina First's "pay none" policy, which existed prior to July 20, 2009, and resulted from differences in market conditions between the Carolinas and Florida. (*See* ECF No. 140-70 at 4-5.) Suffice it to say, this policy distinction has no direct effect on the universal applicability of the available balance theory for all Carolina First customers, including legacy Mercantile Bank customers.

[15] Namely, all Carolina First customers who "incurred an overdraft fee as a result of Carolina First's . . . assessing overdraft fees even when a customer has sufficient funds in their account to cover all merchant requests for payment." (*See* CAC ¶ 182, ECF No. 37 at 53.)

available balance claim." (ECF No. 142-1 at 76.) Defendant seeks to support this argument by demonstrating variations in the named Plaintiffs' understandings of Carolina First's posting order practices, noting that these variations undoubtedly exist among the putative class members' understandings, and concluding that a fact finder would need to determine each customer's understanding, possibly even *when* each person gained that understanding, in order to decide whether recovery should be permitted for any particular fee imposed. (*Id.*) For this reason, the Bank asserts, individual issues will predominate.

Defendant's arguments on this issue are unavailing. The Court finds that common questions predominate with respect to the posting order claims, and that a class action is the superior method for adjudicating those claims. As with the available balance claims, CF Plaintiffs and class members' expectations are immaterial in the context of the uniform contracts and conduct at issue. In this instance, the reasonable expectations of the class can be measured by an objective standard and determined with common evidence. *See, e.g.*, *Union Bank*, 275 F.R.D. at 680. This is especially true where, as here, Carolina First used standardized contracts of adhesion. Accordingly, the Court finds that all of the requirements for certification of the posting order claims have been satisfied.

### iii. Class Certification is Inappropriate for Actual Damages Claims Under the Reg E Theory

The Federal Reserve Board promulgated Reg E's overdraft provisions pursuant to its authority under EFTA. EFTA's civil remedies provision creates a private right of action for consumers affected by violations of the statute and its implementing regulations. That provision states, in pertinent part:

**(a) Individual or class action for damages; amount of award**

Except as otherwise provided by this section and section 1693h of this title, any person who fails to comply with any provision of this subchapter with respect to any consumer, except for an error resolved in accordance with section 1693f of this title, is liable to such consumer in an amount equal to the sum of—

**(1)** any actual damage sustained by such consumer as a result of such failure;

**(2)(A)** in the case of an individual action, an amount not less than $100 nor greater than $1,000; or

**(B)** in the case of a class action, such amount as the court may allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant; and

**(3)** in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1693m.

The Bank argues that Plaintiffs' claim for actual damages under the Reg E theory would require proof of detrimental reliance, therefore making the claim impossible to adjudicate on a class-wide basis because of the intricate factual questions regarding what each class member knew about TD's overdraft program, when they knew it, whether any lack of knowledge or understanding was a result of failure(s) by the Bank, whether the consumer would have made a different DCA election(s) if his or her knowledge had been complete, and so forth. (*See* ECF No. 142-1 at 50-59.) In other words, the Bank maintains that an actual damages claim under § 1693m(a)(1) implicates individualized proof, necessarily precluding certification under Rule 23(b)(3) because individual questions will improperly predominate over common questions. (*Id.*)

Plaintiffs contend that the issue of detrimental reliance is not an individualized issue that defeats Rule 23(b)(3) predominance where plaintiffs complain of "standardized conduct." (*See* ECF No. 140-1 at 67-69.) More generally, Plaintiffs argue that the predominance requirement is satisfied with regard to their Reg E claim because common proof will be utilized to demonstrate that TD's Reg E notices were invalid. (*See id.* at 65-67.)

The Court agrees with Defendant and declines to certify a putative class seeking actual damages under the Reg E theory. The Court finds that proof sufficient to substantiate actual damages under § 1693m(a)(1) would necessitate the adjudication of highly individualized issues, and that such issues would vastly outweigh the common questions applicable to actual damages claims.

Generally speaking, Plaintiffs' five itemized theories about how the Bank allegedly violated Reg E through its TDDCA enrollment materials and procedures (*see supra* at 19-21) boil down to assertions that the Bank's Reg E notices did not conform with the regulation, or that the Bank failed to provide required notices, or that the notices contained material misstatements or omissions. In order to prove that these alleged actions actually harmed them, Plaintiffs would have to show that they suffered injury "as a result of" the Bank's failures. *See* 15 U.S.C. § 1693m(a)(1). To the Court's knowledge, no federal circuit court of appeals has considered a claim for actual damages under EFTA. *But see*, *Vallies v. Sky Bank*, 591 F.3d 152, 161 (3d Cir. 2009) (stating, in dicta, "[A]ctual damages for violations of EFTA's 'notice' provisions, [citing section of EFTA applicable to ATM fee notices], *which are analogous to violations of TILA disclosure provisions*, require a showing of detrimental reliance" (emphasis added)). However, a

majority of district courts that have considered such a claim have held that proof of causation requires detrimental reliance. *See, e.g., Brown v. Bank of Am., N.A.*, 457 F. Supp. 2d 82, 90 (D. Mass. 2006) (holding plaintiffs could not recover actual damages under § 1693m for failure to post required notice of ATM fee where need to indicate consent to fee on click-through screen broke chain of causation because plaintiffs could not show detrimental reliance); *Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 445–46 (D. Minn. 2012) ("A majority of courts have held that the EFTA requires detrimental reliance in order to recover actual damages."); *Stilz v. Glob. Cash Network, Inc.*, No. 10 CV 1998, 2010 WL 3975588, at *5 (N.D. Ill. Oct. 7, 2010) ("[P]laintiff has not pled detrimental reliance, which is a prerequisite to recovering actual damages under the EFTA."); *Voeks v. Pilot Travel Centers*, 560 F. Supp. 2d 718, 721-725 (E.D. Wis. 2008) (same); *see also Gonzalez v. Inv'rs Bank*, No. 2:L2-CV-04084 DMC, 2013 WL 5730528, at *6 (D.N.J. Oct. 21, 2013) (granting judgment on the pleadings with respect to actual damages because plaintiffs failed to plead detrimental reliance); *Archbold v. Tristate ATM, Inc.*, 2012 WL 3887167, at *5 (E.D.N.Y. Sept. 7, 2012); *Muchnik v. Union Credit Bank*, 2009 WL 3012811, at *1 (S.D. Fla. Sept. 16, 2009); *Martz v. PNC Bank, N.A.*, 2007 WL 2343800, at *7-8 (W.D. Pa. Aug. 15, 2007); *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 408 (M.D. Fla. 2004). This is, in the Court's view, the only reasonable way to interpret § 1693m's two-fold remedial scheme, which includes separate provisions for actual damages, (a)(1), and statutory damages, (a)(2). Without a causation requirement, § 1693m(a)(1)'s "as a result of" language would become mere surplusage, and the actual and statutory damages provisions would arbitrarily overlap.

Moreover, courts have required a showing of detrimental reliance for recovery

under the identically-worded actual damages provision of the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1640(a)(1), and courts interpreting § 1693m have often looked to decisions interpreting TILA for guidance. *See, e.g., Brown*, 457 F. Supp. 2d at 90. The Fourth Circuit, in an unpublished opinion, has interpreted TILA's actual damages provision to require a showing of detrimental reliance. *See Jaldin v. ReconTrust Co.*, 539 F. App'x 97, 103 (4th Cir. 2013) (affirming that plaintiffs failed to state a claim for actual damages under TILA because the pleadings did not include an explanation of how the alleged violation caused detrimental reliance); *see also United States v. Petroff-Kline*, 557 F.3d 285, 296-97 (6th Cir. 2009) (holding that "actual damages [under TILA] require a showing of detrimental reliance," and stating that "the debtor must demonstrate that he or she would either have received a better interest rate for the loans elsewhere or would have elected not to take the loan had the required [interest rate disclosure] information been available"); *In re Smith*, 289 F. 3d 1155, 1157 (9th Cir. 2002) (same); *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir. 2001) (finding that the "as a result of" language "indicates that the statute's authors intended that plaintiffs must demonstrate detrimental reliance in order to be entitled to actual damages under TILA"); *Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 435-40 (5th Cir. 2000) ("Without a causation requirement, actual damages would overlay the statutory damages for no apparent reason."); *Peters v. Jim Lupient Oldsmobile Co.*, 220 F.3d 915, 917 (8th Cir. 2000) (setting forth the elements of proof necessary to establish proximate cause of actual damages from a TILA disclosure violation). "In fact, every court of appeals that has spoken on this issue has required a showing of detrimental reliance." *Vallies v. Sky Bank*, 591 F.3d 152, 155 (3d Cir. 2009).

Turning to the relevant facts, the evidence shows that some of the named Plaintiffs opted into and out of DCA service several times, in some instances for multiple accounts. The 23 named Plaintiffs made 75 separate TDDCA elections involving 39 separate consumer checking accounts, including every possible enrollment channel—in branch, by telephone, online, and through TD's mobile app. (Kwon Report ¶¶ 16-17 & App. C, ECF No. 142-18 at 115-17, 152-54.) Elections made in branch and on the telephone necessarily included conversations between any particular Plaintiff and a TD CSR regarding the details of the DCA program. (*Id.* (showing 48 of Plaintiffs' 75 elections were made at branches or through the TD call center).) Complicating matters further, for Plaintiffs who maintained more than one account, their elections to opt into and out of overdraft service were sometimes made via different channels on different occasions. Plaintiff Kasmir, for example, made 19 TDDCA elections during the class period, involving five different checking accounts, using several different channels including branch, telephone, and online. (*Id.*)

The evidence also reveals that Plaintiffs had their own specific reasons for enrolling in the DCA program, each of which would be used by Defendant to contest the assertion of detrimental reliance. For example, Plaintiff Brooker testified that she enrolled in TDDCA because she envisioned it being "useful" as a "safety net" and that, despite her frustration with the fees incurred, she kept her TD checking account open because she has "relied on the TD Bank Debit Card Advance as . . . kind of like a short-term loan" that she needed between paychecks. (Brooker Dep. 107:14-108:1, 119:2-13, ECF No. 142-18 at 330, 333.) Plaintiff Goodall described her reasons for enrolling in TDDCA on multiple occasions in the following manner: "[W]hen I unenrolled or enrolled,

there was different times, different circumstances, different reasons." (Goodall Dep. 77:8-78:2, ECF No. 142-18 at 380.) One example Ms. Goodall gave for opting into overdraft coverage was to ensure that her mortgage or other bills did not "bounce" around Christmastime. (*Id.* 76:11-77:3.) Likewise, Plaintiffs had different reasons for overdrawing their accounts on different occasions. Some may have overdrawn their accounts by accident, whereas others did so intentionally because of their circumstances. For instance, Plaintiff Hurel testified that he intentionally overdrew his account due to "an emergency." (Hurel Dep. 141:7-12, ECF No. 142-19 at 69.)

Given this context, the determination of which specific overdraft charges were the "result of" any particular customer's lack of information or understanding about DCA, or the Bank's failure to provide any particular notification, explanation, or confirmation, would necessarily involve the Court's descent into a veritable quagmire of intricate fact-finding. Mr. Olsen's proposed method for measuring Reg E damages does not account for such intricacies, and it never can. This is because the question of actual damages under Reg E turns on a customer's subjective experience of DCA enrollment, and whether that customer would have made a different DCA election in the absence of the Bank's putative failure, the measure of which must be determined by numerous individual inquiries. Class certification is not an appropriate vehicle to adjudicate a theory of liability that would necessitate thousands of mini-trials.

Plaintiffs' argument that detrimental reliance is not an individualized issue because they have complained of "standardized conduct" is vacuous and assumes its own conclusion. The question of causation here is predicated on real world facts, including the content of unscripted conversations and subjective human understanding.

Merely asserting "standardized conduct" on the part of the Bank does nothing to establish universally applicable harm or the Bank's causation thereof. Indeed, a bald assertion of "standardized conduct" fits intuitively with Plaintiffs' statutory damages claim, *not* the actual damages claim. Plaintiffs' reliance on two EFTA cases for the proposition that detrimental reliance does not preclude a finding of predominance because it is a quantum of damages issue (*see* ECF No. 140-1 at 67-69) is misplaced. *See Flores v. Diamond Bank*, No. 07 C 6403, 2008 WL 4861511, at *3 (N.D. Ill. Nov. 7, 2008) (declining to resolve the question of whether a plaintiff seeking actual damages under EFTA must prove detrimental reliance and noting that, given the facts, statutory damages were the more likely remedy in any event); *Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282 AHM (CTX), 2009 WL 2711956, at *10-*11 (C.D. Cal. Aug. 25, 2009) (distinguishing the EFTA claim at issue, predicated on defendant's policy of continuing EFT withdrawals after customers cancelled memberships, from ATM cases concerned with reliance on a notice required by EFTA). To the extent those cases can even be compared to the instant action, the Court respectfully disagrees with the notion that detrimental reliance is merely a damages calculation problem. On the contrary, it is an element of Plaintiffs' liability case for actual damages pursuant to § 1693m(a)(1). *See Voeks*, 560 F. Supp. 2d at 723-25. *Cf. Turner*, 242 F.3d at 1028 ("We hold that detrimental reliance is an element of a TILA claim for actual damages, that is a plaintiff must present evidence to establish a causal link between the financing institution's noncompliance and his damages."); *Peters*, 220 F.3d at 917 (same).

Additionally, Plaintiffs ineffectively rely on cases seeking statutory damages under § 1693m to advocate for class certification of their actual damages claim. (ECF

No. 140-1 at 66-67); *see Frey v. First Nat. Bank Sw.*, 602 F. App'x 164, 169-72 (5th Cir. 2015) (affirming district court's certification of a class seeking statutory damages for violation of EFTA's ATM fee notice requirements); *Gawarecki v. ATM Network, Inc.*, No. 11-CV-1923 SRN/JJG, 2014 WL 2600056, at *8 (D. Minn. June 10, 2014) (finding "uncontroverted evidence demonstrating that *no putative class member could have suffered actual damages*" and noting "[t]he parties agree that, in order to prove actual damages under the EFTA, a plaintiff must demonstrate his or her detrimental reliance on the lack of notice" (emphasis added)); *Burns v. First Am. Bank*, No. 04 C 7682, 2006 WL 3754820, at *9 (N.D. Ill. Dec. 19, 2006) ("A claim for statutory damages under EFTA does not require each class member to prove [causation]. Each class member's claim requires proof only that EFTA was violated."). Conflation of authority respecting the two claim types will not do where one requires proof of causation and the other does not.

Finally, Plaintiffs rely on *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504 (S.D. Fla. 2013), in which case the district court found Rule 23(b)(3) predominance satisfied for an EFTA claim challenging the adequacy of the defendant's NSF fee notice. (*See* ECF No. 140-1 at 67.) However, the decision in *Muzuco* makes no mention of § 1693m's actual damages provision, and appears to assume that the certified claims are for statutory damages only. *See id.* at 520, 522 (finding that the "large number of claims, along with the relatively small statutory damages," among other reasons, made a class action the superior method for adjudicating plaintiffs' EFTA claims).

The Fourth Circuit has repeatedly held that, where the applicable substantive law requires proof of reliance, individual issues prevent the claims from being susceptible to class-wide proof. In *Broussard v. Meineke Discount Muffler Shops, Inc.*, the court

reversed the district court's certification under Rule 23(b)(3) of a class of franchisees suing the franchisor for fraud and negligent misrepresentation, finding that "these claims turn[ed] on whether each franchisee reasonably relied on [franchisor's] representations." 155 F.3d 331, 341 (4th Cir. 1998). The *Broussard* court stated that "proof of reasonable reliance would depend on a fact-intensive inquiry into what information each franchisee actually had about the operation of the [franchisor's advertising] account," and that such information might come from, *inter alia*, conversations between franchisee employees and franchisor employees. *Id.* Recognizing the inherent individuality of such an inquiry, the court concluded "claims that 'require[ ] proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on those statements to his detriment' are not susceptible to class-wide treatment." *Id.* at 342 (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998)) (modifications in original); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434 (4th Cir. 2003) ("The first reason why common issues do not predominate in [p]laintiffs' claims against [defendants] is the need for individual inquiry into the issue of reliance."); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (stating that where proof of reliance is required "we have consistently held that individual hearings are required"). Like the fraud and negligent misrepresentation claims at issue in *Broussard*, *Gunnells*, and *Thorn*, Plaintiffs' actual damages claim under § 1693m(a)(1) requires proof of reliance to show causation of harm. There is nothing to indicate that the reliance at issue here should be treated, from a putative class perspective, any differently than the reliance at issue in those cases.

Assuming, without deciding, that Plaintiffs could satisfy the requirements of Rule

23(a) with respect to their actual damages claim under § 1693m(a)(1), their inability to satisfy Rule 23(b)(3) predominance dictates the Court's finding that class certification is unfeasible. Accordingly, this Court joins other courts in holding that the detrimental reliance requirement for actual damages claims under EFTA precludes class certification. *See, e.g.*, *Brown*, 284 F.R.D. at 447 ("Because the proposed class includes a claim for actual damages—and those claims require detrimental reliance—each putative class member would have to individually prove detrimental reliance and individual issues would overwhelm the common ones."); *Martz*, 2007 WL 2343800, at *7-8 (same); *Polo*, 232 F.R.D. at 408-09; *see also Mabary v. Hometown Bank, N.A.*, 888 F. Supp. 2d 857, 860 (S.D. Tex. 2012) ("[I]f Plaintiff were seeking actual damages [under EFTA], the suit could not proceed as a class action. Each member of the putative class would have to show detrimental reliance, and this need for proof would preclude the certification of a class.").

### iv. Class Certification is Appropriate for Statutory Damages Under the Reg E Theory

In contrast to the actual damages claims, Plaintiffs' statutory damages claims under the Reg E theory are ideally suited for class certification. As the Bank concedes in its opposition memorandum, "To recover statutory damages, a plaintiff need only prove a technical violation of the substantive provisions of the statute or its implementing regulations, and need not prove that he or she suffered any resulting harm." (ECF No. 142-1 at 16.) The Bank further states, "The case law under EFTA is clear: consumers may recover *statutory* damages without proof that the violation caused them harm, but they must prove injury and causation to recover *actual* damages." (ECF No. 142-1 at 50 (emphasis in original).) Given these concessions, and the lack of any

argument by TD that the statutory damages claims do not satisfy Rule 23, the Court finds that the requirements of commonality, typicality, and predominance are satisfied for this portion of the Reg E theory.

This finding is not difficult for the Court to make given the nature of the Reg E claims, which implicate enterprise-wide conduct on the part of the Bank. For example, if TD's Reg E Form is determined to provide insufficient notice of the Bank's overdraft policies, then every customer whose DCA enrollment was predicated on the use of the Reg E Form as notice pursuant to 12 C.F.R. § 1005.17(b)(1)(i)—presumably almost all customers who were, in fact, enrolled—would be entitled to statutory damages. Or, if TD's practice of enrolling customers based on a CSR's computer screen entry, rather than the customer checking a box or signing a form him or herself, is found to fall short of providing the customer a "reasonable opportunity to affirmatively consent" to the overdraft service, *see* § 1005.17(b)(1)(ii), then every customer enrolled in this fashion would be entitled to statutory damages. Of course, the Court is not commenting on the merits of these EFTA sub-theories, but only giving examples of how standardized the inquiries requisite to resolving any particular sub-theory of liability would be.

However, the Court cannot certify the EFTA Class as it is currently defined. The Consolidated Amended Class Action Complaint proposes the following definition:

> All customers of TD Bank that either opened a checking account after August 15, 2010, or have claims not released in the settlement class in *In re Checking Account Overdraft Litigation*, who were assessed an overdraft fee for an ATM or debit card transaction after July 1, 2010, if the account was opened on or after July 1, 2010, or August 15, 2010, if the account was opened prior to July 1, 2010, even though TD Bank failed to comply with the Electronic Funds Transfer Act ("EFTA Class").

(CAC ¶ 182, ECF No. 37 at 53.) The Bank argues that this proposed class definition is

an impermissible "fail-safe" class, which is "improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (citing *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (holding fail-safe class definition was one of two grounds for decertifying class)); *see also EQT Prod. Co.*, 764 F.3d at 360 n.9 (citing *Messner* and directing district court to consider the fail-safe class issue on remand as part of its class-definition analysis); *Cuming v. S.C. Lottery Comm'n*, No. 3:05-CV-03608-MBS, 2008 WL 906705, at *1 (D.S.C. Mar. 31, 2008) ("The proposed class definition must not depend on subjective criteria or the merits of the case or require an extensive factual inquiry to determine who is a class member."). According to the Bank, membership in the EFTA Class as currently defined "turns on the Court's determination of whether any of TD Bank's challenged practices violated Regulation E," and is ultimately contingent upon "whether a person has a legally valid claim." (*See* ECF No. 142-1 at 94.) Plaintiffs dispute the notion that the EFTA Class is a fail-safe class, but request that if the Court should so find, that the class definition be refined rather than certification be denied. *Melton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 289 (D.S.C. 2012) ("It is better in these circumstances, when practical and possible, to refine the class definition before flatly denying class certification on that basis").

The Court agrees with Defendant that the EFTA Class is a fail-safe class as currently defined, and directs Plaintiffs to submit a new class definition(s) that captures the nuances of the sub-theories contained in the Reg E statutory damages claims. The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold

requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358 (citing *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir.1972)). The current EFTA Class definition mentions no mechanism(s) by which the Bank putatively failed to comply with Reg E, but simply includes all customers charged an overdraft fee for an ATM or one-time debit transaction for whom "TD Bank failed to comply with the Electronic Funds Transfer Act." This is tantamount to saying "all customers who have a meritorious Reg E claim," or "all customers with respect to whom TD Bank violated the law." Such a class definition will not do, precisely because class members can only be identified once it has been determined that their Reg E claim is successful.

The Court has distilled the following five sub-theories, more fully detailed above (*see supra* at 19-21), from the evidence and argument presented by Plaintiffs regarding the Reg E theory: (1) the Bank's Reg E Form was non-conforming because the description of when an overdraft would occur was misleading and did not provide the customer with adequate notice as required by 12 C.F.R. § 1005.17(b)(1)(i); (2) the Bank's opt-in procedure for telephone and online enrollments was flawed where it failed to ensure that the customer saw and reviewed the Reg E Form, segregated from all other information, before choosing enrollment, in violation of § 1005.17(b)(1)(i)'s notice provision and/or § 1005.17(b)(1)(ii)'s requirement that the customer's opportunity to give affirmative consent be "reasonable;" (3) the Bank failed to properly obtain affirmative consent during the in-branch opt-in process when it allowed branch employees to check a box on the employee's computer screen rather than allowing the customer to check a box or sign a form, in violation of § 1005.17(b)(1)(ii) and/or (iii); (4) the Bank failed to

provide written confirmation of enrollment to certain groups of customers including a statement of the customers' right to revoke consent, as required by § 1005.17(b)(1)(iv); (5) even where the Bank did provide enrollment confirmation forms, they were universally deficient because the language employed by the Bank impermissibly obfuscated the customers' right to revoke consent, in violation of § 1005.17(b)(1)(iv).

These sub-theories appear to offer possible bases from which a Rule 23-compliant class definition(s) might be formed. But the Court is not authorized or equipped to assist Plaintiffs in crafting such a definition, and as with other aspects of pleading discretion, Plaintiffs are master of their claim in this respect. Assuming Plaintiffs are able to provide a proper EFTA Class definition, the Court will join other courts in certifying a class(es) seeking statutory damages pursuant to 15 U.S.C. § 1693m(a)(2)(B). *See, e.g.*, *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 170 (5th Cir. 2015) (affirming class certification of ATM notice claims under EFTA).

### v. Affirmative Defenses do not Preclude a Finding of Predominance

The Bank raises a whole series of affirmative defenses in this case (*see* Answer, ECF No. 69 at 40-53). Resolution of a number of these affirmative defenses, the Bank asserts, will cause individual issues to predominate because the defenses turn on individualized evidence concerning each customer's knowledge and course of performance. (*See* ECF No. 142-1 at 77-82.)

First, the Bank asserts that the defenses of ratification, waiver, estoppel, voluntary payment, and failure to mitigate all place the individual consumer's knowledge and acceptance of TD's practices in issue. The presence of such notice-based defenses would purportedly require individualized analyses of when class members knew or

should have known about Defendant's practices. (*See* ECF No. 142-1 at 77-80.) But Defendant's arguments in this regard are undercut by its repeated assertions that documents universally provided to class members *themselves functioned as sufficient notice to invoke knowledge and understanding* of the overdraft practices. In other words, where Defendant will rely upon the TD PDAA, the Carolina First Account Agreement and Fee Schedule, TD's Reg E Form, overdraft notices automatically mailed to customers each time they incurred a fee, and other universally supplied documentation, the Court finds that these notice-based defenses are susceptible to class-wide proof. *See Comerica*, 286 F.R.D. at 660 (finding, in high-to-low posting order case, that bank's affirmative defenses, including ratification and waiver, were amenable to class-wide proof); *Union Bank*, 275 F.R.D. at 677-78 (finding same with respect to bank's waiver, ratification, and voluntary payment defenses); *TD Bank*, 281 F.R.D. at 678-79 (finding bank's affirmative defenses of accord and satisfaction, waiver, estoppel, voluntary payment, and failure to mitigate inadequately pled, but not defeating predominance even if sufficiently pled).

Additionally, under the law of the sixteen states at issue, the defenses of ratification,[16] waiver,[17] and voluntary payment[18] require Plaintiffs and class members to

---

[16] *See E. Devoe Tompkins, Inc., v. City of Bridgeport*, 123 A. 135, 137 (Conn. 1923) (requiring "full knowledge" for ratification); *Dannley v. Murray*, No. CIV.A. 5383, 1980 WL 268061 (Del. Ch. July 3, 1980) (same); *Wittlin v. Giacalone*, 171 F.2d 147, 148 (D.C. Cir. 1948) (same); *Deutsche Credit Corp. v. Peninger*, 603 So.2d 57, 59 (Fla. Dist. Ct. App. 1992) (same); *Wilkins v. Waldo Lumber Co.*, 130 Me. 5, 153 A. 191, 193 (1931) (same); *Oaks v. Connors*, 660 A.2d 423, 426 (Md. 1995) (same); *Jacob Trinley & Sons v. Golter*, 41 A.2d 243 (N.H. 1945) (same); *Kidder v. Greenman*, 187 N.E. 42, 48 (Mass. 1933); *Maltese v. Twp. of N. Brunswick*, 802 A.2d 529, 542 (N.J. Super. Ct. App. Div. 2002) (same); *New York State Me. Transporters Ass'n, Inc. v. Perales*, 566 N.E.2d 134, 137 (N.Y. 1990) (same); *Leiber v. Arboretum Joint Venture, LLC*, 702 S.E.2d 805, 812 (N.C. Ct. App. 2010) (same); *DeSilvio v. Restauire*, 400 A.2d 211, 213 (Pa. Super. Ct. 1979) (same); *UST Corp. v. Gen. Road Trucking Corp.*, 783 A.2d 931, 939 (R.I. 2001) (same); *Neely v. Love*, 142 S.E. 623, 642 (S.C. 1928) (same); *Smith v. Mountjoy*, 694 S.E.2d 598, 603 (Va. 2010) (same); *Page v. Suraci*, 483 A.2d 601, 603 (Vt. 1984) (same).
[17] *See Roy v. Metro. Prop. and Cas. Ins. Co.*, 909 A.2d 980, 982 (Conn. App. Ct. 2006) ("Waiver involves an *intentional* relinquishment of a *known* right . . . .") (emphasis added and internal quotation marks

68

have had *full knowledge* of all material facts for their actions to be considered knowing, intentional, and voluntary.[19] But a core allegation underlying all of Plaintiffs' theories of liability is their contention that the Bank obscured or intentionally concealed material information about its overdraft policies, including, *inter alia*, the OD Points and Pay Matrix programs which controlled the imposition of fees, such that customers could not have had full knowledge of the Bank's practices. (*See* ECF No. 143-1 at 29-30.)

---

omitted); *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 27 A.3d 522, 529-30 (Del. 2011) (same); *Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Intern. Union*, 770 A.2d 978, 992 (D.C. 2001) (same); *Alston v. Alston*, 960 So.2d 879, 881 (Fla. Dist. Ct. App. 2007) (same); *Kraul v. Maine Bonding & Cas. Co.*, 559 A.2d 338, 338-39 (Me. 1989) (same); *Hartford Underwriters Ins. Co. v. Phoebus*, 979 A.2d 299, 310 (Md. Ct. Spec. App. 2009) (same); *Niagara Fire Ins. Co. v. Lowell Trucking Corp.*, 56 N.E.2d 28, 31 (Mass. 1944); *Margolis v. St. Paul Fire & Marine Ins. Co.*, 125 A.2d 768, 771 (N.H. 1956) (same); *W. Jersey Title & Guar. Co. v. Indus. Tr. Co.*, 141 A.2d 782, 786 (N.J. 1958); *Fish King Enters. v. Countrywide Ins. Co.*, 930 N.Y.S.2d 256, 259 (N.Y. App. Div. 2011) (same); *Liptrap v. Coyne*, 675 S.E.2d 693, 696 (N.C. Ct. App. 2009) (same); *Com. v. Lucarelli*, 971 A.2d 1173, 1179 (Pa. 2009) (same); *Tidewater Realty, LLC v. State, Providence Plantations*, 942 A.2d 986, 995 (R.I. 2008) (same); *King v. James*, 694 S.E.2d 35, 43 (S.C. Ct. App. 2010) (same); *Waterbury Feed Co., LLC v. O'Neil*, 915 A.2d 759, 762 (Vt. 2006) (same); *Stockbridge v. Gemini Air Cargo, Inc.*, 611 S.E.2d 600, 605 (Va. 2005) (same).

[18] *See Eagle Maint. Servs., Inc. v. Dist. of Columbia Contract Appeals Bd.,* 893 A.2d 569 (D.C. 2006) ("[T]he voluntary payment doctrine . . . provides that money *voluntarily paid* under a claim of right to the payment, and *with knowledge of the facts* by the person making the payment, cannot be recovered by the payor . . . .") (emphasis added, and internal citations and quotation marks omitted); *Morris v. City of New Haven,* 63 A. 123, 124 (Conn. 1906) (same); *W. Natural Gas Co. v. Cities Serv. Gas Co.,* 201 A.2d 164 (Del. 1964) (same); *City of Key W. v. Florida Keys Cmty. Coll.,* 81 So.3d 494 (Fla. Dist. Ct. App. 2012) (same); *Norton v. Marden,* 15 Me. 45, 45 (1838) (same); *Dua v. Comcast Cable of Maryland, Inc.,* 805 A.2d 1061 (Md. 2002) (same); *Carey v. Fitzpatrick,* 17 N.E.2d 882, 883 (Mass. 1938) (same); *E.D. Clough & Co. v. Boston & M.R.R.,* 90 A. 863, 876 (N.H. 1913) (same); *New Jersey Hosp. Ass'n v. Fishman,* 661 A.2d 842, 849 (N.J. Super. Ct. App. Div. 1995) (same); *Dillon v. U-A Columbia Cablevision of Westchester, Inc.,* 790 N.E.2d 1155, 1156 (N.Y. 2003) (same); *Collins v. Covert,* 98 S.E.2d 26, 29 (N.C. 1957) (same); *Peebles v. City of Pittsburgh,* 101 Pa. 304, 304 (1882) (same); *Fairbanks v. Mann,* 34 A. 1112, 1113 (R.I. 1896) (same); *Hardaway v. S. Ry. Co.,* 73 S.E. 1020, 1025 (S.C. 1912) (same); *Wilson v. Alexander,* 428 A.2d 1089 (Vt. 1981) (same); *Dodson v. Newport News Shipbuilding & Dry Dock Co.,* No. 0278–99–1, 1999 WL 1133301 (Va. Ct. App. Aug. 10, 1999) (same).

[19] It is not entirely clear what Defendant means by its estoppel and failure to mitigate defenses, or how they are supposed to differ from Defendant's theories of ratification, waiver, and voluntary payment. In any event, case law cited by TD demonstrates that these defenses, if applicable, would also require Plaintiffs and class members to have sufficient knowledge of the overdraft policies and practices in question. *See Melton ex rel. Dutton v. Carolina Power & Light Co.*, 283 F.R.D. 280, 293 (D.S.C. 2012) (noting that estoppel applies "if a person, by his actions, conduct, words or silence which amounts to a representation, or a concealment of material facts, causes another to alter his position to his prejudice or injury") (internal citations and quotation marks omitted); *Shelley v. AmSouth Bank*, No. CIV.A.97-1170-RV-C, 2000 WL 1121778, at *11 (S.D. Ala. July 24, 2000) (stating, in denying class certification, that bank's "failure to mitigate" defense would require individual assessments of what depositors did or would have done "once armed with *sufficient awareness* of the defendant's actual policies") (emphasis added), *aff'd*, 247 F.3d 250 (11th Cir. 2001).

Plaintiffs have offered evidence to support this contention. (*See, e.g.*, Oct. 4, 2006 Email, ECF No. 140-43 at 2 (showing intentional concealment of the OD Points system); Recommendation MX02, ECF No. 140-86 at 2 (directing Carolina First not to disclose the overdraft limit established by Pay Matrix in any balance disclosed to customers through any channel).) If Plaintiffs can prove these allegations they will undercut TD's notice-based defenses by common evidence, thereby supporting satisfaction of the predominance requirement. *See Comerica*, 286 F.R.D. at 660.

Second, Defendant argues that the defense of accord and satisfaction necessitates the introduction of individual communications between the Bank and its customers for each instance where an overdraft fee was refunded. (*See* ECF No. 142-1 at 80-81.) However, if this defense applies to this case, it pertains to damages rather than liability, and can be accounted for by Mr. Olsen in his calculations. *See TD Bank*, 281 F.R.D. at 678 (citing *Carbajal v. Capital One*, 219 F.R.D. 437, 441 n.2 (N.D. Ill. 2004) (finding no reason to believe that setoffs would be a significant focus of the case, and would involve nothing more than a mere calculation)). Moreover, courts have repeatedly held that issues related to damages do not typically defeat class certification. *See, e.g.*, *Gunnells*, 348 F.3d at 428 ("Indeed, in actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred.") (internal modifications and quotation marks omitted).

Third, TD asserts that individualized inquiries will be necessary to determine whether class members' claims are time-barred. The Bank notes that several states apply the "discovery rule" to at least some of Plaintiffs' causes of action. *See, e.g.*, *Prince v. Liberty Life Ins. Co.*, 700 S.E.2d 280, 282 (S.C. Ct. App. 2010) (holding that

the discovery rule applies to breach of contract claims in South Carolina, and stating, "Under the discovery rule, the statute of limitations begins to run when a cause of action *reasonably ought to have been discovered*") (emphasis added, internal citations and quotation marks omitted). Defendant argues that the discovery rule requires individualized determinations as to when class members knew or should have known about the Bank's allegedly unlawful practices. However, the Court finds that the statute of limitations defenses at issue here do not defeat the predominance of common questions. To the extent the discovery rule applies, an objective standard ("reasonably ought to have been discovered") can be utilized to determine when class members had constructive knowledge, if not actual knowledge, that a cause of action had accrued— for example, the first time the Bank mailed a customer an overdraft notice after assessing a fee based on a negative available balance rather than a negative ledger balance, *or* simply the date upon which any particular fee was imposed, etc. These questions of constructive knowledge can be answered on a subclass-wide basis, specific to the State statute of limitations at issue, and applied systematically to the datasets procured in order to identify any time-barred claims.

### vi. Class Members are Ascertainable and Damages are Calculable

"At the certification stage, plaintiffs must demonstrate their ability to prove liability on a class-wide basis, including that each member suffered injury and that the amount of damages is readily calculable for each class member." 1 McLaughlin on Class Actions § 4:19 (14th ed.). The damages in question must be measurable classwide through use of a common methodology. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 30-38 (2013).

Plaintiffs assert that their expert, Mr. Olsen, can identify class members from the transaction records maintained by TD Bank and produced during the course of this litigation. Plaintiffs' theory regarding the available balance claims is that if they prevail, each class member is entitled to recover the difference between the amount of overdrafts actually assessed, and the amount of overdrafts they would have been charged if the Bank had used ledger balance, not available balance, to determine whether a transaction was overdrawn. This measure of damages has been adopted in other banking overdraft cases, to include Mr. Olsen's own analyses pertaining to high-to-low posting order claims. *See, e.g.*, *Gutierrez v. Wells Fargo Bank, NA*, 589 F. App'x 824, 827 (9th Cir. 2014) (affirming restitution award based upon the difference between the amount of overdraft fees assessed due to high-to-low posting, and what would have been assessed under the alternative posting theory advanced by plaintiffs). (*See also* Olsen Report ¶¶ 4-36, ECF No. 140-33 at 3-14.)

Defendant asserts that Mr. Olsen's expert opinions fail to establish that causation and damages can be determined on a class-wide basis. (*See* ECF No. 142-1 at 86-88.) Here, the Bank superimposes its previous arguments about customer consent, reliance, and knowledge being central to liability determinations (*see* sections B.i. to B.iv. *supra*) upon its challenge to ascertainability of the classes and calculation of damages. Of course it is true that Mr. Olsen, by way of computer data analysis, cannot determine the particular reason why a customer chose to opt into or out of TDDCA, or whether a customer was fully aware of the Bank's practice of assessing overdraft fees based on available balance, or whether a customer understood Carolina First's debit transaction posting practices. But he need not do so. It is enough that, should Plaintiffs prevail on

any of their claims, Mr. Olsen has adequately demonstrated he can mine the Bank's customer transaction data, determine the number of fees each customer did incur or would have incurred under differing accounting and posting scenarios defined by objective criteria, and adjust these calculations based upon data parameters established by the Court. (*See generally*, Olsen Decl. & Report, ECF Nos. 21 & 33.)

Defendant persists by arguing that Mr. Olsen's proposed methodologies cannot reliably match an overdraft refund to the particular overdraft fee from which it stemmed, and that his proposed calculations for the available balance and posting order claims do not "fit" the liability theories at issue. (*See* ECF No. 142-1 at 87-91.) Specifically, the Bank asserts that the balances that Mr. Olsen was instructed to use—e.g., the ledger balance—do not always reflect "the money in the account" as Plaintiffs would like the Court to interpret that phrase. For example, ledger balance within the data Mr. Olsen used to generate damages estimates excluded ATM withdrawals that occur late in the day. (Kwon Report ¶ 25, ECF No. 142-18 at 119-20.) In such cases, the available balance would more accurately represent "the money in the account" than the ledger balance, because the available balance would reflect cash withdrawn and carried away by the customer. In other instances, the differences between a customer's available balance and ledger balance may be due to holds on *deposits*, rather than pending *debits* (*see* Sacknoff Decl. ¶¶ 79, 99, ECF No. 142-3 at 29, 32), potentially making the identification of putatively improper fees more complex *in those scenarios*.

Undoubtedly, Mr. Olsen's precise calculations will need to be refined as these, and likely other, issues are resolved in this case. But it is abundantly clear to the Court that any such individualized issues are vastly outweighed by the common questions

predominating in this litigation. Morever, damages calculations made pursuant to a common methodology "need not be exact" at the class-certification stage. *Comcast*, 569 U.S. at 35. Rather, the Court must be satisfied that "any model supporting a plaintiff's damages case [is] consistent with its liability case." *Id.* (citation and internal quotation marks removed). Plaintiffs have met this burden, and the Court has little doubt that the parties' technical disputes over class member identification and damages will be resolvable as this litigation proceeds.

Lastly, the Court finds that potential statutory damages under the Reg E theory are readily calculable on a class-wide basis. Plaintiffs' theory is grounded in the assertion that the Bank must *strictly comply* with EFTA's opt-in requirements, itemized in 12 C.F.R. § 1005.17(b)(1), prior to assessing any overdraft fee for paying an ATM or one-time debit transaction. If Plaintiffs prevail on their Reg E claim—e.g., by proving that the Bank's Reg E form was materially misleading—Mr. Olsen's identification of class members and calculation of statutory damages will be purely ministerial in nature.

### vii. Subclasses are Appropriate

Based upon the findings and conclusions above, the Court certifies the creation of seventeen (17) subclasses of the Sufficient Funds Class, and nine (9) subclasses of the South Financial Class. Plaintiffs' trial plan, included as Appendix I to its motion, sets forth an analysis of the projected application of multi-state law in this case and an extensive set of surveys of that law as it applies to each of Plaintiffs' causes of action. (*See* ECF No. 140-2 at 13-22, 26-86.)

The Court finds that the creation of subclasses to address variations in the applicable law will assist the parties, the trier of fact, and the Court, and will render this

case manageable as a class action. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). Though there are numerous causes of action and multiple theories of liability, the variations of law documented in the surveys will not materially affect the fair and efficient adjudication of this case. Moreover, the proposed special verdict forms will afford a reasonably efficient vehicle to determine and document the findings at trial. (*See* ECF No. 140-2 at 88-124.)

## CONCLUSION

In accordance with the findings above, it is hereby ordered, adjudged, and decreed that Plaintiffs' motion for class certification (ECF No. 140) be, and the same is hereby, GRANTED in part and DENIED in part. The Court certifies classes under Federal Rule of Civil Procedure 23, consisting of:

> All customers of TD Bank that either opened a checking account after August 15, 2010, or have claims not released in the settlement class in *In re Checking Account Overdraft Litigation*, who, from August 16, 2010, to the date of class certification, incurred an overdraft fee as a result of TD Bank's practice of assessing overdraft fees even when a customer had sufficient funds/money in their account to pay the amount of the posted transaction ("TD Sufficient Funds Class").

> All customers of Carolina First, Mercantile, and/or South Financial who, within the applicable statute of limitations preceding the merger of accounts onto the TD system in June 2011 to the date of class certification, incurred an overdraft fee as a result of Carolina First's, Mercantile's, and/or South Financial's practices of (1) re-sequencing debit card transactions from highest to lowest and debiting items for which no timestamp exists before debit card transactions for which a time-stamp exists, or (2) assessing overdraft fees even when a customer has

sufficient funds in their account to cover all merchant requests for payment ("South Financial Class").

It is further ordered, adjudged, and decreed that Plaintiffs' motion for the creation of certain subclasses included in its motion for class certification be, and the same is hereby, GRANTED. The Court certifies the following seventeen (17) subclasses of the Sufficient Funds Class:

Two breach of contract subclasses (one encompassing good faith and fair dealing subclasses (one encompassing Connecticut, Delaware, District of Columbia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, South Carolina, Vermont, and Virginia; one encompassing Florida, Maine, North Carolina, and Pennsylvania).

Three good faith and fair dealing subclasses (one encompassing Connecticut, Delaware, New Hampshire, New Jersey, North Carolina, and Vermont; one encompassing the District of Columbia, Maryland, Massachusetts, New York, Rhode Island, South Carolina, and Virginia; one encompassing Florida, Maine, and Pennsylvania).

Three conversion subclasses (one encompassing Delaware, District of Columbia, Florida, Maine, Maryland, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, and Virginia; one encompassing Connecticut; one encompassing Massachusetts and New Hampshire).

Three unjust enrichment subclasses (one encompassing Connecticut, District of Columbia, New Hampshire, and Vermont; one encompassing Florida, Maine, Maryland, Pennsylvania, Rhode Island, South Carolina, and Virginia; and one encompassing Delaware, Massachusetts, New Jersey, New York, and North Carolina).

Six consumer protection law subclasses (one subclass for each of the following states, Connecticut, Maryland, New Jersey, New York, North Carolina, and the District of Columbia).

The Court certifies the following nine (9) subclasses of the South Financial Class:

Two breach of contract subclasses (one encompassing South Carolina; one encompassing Florida and North Carolina).

Three good faith and fair dealing subclasses (one encompassing Florida; one encompassing North Carolina; one encompassing South Carolina).

One conversion subclass (encompassing Florida, North Carolina, and South Carolina).

Two unjust enrichment subclasses (one encompassing Florida and South Carolina; one encompassing North Carolina).

One consumer protection law subclass (encompassing North Carolina).

The Court appoints Plaintiffs as representatives of the Sufficient Funds Class, with its related subclasses, and the South Financial Class, with its related subclasses, as more particularly itemized and set out in Plaintiffs' Proposed Trial Plan. (*See* ECF No. 140-2 at 13-22.) The Court also appoints the following firms as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g): Webb, Klase & Lemond, LLC; McCune Wright LLP; Golomb & Honik, P.C.; Tycko & Zavareei LLP; Kohn, Swift & Graf, P.C.; Carey, Danis & Lowe; Hargrove Pierson & Brown, P.A.; Law Office of Mark C. Tannenbaum; Hopkins Law Firm, LLC.

The Court DENIES certification of a class seeking actual damages under the Electronic Funds Transfer Act. The Court preliminarily grants Plaintiffs' motion with respect to a class seeking statutory damages under the EFTA but directs Plaintiffs to submit for the Court's consideration, within fourteen (14) days, a revised class definition of the EFTA Class that conforms with Rule 23 and applicable case law, particularly that law which prevents certification of a fail-safe class; Defendant shall have (7) days thereafter to file a response to the proposed, revised class definition.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

February 22, 2018
Greenville, South Carolina